IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WESTERNBANK PUERTO RICO,

     Plaintiff,

     v.

JACK KACHKAR *ET AL.*,

     Defendant.

Civil No. 07-1606 (ADC/BJM)

## REPORT AND RECOMMENDATION

Plaintiff Westernbank Puerto Rico ("Westernbank") filed a motion for an order freezing the assets of defendant Inyx, Inc. ("Inyx"), and certain assets of defendants Jack Kachkar and Victoria Benkovitch. (Docket No. 6). Inyx, Kachkar, and Benkovitch each submitted briefs in opposition to Westernbank's motion. (Docket No. 21, 22, 23). This case was referred to me by the presiding district court judge for a report and recommendation. (Docket No. 160). After careful review of the briefs on file and evidence submitted, I recommend that Westernbank's motion be granted.[1]

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case concerns various loan agreements between Westernbank and Inyx and its wholly owned subsidiaries, Inyx USA, Ltd., Inyx Europe, and Ashton Pharmaceuticals (with Inyx, the "Inyx Borrowers") through which Westernbank loaned over $142 million to the Inyx Borrowers. [2]

---

[1] Defendants Kachkar and Benkovitch requested oral arguments and an evidentiary hearing on this motion. (Docket No. 50). A hearing is not necessary in the circumstances at hand. The parties have had sufficient opportunity to make written submissions and offers of proof, and the critical facts are not genuinely in dispute. See Aoude v. Mobil Oil Corp., 862 F.2d 890, 894 (1st Cir. 1988) (district court acted within its discretion in granting preliminary injunction without a hearing); Campbell Soup Company v. Giles, 47 F.3d 467, 470-71 (1st Cir. 1995) (evidentiary hearing not required where parties had a fair opportunity to present relevant facts and arguments and counter the opponent's submissions, and material factual issues were not genuinely in dispute).

[2] The parties are involved in various other judicial proceedings worldwide, including administration proceedings in the United Kingdom, receivership proceedings in Toronto, Canada, bankruptcy proceedings in Delaware, and a parallel action pending in the Southern District of Florida.

(Affidavit of Juan Carlos Pavia (Docket No. 7-2, Ex. 1) ("Pavia Aff."), ¶¶ 5, 23.)  Under the terms

of the agreements, Westernbank agreed to provide the Inyx Borrowers with lines of credit upon

which they could draw down based on a percentage of their accounts receivable, as reflected through

invoices and reports provided to Westernbank.  (Id.)  Inyx is a holding company for a number of

wholly-owned subsidiaries, including the Inyx Borrowers.  (Affidavit of Jonathan Middup (Docket

No. 7-2, Ex. 2) ("Middup Aff."), ¶ 5.  Defendant Jack Kachkar is the Chairman and CEO of Inyx,

and defendant Victoria Benkovitch is Kachkar's wife.  (Docket No. 9, Ex. A.)

In March 2005, Inyx and its subsidiary, Inyx USA, entered into a Loan and Security

Agreement with Westernbank (the "USA Loan Agreement").  (Docket No. 9, Ex. A).  In August

2005, Inyx subsidiaries Inyx Europe and Ashton Pharmaceuticals entered into a separate Loan and

Security Agreement with Westernbank (the "EU Loan Agreement").  (Docket No. 9, Ex. C.)  To

secure payment and performance of their obligations under each loan agreement, the borrowers

granted to Westernbank a security interest over virtually all of their assets.[3]  (Docket No. 9, Ex. A,

---

(Docket No. 7-2, Ex. 2, ¶ 2; Ex. 3, ¶ 1; Ex. 5, p.1).  Defendants moved to transfer venue of this action to Florida, or to stay proceedings pending the outcome of the Florida action, and this court denied that motion.  (Docket No. 147).

[3] Specifically, the agreements provide:

Grant of Security Interest.  To secure payment and performance of all Obligations, Borrower hereby grants to Lender a continuing security interest in, a lien upon, and a right of set off against, and hereby assigns to Lender as security, the following property and interests in property of Borrower, whether now owned or hereafter acquired or existing, and wherever located (together with all other collateral security for the Obligations at any time granted to or held or acquired by Lender collectively (the "Collateral")[:]

(a) all Accounts;
(b) all present and future general intangibles, including all Intellectual Property;
(c) all Inventory;
(d) all Equipment;
(e) all Real Property and fixtures and all Real Estate security;
(f) all chattel paper, including all tangible and electronic chattel paper;
(g) all instruments, including all promissory notes;
(h) all documents;
(i) all deposit accounts;
(j) all letters of credit, banker's acceptances and similar instruments and including all

§ 5.1; Ex. C, § 5.1 ).  Each agreement provided that, in the event of default, Westernbank was

entitled to accelerate all amounts due and owed to it, demand immediate payment from the

borrowers, and foreclose on the borrowers' pledged collateral.  (Docket No. 9, Ex. A, § 10.2(b); Ex.

C, § 10.2(b)).  The agreements obligated the Inyx companies to establish "lock box" accounts in

which they would direct their customers to remit payment for all accounts receivable.  (Docket No.

---

letter of credit rights;
(k) all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of surety ship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing and evidencing, Receivables or other collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations or account debtors;
(l) all (i) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (ii) monies, credit balances, deposits and other property of Borrower, now or hereafter held or received by or in transit to Lender or at any other depository or other institution from or for the account of Borrower whether for safekeeping, pledge, custody, transmission, collection or otherwise;
(m) all commercial tort claims, including, without limitation, those identified in the Information Certificate;
(n) to the extent not otherwise described above, all Receivables and all goods;
(o) all Records;
(p) the leases of all premises leased by Borrower (including an assignment thereof);
(q) all motor vehicles;
(r) all shares of capital stock of each Subsidiary of Borrower and the certificates representing such shares;
(s) assignment of proceeds of Manufacturing Contracts;
(t) all products and proceeds of the foregoing in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other collateral and any indemnities, warranties and guaranties payable by reason of loss or damage to or otherwise with respect to any of the foregoing items.

(Docket No. 9, Ex. A, §5.1, see also Docket No. 9, Ex. C., §5.1 (identical except (s) provides "all Manufacturing Contracts and assignment of proceeds of all Manufacturing Contracts" and the agreement also provides for "(t) all Licenses")).

9, Ex. A, § 6.3(a); Ex. C, § 6.3(a)).  Under the agreements, all payments made to the lock box account became the property of Westernbank.  (Docket No. 9, Ex. A, § 6.3(a); Ex. C, § 6.3(a)).

On August 31, 2005, the Inyx Borrowers entered into a Cross Default Agreement-Security Agreement and a Cross-Collateral Agreement with Westernbank, in which they agreed that (1) a default under one Loan Agreement would also be considered a default under the other, and (2) any collateral afforded under either Loan Agreement would serve as collateral under both agreements. (Pavia Aff., ¶ 16).

On June 7, 2007, defendants Kachkar and Benkovitch executed an Amended and Restated Limited Guarantee (the "First Personal Guarantee") personally guaranteeing all the Inyx Borrowers' obligations to Westernbank up to a limit of $30.1 million.  (Docket No. 9, Ex. J, §§ 1(a), 15(a)). On June 20, 2007, Kachkar and Benkovitch executed an additional guarantee (the "Second Personal Guarantee") personally guaranteeing all obligations of the Inyx Borrowers to Westernbank up to a limit of $70 million plus the amount that the repayment obligations under the Loan Agreements exceeded $142.4 million.  (Docket No. 9, Ex. K, p. 1; §15(a)).  The Second Personal Guarantee was made "in addition to and not in substitution" of the First Personal Guarantee.  (Docket No. 9, Ex. K, §15).  On the same day, Kachkar and Benkovitch also executed a letter agreement providing an additional guarantee to Westernbank in the form of mining collateral stated to have a value of at least $400 million.  (Docket No. 9, Ex. L, p. 2).

Westernbank claims, and defendants do not dispute, that by June 2007, the Inyx Borrowers were in default of numerous provisions of the Loan Agreements.  (Pavia Aff., ¶ 24).  Westernbank claims that Inyx is in default of obligations totaling $142,778,299.77.  (Pavia Aff., ¶¶ 26, 29; Docket No. 9, Ex. N).  In addition to failing to pay their loan obligations, Westernbank claims that the Inyx Borrowers also diverted funds away from the lock box accounts, breached their representations about their accounts receivable by providing Westernbank with false invoices and inaccurate accounts receivable reports, and failed to maintain minimum cash flow, capital, and net worth levels as required by the Loan Agreements. (Pavia Aff., ¶ 24).  Westernbank sent the Inyx Borrowers,

Kachkar, and Benkovitch notices of default and demand for payment on July 3, 2007, and July 10, 2007.  (Pavia Aff.,  ¶¶ 26-28).   In the Second Personal Guarantee, Kachkar and Benkovitch acknowledged that the Inyx Borrowers were "'out of formula' under the Loan Agreement and there is a substantial collateral deficiency thereunder."  (Docket No. 9, Ex. K, p. 1).  In their filings on this motion, defendants do not dispute that the Inyx Borrowers were in default on the loans.  See, e.g., Kachkar Aff., ¶ 3 (Docket No. 164) ("I do not deny that there were issues with the Inyx loans; rather, I assert that these issues were raised and openly discussed with Westernbank, and resolved between the parties in the ordinary course of business.")  Instead, defendants contend, without providing any evidence, that Westernbank made an oral promise in June 2007 agreeing to forebear calling the Inyx loan for 150 days and agreeing to continue to finance Inyx in the meantime.  (Docket No. 23, p. 1).

Westernbank also alleges that defendants engaged in fraud in connection with the Loan Agreements, providing detailed evidence of the alleged fraud in the form of an affidavit and accompanying exhibits by Jonathan Middup, a partner in Ernst & Young LLP's Fraud Investigation & Dispute Services.  (Middup Aff., ¶ 1).  Mr. Middup was retained to investigate Inyx in connection with Inyx's United Kingdom subsidiaries being placed into administration in a UK proceeding. (Middup Aff., ¶ 2).  Mr. Middup discovered evidence that the Inyx Borrowers submitted duplicate and altered invoices to Westernbank which did not accurately reflect the accounts receivable that were actually due to the Inyx Borrowers from their customers.  (Middup Aff., ¶¶ 14-17).  This included a series of seventeen invoices totaling more than $14 million that were not recorded on Inyx's internal records and never paid by customers, and $5.4 million in "duplicate" invoices. (Middup Aff., ¶¶ 15, 17). Middup also stated that "development invoices" valuing $39 million were reflected on the accounts receivable reports submitted to Westernbank but were subsequently cancelled by the Inyx Companies without adjustment to the information provided to Westernbank.  (Middup Aff., ¶¶ 20-22).  Westernbank also provided evidence that the Inyx Borrowers failed to direct their customers to make payments to the lock box accounts, as required by the Loan

**Westernbank Puerto Rico v. Jack Kachkar, et al.**                                          Page 6
Civil No. 07-1606 (ADC/BJM)
REPORT AND RECOMMENDATION

Agreements, even though the underlying invoices for such accounts were submitted to Westernbank in Inyx's accounts receivable reports.  (Middup Aff., ¶¶ 27).

Westernbank also submitted an affidavit from Atle Moen, Chief Financial Officer of Pareto Securities, concerning a letter which Mr. Kachkar provided to Westernbank in March 2007.  (Docket No. 165-2 (the "Moen Aff.")).  In an attempt to assure Westernbank that it would be able to obtain additional financing, Inyx had submitted a letter purporting to be from Pareto Securities confirming an agreement to provide Inyx with $300 million in bridge financing.  (Docket No. 165).  Mr. Moen stated in his affidavit that the letterhead was not Pareto's official letterhead, that Pareto had never employed anyone by the name of the letter's signatory, and further, that Pareto never agreed to provide Inyx with the financing described in the letter.  (Moen Aff.).

In further support of its fraud allegations, Westernbank submitted the opinion of the Superior Court of Justice in Ontario, Canada, which reviewed the results of Mr. Middup's forensic analysis in connection with receivership proceedings against Inyx Canada.  (Docket No. 7-2, Ex. 3 ("Canadian Order")).  The Canadian court found evidence that the Inyx companies "operated as an integrated whole," thus finding that Mr. Middup's analysis of the Inyx United Kingdom entities was relevant to the proceedings concerning Inyx Canada.  (Canadian Order, ¶ 7).  The court found evidence "that advances of significant magnitude in the aggregate were obtained on the strength of invoices that were 'raised' but not rendered and which were subsequently written off, resulting in a shortage of security."  (Id., ¶ 15).  Moreover, the Inyx Borrowers' "failure ... to deposit receipts to the designated account in contravention of the Loan Agreement is reasonably capable of supporting an inference that funds are being diverted or concealed."  (Id., ¶ 18).

The Inyx defendants have not provided any evidence contradicting Westernbank's evidence of fraudulent conduct.  Inyx argues that Westernbank's allegations are "refuted by sworn declarations in Inyx's filings in the case before the Miami court," but does not cite to any affidavits or evidence which are a part of the record in this case.  (Docket No. 23, p.4).  Defendants Kachkar and Benkovitch argue that certain of Westernbank's evidence is inadmissible for reasons that I find

without merit, see section 1.B.2., infra, but they do not refute the substance of Westernbank's contentions.

Westernbank commenced this action on July 6, 2007, and filed an amended complaint against Inyx, Kachkar and Benkovitch, as well as certain other Inyx executives, on August 23, 2007, alleging, *inter alia*, claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(a)), violations of Puerto Rico Civil Code Article 1802 (31 L.P.R.A. § 5141), breach of contract and collection of monies, breach and foreclosure of collateral under all security agreements, breach and enforcement of personal guarantees, and fraud. (Docket No. 3).  On September 19, 2007, Westernbank moved for an order freezing the assets of Defendants Inyx, Inc., Kachkar, and Benkovitch.  (Docket No. 6).  Defendants filed opposition briefs (without any supporting affidavits or evidence) (Docket Nos. 21, 22, 23), and Westernbank replied (Docket No. 38).  Westernbank provided a proposed order pursuant to Local Rule 65.1.  (Docket No. 37-9). Defendants Kachkar and Benkovitch moved to exclude Westernbank's Middup Affidavit (Docket No. 79), which Westernbank opposed.  (Docket No. 95).

Seven months after briefing on the motion to freeze was complete, defendants Kachkar and Benkovitch submitted two affidavits by Mr. Kachkar, attaching dozens of exhibits.  (Docket Nos. 164, 168).  Defendants purported to offer these affidavits in further opposition to the motion to freeze assets, although the affidavits and their accompanying exhibits are not referenced in the legal memoranda offered by defendants.  Westernbank submitted a notice of filing the Moen Affidavit in further support of their motion. (Docket No. 165).  Defendants Kachkar and Benkovitch moved to strike the Moen Affidavit (Docket No. 174), and I denied their motion.  (Docket No. 177). Defendants Kachkar and Benkovitch then submitted a substantive response to the Moen Affidavit. (Docket No. 182).

## DISCUSSION

### I.    Asset Freeze Standard Under Rule 65

A motion to freeze assets is considered a request for injunctive relief, and must be justified under the traditional four-part standard applicable to preliminary injunctions in this Circuit. Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc., 370 F.3d 151, 157 (1st Cir. 2004), Defendants argue initially that this court does not have jurisdiction to order the freeze of assets located outside of Puerto Rico. This is incorrect. An asset freeze is in the nature of an injunction, and thus directs the conduct of parties subject to this court's jurisdiction. As the Supreme Court has held, "Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under its control[.]" United States v. First Nat'l City Bank, 379 U.S. 378, 384 (1965) (upholding order enjoining transfer of assets located outside United States). See also Goya Foods, Inc. v. Wallack Mgmt. Co., 290 F.3d 63 (1st Cir. 2002) (affirming order by the District Court of Puerto Rico enjoining transfer of assets located in New York City).

In applying the preliminary injunction standard, the court must consider:  (1) whether the applicant has demonstrated a likelihood of success on the merits; (2) whether the applicant will be irreparably harmed absent injunctive relief; (3) whether issuance of the injunction will injure other parties; and (4) where the public interest lies. Acevedo-Garcia v. Vera-Monroig, 296 F.3d 13, 17 (1st Cir. 2002); In re Elias, 182 Fed. Appx. 3 (1st Cir. 2006). The moving party bears the burden of proof to demonstrate that these four factors weigh in its favor. Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006). As the First Circuit has explained, "The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Services, Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

**Westernbank Puerto Rico v. Jack Kachkar, et al.**                                            Page 9
Civil No. 07-1606 (ADC/BJM)
REPORT AND RECOMMENDATION

A.      **Availability of an Asset Freeze Under Grupo Mexicano**

As a preliminary matter, I consider whether an asset freeze order is available here.  Following the Supreme Court's opinion limiting the availability of asset freeze orders in Grupo Mexicano de Desarollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999), courts have found an asset freeze appropriate only where, as explained by a frequently-cited Fourth Circuit opinion, "the plaintiff creditor asserts a cognizable claim to specific assets of the defendant" and requests that a court "invoke equity to preserve the status quo pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested." Rahman v. Oncology Assocs., P.C., 198 F.3d 489, 498 (4th Cir. 1999). See also Fairview Machine & Tool Co. v. Oakbrook Int'l Inc., 77 F.Supp.2d 199, 204 (D.Mass. 1999) (citing Rahman).

Courts have granted orders freezing assets where a plaintiff sought both legal and equitable relief.  See, e.g., Fairview Machine & Tool Co., 77 F.Supp.2d at 201; Francis v. Pulley, Civ. No. 06-CV-480-JM, 2007 WL 119156, at *7, n.4 (D.N.H. Jan. 10, 2007).  Here, Westernbank seeks both equitable and legal relief.  For example, its sixth and eighth causes of action seek foreclosure of collateral under all security agreements relating to the Loan Agreements and Personal Guarantees. See Johnson v. Home State Bank, 501 U.S. 78, 84 (1991) (right to foreclose can be viewed as a "right to an equitable remedy" for the debtor's default on the underlying obligation).  Since Westernbank seeks to freeze the very assets that it ultimately seeks to foreclose on, there is a clear "nexus between [their] cognizable claim in equity and the assets of the defendant[s] that are the target of the preliminary injunction."  Fairview Machine & Tool Co., 77 F.Supp.2d at 204.  Just as "[t]o impose a constructive trust over assets obtained through fraud requires preservation of the assets;" here, to foreclose on assets pledged as collateral requires preservation of those assets. Rahman, 198 F.3d at 498.

Courts have found asset freeze orders reasonable to prevent the dissipation of assets where plaintiffs put forth sufficient evidence of fraud to provide a "strong indication" that defendants might conceal or dissipate assets.  Micro Signal Research, Inc. v. Otus, 417 F.3d 28,  31 (1st Cir. 2005).

See also Rahman, 198 F.3d 489 (freezing assets obtained through Medicare fraud scheme where some assets were allegedly being sold and transferred to offshore accounts); Francis, 2007 WL 119156 (enjoining defendant from transferring real estate properties obtained through undue influence).

Here, Westernbank has submitted sufficient evidence that the Inyx Borrowers have engaged in fraud to provide a "strong indication" of a risk that defendants will dissipate assets. Micro Signal Research, Inc., 417 F.3d at 31. Westernbank provided evidence that defendants diverted funds away from the lock box accounts and misrepresented their accounts receivable by providing Westernbank with false invoices and inaccurate accounts receivable reports. (Pavia Aff., ¶ 24). Specifically, Westernbank provided evidence that the Inyx Companies submitted duplicate and altered invoices to Westernbank to the tune of $50 million. (Middup Aff., ¶¶ 15, 17, 20-22). Additionally, Westernbank provided persuasive evidence in the form of the Moen affidavit that Inyx engaged in fraud in connection with its assurances to Westernbank that it was obtaining additional financing to boost its capital and make it compliant with the loan terms. (Docket No. 165). Finally, Westernbank provided evidence that the Canadian court concluded that the Inyx Borrowers' "failure ... to deposit receipts to the designated account in contravention of the Loan Agreement is reasonably capable of supporting an inference that funds are being diverted or concealed." (Canadian Order, ¶ 18). I concur with that view and find that Westernbank has provided sufficient evidence to support the inference that there is a risk defendants will dissipate or conceal its assets and therefore, an order freezing assets is a "reasonable measure to preserve the status quo in aid of the ultimate relief sought." Rahman, 198 F.3d at 498.

Defendants rely on Charlesbank to support their argument that a freeze order is unavailable here. (Docket No. 22, p. 11). However, the First Circuit in Charlesbank recognized the rule announced in Grupo Mexicano that an injunction was unavailable where "no preexisting lien or equitable interest had been claimed." 370 F.3d at 159. The court assumed, without deciding, that

a security interest satisfied the "equitable interest" requirement, and proceeded to apply the four-part preliminary injunction test, ultimately denying the injunction on other grounds.  Id.

Because Westernbank seeks cognizable relief in equity in the form of foreclosure on the Loan and Guarantee Agreements, and has shown that an asset freeze order is reasonable given the evidence of fraud here, and would aid in the ultimate relief of foreclosure which it seeks, it has adequately demonstrated that a motion to freeze assets is available in this case.  I therefore turn to the four-part preliminary injunction standard to analyze whether such relief is warranted.

### B.    Likelihood of Success on the Merits

In order to prevail on a preliminary injunction motion, the moving party must demonstrate its likelihood of success on the merits.  Westernbank argues that it is likely to succeed on its claims for breach of contract and fraud, providing ample documentary evidence and affidavits.  (Docket Nos. 7-2, 9).  Defendants do not offer any affidavits or other evidence refuting Westernbank's contract and fraud claims, and instead make various other arguments, all of which prove meritless as discussed below.[4]

### 1.    Breach of Contract

Westernbank first argues that defendants are liable for breach of contract.  Specifically, Westernbank argues that the Inyx Borrowers failed to comply with their obligations under the Loan Agreements to repay the loan amounts when due, provided inflated, duplicate, and false accounts receivable invoices and reports, and diverted accounts receivable payments away from the lock box

---

[4]    The Inyx defendants do not cite to *any* evidence or affidavits in their memoranda of law in opposition to the motion to freeze.  (Docket Nos. 21-23).  Defendants Kachkar and Benkovitch submitted two affidavits by Kachkar, with accompanying exhibits, eight months after defendants submitted their briefs. The affidavits provide testimony concerning, primarily, Inyx's assertion that Westernbank knew about defendants' business practice and deficiencies with respect to the Loan Agreements well in advance of attempting to foreclose on the loans.  Defendants appear to be arguing  that Westernbank's alleged tacit approval of Inyx's "business practices" and loan deficiencies precluded it from later attempting to foreclose on the loans. This affidavit fails to refute Westernbank's evidence of breach of contract and fraud, but in any event, "[d]istrict courts are not required to ferret through sloppy records in search of evidence supporting a party's case."  Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 50 (1st Cir. 2005).

**Westernbank Puerto Rico v. Jack Kachkar, et al.**                          Page 12
Civil No. 07-1606 (ADC/BJM)
REPORT AND RECOMMENDATION

accounts. (Pavia Aff., ¶ 24). Westernbank has further shown that, under the Loan Agreements, it has a security interest in virtually all assets of the Inyx Borrowers, and under the Personal Guarantees, it has a security interest in substantial assets of Mr. Kachkar and Ms. Benkovitch. (Docket No. 9, Ex. A; § 5.1, Ex. C, § 5.1; Docket No. 9, Exs. J-K). Westernbank has demonstrated that under the Loan Agreements, it has the right, in the event of a default, to accelerate all amounts due and owed to it, and to demand immediate payment from the borrowers, as well as to foreclose on the assets pledged as collateral. (Docket No. 9, Ex. A; § 10.2; Ex. C, § 10.2). Under the personal guarantees, Westernbank has the right to collect the loan obligations from Mr. Kachkar and Ms. Benkovitch, up to the limits of the Personal Guarantees. (Docket No. 9, Exs. J-K).

Defendants do not contest Westernbank's claim that they have breached the Loan Agreements. Instead, their principal defense is that the parties entered into an oral agreement which precluded Westernbank from foreclosing on the loans. (Docket No. 23, p. 6). Defendants argue that they entered into the Personal Guarantees in reliance on a June 7, 2007 promise made by Westernbank official Frank Stipes at a meeting in Miami that Westernbank would forebear calling the loans for 150 days. (Docket No. 23, p.6). However, defendants do not provide any evidence of such agreement, and their contentions are foreclosed by the contractual language and settled law. First, the express terms of the Loan Agreements provide that the agreements may not be "amended, modified, waived or discharged *orally* or by course of conduct, *but only by a written agreement* signed by an authorized officer of [Westernbank]." (Docket No. 9, Ex. A, § 11.3) (emphasis added). While the Second Personal Guarantee acknowledged that it was made "in exchange for" Westernbank's agreement to not "make demand for immediate payment of all amounts due under the Loan Agreement . . . at this time," it specifically preserved Westernbank's right to make such demand "at any time, hereafter." (Docket No. 9, Ex. K, p. 1). Defendants have not provided any evidence of a written agreement purporting to modify the Loan Agreements, or specifically, of an agreement by Westernbank purporting to forebear making demand on the loan for 150 days.

The Loan Agreements provide that they are to be governed by Puerto Rico law. (Docket No. 9, Ex. A, § 11.1(a); Ex. C, § 11.1(a)). Courts applying Puerto Rico law have vigilantly enforced written agreements and rejected attempts to alter the terms of written contracts based on alleged oral agreements. See, e.g., Nike Int'l Ltd. v. Athletic Sales, Inc., 689 F.Supp. 1235, 1244 (D.P.R. 1988) (refusing to enforce alleged oral agreement where written contract provided that terms could be waived, changed, or otherwise modified only in writing); Freightliner, LLC v. Puerto Rico Truck Sales, 399 F.Supp.2d 57, 74 (D.P.R. 2005) (same). Courts also have enforced the Puerto Rico statute of frauds rule which would be applicable here, 10 L.P.R.A. § 1302, precluding a party from proving the existence of commercial contracts over $300 based solely on testimonial evidence. Garita Hotel Ltd. P'ship v. Ponce Federal Bank, F.S.B., 954 F. Supp. 438, 454 (D.P.R. 1996), aff'd, 122 F.3d 88 (1st Cir. 1997) (refusing to enforce oral loan agreement where plaintiff could not furnish any non-testimonial evidence that bank had consented to agreement).

Here, defendants do not provide any written evidence that the Loan Agreements had been modified. In fact, there is substantial written evidence by defendants acknowledging that the borrowers were in violation of various provisions of the Loan Agreements. The Second Personal Guarantee, signed by Kachkar and Benkovitch, provides, "the Borrower is 'out of formula' under the Loan Agreement and there is a substantial collateral deficiency thereunder." (Docket No. 9, Ex. K, p. 1). In the June 20, 2007 Mining Collateral Guarantee, Kachkar and Benkovitch stated, "[a] substantial 'Collateral Deficiency' exists under the Loan Agreements." (Docket No. 9, Ex. L, p. 1). Mr. Kachkar even stated in his affidavit that he "do[es] not deny that there were issues with the Inyx loans," arguing instead, "rather, I assert that these issues were raised and openly discussed with Westernbank, and resolved between the parties in the ordinary course of business." (Kachkar Aff., ¶ 3). I therefore find defendants' arguments that an oral agreement controlled to be without merit.

Defendants also argue that Westernbank cannot prevail on the merits of its breach of contract claim because the Southern District of Florida has exclusive jurisdiction to interpret the Loan Agreements (Docket Nos. 21, pp. 5, 11; 22, pp. 5, 11; 23, p. 7). This assertion clearly conflicts with

the express terms of the Loan Agreements, which make Puerto Rico the choice of forum for resolving all disputes under the Agreements.[5]  (Docket No. 9, Ex. A, § 11.1(b); Ex. C, § 11.1(b)).   The First Circuit instructs that courts "must give effect to . . . freely-negotiated forum selection clauses" in the absence of "some compelling and countervailing reason."  KKW Enters. v. Gloria Jean's Gourmet Coffees Franchising Corp., 184 F.3d 42, 52 (1st Cir. 1999).  Defendants argue that this rule does not apply where the agreements themselves are attacked as invalid and unenforceable; however, defendants have not attacked the Loan Agreements as unenforceable in this proceeding. (Docket No. 31, p. 18).  Moreover, defendants' arguments that this court should refrain from exercising its jurisdiction under the "first filed" rule are also without merit.  This action was commenced more than one month before the Florida action, and thus, if anything, *this* action is preferred under the rule that "[w]here identical actions are proceeding concurrently in two federal courts, entailing duplicative litigation and a waste of judicial resources, the first filed action is generally preferred in a choice-of-venue decision."  Cianbro Corp. v. Curran-Lavoie, Inc., 814 F.2d 7, 11 (1st Cir. 1987).  Defendants' attempt to somehow link the Florida action with an earlier-filed New York action does not save the day because it cannot explain how those two actions are related for the purposes of this analysis.  Therefore, defendants' arguments that this court lacks jurisdiction to interpret the Loan Agreements are unavailing.

---

[5]    The Agreements provide, "Borrower and Lender irrevocably consent and submit to the non-exclusive jurisdiction of the United States District Court for the District of Puerto Rico and to the Court of First Instance, (Superior Court) of San Juan, Puerto Rico and waive any objection based on venue of forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Financing Agreements or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard *only* in the courts described above (except that Lender shall have the right to bring any action or proceeding against Borrower or its property in the courts of any other jurisdiction which Lender deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against Borrower and its property).   (Docket No. 9, Ex. A, § 11.1(b); Ex. C, § 11.1(b)) (emphasis added).

Westernbank has provided sufficient evidence that defendants violated various loan provisions, and defendants have not refuted those claims.  Therefore, Westernbank has demonstrated a strong likelihood of success on its breach of contract claims.

### 2.       Fraud

Westernbank further argues that it is likely to prevail on its fraud claims.  As discussed above, Section I.A., supra, Westernbank has provided substantial evidence that the Inyx Borrowers engaged in fraud, including Mr. Middup's affidavit and accompanying exhibits, the Moen affidavit, and the Canadian Order.  Mr. Middup offered evidence that the Inyx Borrowers provided Westernbank with fraudulent invoices and fraudulent accounts receivable records, and directed its customers to circumvent the lock box accounts required by the Loan Agreements. (Middup Aff., ¶¶ 14-17, 20-22, 27).  Westernbank also submitted evidence that Inyx provided fraudulent letters to Westernbank purporting to be evidence that it had secured additional financing.  (Docket No. 165-1).  Finally, Westernbank also submitted the opinion of a court in Canada finding the evidence of Inyx's conduct is "reasonably capable of supporting an inference that funds are being diverted or concealed."  (Canadian Order, ¶ 18).

The Inyx defendants have not rebutted Westernbank's evidence of fraudulent activities.[6]  Inyx argues that Westernbank's allegations are "refuted by sworn declarations in Inyx's filings in the case before the Miami court," but fails to cite to any affidavits or evidence which are a part of the record in this case.[7]  (Docket No. 23, p.4 ).  Inyx devotes most of its brief to contesting the RICO claim alleged in Westernbank's complaint.  (Docket No. 23).  However, fraud claims are sufficient to

---

[6] Ms. Benkovitch argues that Westernbank has not alleged her involvement in any scheme to defraud the bank.  (Docket No. 22, p.2).  Westernbank responds that Ms. Benkovitch voluntarily associated herself with Inyx by agreeing to personally guarantee Inyx's obligations, and further, the assets of Inyx and Mr. Kachkar may be improperly diverted to her in the absence of an order freezing her assets.  (Docket No. 37-2, p. 18, n. 12).  I find Westernbank's arguments sufficient to apply the order to Ms. Benkovitch.

[7] See note 4, supra.

justify an asset freeze order, <u>Micro Signal Research, Inc.</u>, 417 F.3d at 31, and I need not reach the merits of plaintiffs' RICO claim at this time.

Defendants Kachkar and Benkovitch argue that Westernbank's evidence is inadmissible for a host of reasons, which I find to be without merit. First, defendants Kachkar and Benkovitch argue that the Middup affidavit is unreliable because Middup is biased and his testimony constitutes hearsay. (Docket No. 79). As defendants themselves admit, courts have embraced a relaxed evidentiary standard on motions for preliminary injunctions. (Docket No. 79, p. 6). "Affidavits and other hearsay materials are often received in preliminary injunction proceedings. The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding." <u>Asseo v. Pan American Grain Co., Inc.</u>, 805 F.2d 23, 26 (1st Cir. 1986). I find the Middup affidavit sufficiently credible in these circumstances. Mr. Middup is a partner at Ernst & Young LLP in the Fraud Investigation & Dispute Services department, making him duly qualified to provide a forensic analysis of alleged fraudulent accounting activities. (Middup Aff., ¶ 1). After members of Ernst & Young LLP were appointed by Westernbank to be the administrators of Inyx's UK subsidiaries, those administrators asked Mr. Middup to conduct a forensic investigation of certain aspects of the Inyx UK companies' accounts. (Middup Aff., ¶ 2). Mr. Middup investigated the Inyx companies in the course of his professional duties, and was not a biased "hired gun" as defendants suggest. I find the Middup affidavit and accompanying evidence sufficiently reliable at this stage in the proceedings, and deny defendants' motion to exclude it.

Defendants Kachkar and Benkovitch similarly argue that the Moen affidavit is inadmissible hearsay and fails to support Westernbank's contentions. (Docket No. 182). As discussed above, the Rules of Evidence do not apply strictly to preliminary injunction submissions. <u>Asseo</u>, 805 F.2d at 26. Defendants object that the Moen affidavit does not specifically state that Harold Suain, the signatory of the purported Pareto letter, could not have been acting on Pareto's behalf in submitting the letter. (Docket No. 182). However, defendants do not offer a compelling alternate explanation

of Suain's relationship with Pareto, and I find the Moen declaration sufficiently clear to provide reliable evidence in support of Westernbank's fraud allegations.

Westernbank presents a case very similar to Micro Signal Research, Inc. 417 F.3d at 31. Just as in that case, "the evidence thus far, strongly suggest[s] fraud on [defendant's] part.......[Defendant] may offer a countervailing version of events when the merits are tried but, on this record, a likelihood of success on the fraud claim against him [] is made out." Micro Signal Research, Inc., 417 F.3d at 31. Specifically, the First Circuit in that case upheld an injunction freezing the assets of a defendant engaged in "prevarications about repayment" and "probable fraud." Id. Westernbank's allegations parallel those in Micro Signal: when the plaintiff sought repayment of a loan, defendant falsely represented to plaintiff "over several months ... that he would repay the money, eventually saying he [was] on the verge of refinancing ... to pay [plaintiff] back." Id., 417 F.3d at 30. As here, "[n]o repayment ever occurred." Id. I find that Westernbank's evidence of "prevarications about repayment" and "probable fraud" are sufficient to meet its burden of demonstrating a likelihood of success on its fraud claims.

### C.    Irreparable Harm

In the context of a motion to freeze assets, a court generally will find irreparable harm if the plaintiff provides evidence demonstrating a "strong indication that the defendant may dissipate or conceal assets." Micro Signal Research, Inc., 417 F.3d at 31 (internal citations omitted). See also Charlesbank Equity Fund II, 370 F.3d at 162 ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.")

The First Circuit found evidence sufficient to indicate such a risk of dissipation or concealment of assets where defendants allegedly engaged in fraud, prevaricated about repayment of the debt, and converted their business into a new company. Micro Signal Research, Inc., 417 F.3d at 32. See also Francis, 2007 WL 119156 at *7 (plaintiff made showing of irreparable harm where

defendant was attempting to sell real estate in which they held an interest, which he had obtained through undue influence).

Westernbank argues that it will suffer irreparable harm in the absence of an order freezing the requested assets due to defendant's alleged history of fraud.  As discussed above, Section I.A., supra, Westernbank provided detailed evidence that the Inyx Borrowers engaged in fraudulent activities with respect to their Loan Agreements in the past.  Specifically, Westernbank provided evidence that defendants diverted funds away from the lock box accounts, misrepresented their accounts receivable by providing Westernbank with false invoices and inaccurate accounts receivable reports, and made fraudulent representations to Westernbank concerning its ability to obtain additional financing.  (Middup Aff., ¶¶ 14-77, 20-22, 27, Pavia Aff., ¶ 24; Docket No. 165).  This would not be the first court to find that Inyx's history of fraud reasonably supports "an inference that funds are being diverted or concealed."  (Canadian Court, ¶ 18).

Defendants, citing Charlesbank, argue that Westernbank will not be irreparably harmed (1) because it is a secured creditor, and (2) because their assets are already under supervision in bankruptcy, receivership, and administration proceedings.  Defendants' first argument misconstrues the holding in Charlesbank.  A freeze order was unavailable, the court held, because plaintiffs offered nothing more than "conjecture, surmise, [and] unsubstantiated fears" that they may not be able to recover damages.  370 F.3d 151.  The court's reference to Charlesbank's perfected security interest as a means to secure a judgment was a corollary to its finding that Charlesbank had alleged no risk of irreparable harm because it sought only damages and could not allege any fraud or other risk that assets would be dissipated before judgment.  Id. at 163.  This case is instead controlled by the First Circuit's later decision in Micro Signal Research, where the court noted this general rule and distinguished the facts at hand: "the story is quite different where there is a strong indication that the defendant may dissipate or conceal assets."  417 F.3d at 31.  As to their second argument, defendants' reliance on Resource Management Company v. Gregory, 06-CV-366-JD, 2007 WL 54821 (D. N.H. Jan. 5, 2007), is misplaced.  In that case, the very assets at issue had already been

placed in a trust account.  Here, the assets in question - those belonging to Inyx, Inc., Mr. Kachkar, and Ms. Benkovitch - are not currently protected in the proceedings defendants reference, which instead concern Inyx subsidiaries Inyx USA, Inyx Canada, Inyx Europe, and Ashton Pharmaceuticals.

Defendants have not submitted any evidence or made any colorable arguments refuting Westernbank's evidence of fraud and the accompanying risk assets may be dissipated, and their other arguments are without merit.  Therefore, Westernbank has met its burden of showing that it will be irreparably harmed in the absence of an order freezing defendants' assets.

### D.    Balance of Hardships

Westernbank argues that the balance of hardships tips in its favor because defendants offered their assets as security on loans that are now in default and thus defendants can have no reasonable expectation of continued control over those assets.  (Docket No. 7).  Defendants do not refute this argument or offer any evidence of hardships they would face if the injunction is granted.  Therefore, Westernbank has satisfied its burden of demonstrating that the balance of hardships weighs in its favor.

### E.    Public Interest

Westernbank argues that granting the injunction will serve the public interest because such an order will deter future fraud schemes and ensure financial institutions' willingness to extend credit to deserving companies knowing that they will be adequately protected from those who defraud them.  (Docket No. 7).  Defendants Kachkar and Benkovitch argue that the public interest weighs against "financially crippling an individual litigant to the benefit of a well-secured financial institution, especially where that relief is obviously geared to thwart further litigation against Westernbank rather than truly protect assets."  (Docket Nos. 21, 22).  I find this argument without merit.  Given Westernbank's substantial evidence of breach of contract and fraud, the requested injunction will protect Westernbank's right to the assets which defendants willingly pledged as collateral in the Loan Agreements.  Therefore, Westernbank has satisfied its burden of demonstrating

that the public interest lies in its favor.

## II.   Request for Bond

Defendants Kachkar and Benkovitch request that, if the motion for an asset freeze is granted, Westernbank be required to post a bond.  Federal Rule of Civil Procedure 65(c) provides that " No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Commentators have observed that "the rule is phrased in mandatory terms and the conclusion seems inescapable that once the court decides to grant equitable relief under Rule 65 it must require security from the applicant."  Wright, Miller & Kane, 11A *Federal Practice & Procedure*, Civil 2d. § 2954.

Westernbank argues that an exception to this rule should apply.  First, Westernbank argues that defendants explicitly waived any right to a bond in the Loan Agreements.  See Docket No. 9, Ex. A, § 10.2(b); Ex. C. § 10.2(b) ("In the event Lender institutes an action to recover any Collateral or seeks recovery of any Collateral by way of prejudgement remedy, Borrower waives the posting of any bond which might otherwise be required").  However, the Personal Guarantees do not contain an analogous provision and Westernbank has not explained how this waiver extends to Kachkar and Benkovitch.

Moreover, while the First Circuit has observed that a bond may not be required in cases "where the likelihood of success is extraordinarily high," Crowley v. Furniture & Piano Moving, Furniture Store Drivers, 679 F.2d 978, 1000, n.25 (1st Cir. 1982), I hesitate to characterize this case in such extreme terms, notwithstanding the fact that Westernbank has demonstrated a strong likelihood of success on the merits for its breach of contract claim.  Westernbank also urges that no security should be required where the applicant is a "corporation with more than adequate financial resources," but the First Circuit has found that this argument weighs the other way because such parties "can be assumed capable of bearing most bond requirements, so hardship to them is less of a factor."  Crowley, 679 F.2d at 1000.

Therefore, this is not a case meriting an exception to the security requirement of Rule 65(c). At the same time, however, "the burden is on the party seeking security to establish a rational basis for the amount of the proposed bond." Int'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd., 441 F.Supp.2d 552, 566 (S.D.N.Y. 2006).  See also Connecticut General Life Ins. Co. v. New Images of Beverly Hills,  321 F.3d 878, 882 (9th Cir. 2003) ("the bond amount may be zero if there is no evidence the party will suffer damages from the injunction"); Doctor's Assocs. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996) ("it has been held proper for the court to require no bond where there has been no proof of likelihood of harm").  Kachkar and Benkovitch have not put forth any evidence demonstrating the nature or quantum of hardship they would suffer if their assets are frozen, even though they have had the opportunity to do so both in the context of their bond argument as well as the preliminary injunction analysis itself.

In the end, the parties have not put the court in position to determine what would be an appropriate bond in this case.  Kachkar and Benkovitch are therefore ordered to file within ten working days a motion as to the amount of bond that should be imposed, supported with affidavits providing evidence of damages they may suffer as the result of an asset freeze.  Westernbank is granted ten working days to respond.

## CONCLUSION

For the reasons stated above, I recommend that Westernbank's motion for an order freezing certain assets be **GRANTED**, and that the following terms be ordered to apply:

(1)     As of the date of this Order, Inyx, Kachkar, and Benkovitch shall not sell, transfer, or otherwise dispose of or encumber any assets without permission of the Court. Any motion to dispose of or encumber assets shall demonstrate that sufficient unencumbered assets remain to satisfy the amount of Westernbank's breach of contract claim.

(2)     Within twenty (20) days of the date of this Order, Inyx, Kachkar, and Benkovitch each shall submit a sworn affidavit listing all assets worth over $10,000 in which they hold a legal or equitable interest, describing and identifying each such asset and identifying for each such asset:  (a) the estimated value of the asset; (b) the nature of

the legal or equitable interest in the asset; (c) its physical location; (d) the owner of record thereof; (e) the holder thereof; and (f) any liens or security interests in the asset other than the one held by Westernbank.

(3)     In the same sworn affidavit, Inyx, Kachkar, and Benkovitch each shall identify any transfers of money of more than $10,000 that they have made since June 1, 2007, and any assets worth more than $10,000 that they have sold, transferred, or otherwise disposed of or encumbered since June 1, 2007.  Moreover, Inyx, Kachkar, and Benkovitch shall identify to whom each such transfer of money, or each such sale, transfer, or other disposition of assets, was made and in favor of whom such asset was encumbered, and what consideration was received in return.

(4)     Alternatively, Inyx, Kachkar, and/or Benkovitch may elect to pay the sum of $143 million ($143,000,000) in cash into a Court-approved escrow account, in which case the terms set forth in paragraphs (1) through (3) above shall be discharged upon payment in full.[8]

Further, defendants' motion for a hearing (Docket No. 50) is **DENIED** and Defendants' motion to exclude the Middup affidavit (Docket No. 79) is **DENIED**.

Finally, defendants Kachkar and Benkovitch are therefore ordered to file within ten working days a motion as to the amount of bond that should be imposed, supported with affidavits providing evidence of damages they may suffer as the result of an asset freeze.  Westernbank is granted ten working days to respond.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.   Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review.  See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch

---

[8] I note that although the defendants opposed Westernbank's request to freeze assets, they did not respond to the scope of Westernbank's proposed injunction order (Docket No. 37-9).  In the event that defendants' unencumbered assets exceed the amount of the Westernbank loans, it might be argued that the court could fashion a more narrowly tailored order that would freeze only certain identified unencumbered assets whose value is sufficient to satisfy Westernbank's claims.  However, defendants have not proposed such an alternative order at this time.

Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health &

Human Servs., 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED**.

In San Juan, Puerto Rico, on this 23rd day of July, 2008.


**S/Bruce J. McGiverin**
BRUCE J. MCGIVERIN
United States Magistrate Judge