**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**WESTERNBANK PUERTO RICO,**
      **Plaintiff,**

      **v.**

**JACK KACHKAR, et al.,**
      **Defendants.**

Civil No. 07-1606 (ADC)

<u>**OPINION AND ORDER**</u>

Plaintiff, Westernbank Puerto Rico ("plaintiff"), filed suit against, amongst others, Inyx, Inc. ("Inyx"), Jack Kachkar ("Kachkar") and his wife Viktoria Benkovitch ("Benkovitch") (collectively, "co-defendants"), alleging fraud and breach of contract related to various loan and guarantee agreements. **Docket No. 3**.[1] Plaintiff thereafter filed a motion and memorandum of law requesting an order to freeze co-defendants' assets pursuant to Federal Rules of Civil Procedure 64 ("Rule 64") and 65 ("Rule 65"). **Docket Nos. 6, 7**. Now before the court are co-defendants' objections (**Docket No. 209**) to the Report and Recommendation ("R & R") (**Docket No. 197**) issued by Magistrate-Judge Bruce J. McGiverin ("Magistrate-Judge"), which recommended granting said motion. After reviewing the R & R, objections, and pleadings, the court **ADOPTS** the R & R in full.

**I.    Factual and Procedural Background**

The following relevant facts are derived from the R & R, the court's prior Opinion and Order, and the exhibits brought forth by the parties.

Juan Carlos Pavia ("Pavia"), Westernbank Business Credit's Auxiliary Vice President, testified that on March 31, 2005, Inyx and its wholly owned subsidiary Inyx USA, Ltd. ("Inyx USA") entered into a Loan and Security Agreement with the plaintiff (the "USA Loan Agreement"). **Docket No. 7-2**, Ex. 1 at ¶¶ 2, 6 ("Pavia Affidavit"); **Docket No. 9**, Ex. A. In

---

[1] The original complaint was filed on July 6, 2007 (**Docket No. 2**), and was amended on August 23, 2007 (**Docket No. 3**). The court will refer to the amended complaint as the complaint.

May of 2005, another Inyx subsidiary, Inyx Pharma, Ltd ("Inyx Pharma"), signed an amendment to the USA Loan Agreement and became a co-borrower. Pavia Affidavit at ¶ 11; **Docket No. 9**, Ex. B. On August 31, 2005, the European subsidiaries, Inyx Europe and Ashton Pharmaceuticals ("Ashton"), entered into a separate Loan and Security Agreement with plaintiff (the "EU Loan Agreement"). Pavia Affidavit at ¶ 12; **Docket No. 9**, Ex. C.

Under the terms of the loans, plaintiff agreed to provide the Inyx Borrowers[2] with credit lines upon which they could draw down based on a percentage of their accounts receivable, which were reflected through invoices and reports the Inyx Borrowers provided to the plaintiff. Pavia Affidavit at ¶ 5. In order to secure payment and performance of their obligations under each loan agreement, the Inyx Borrowers granted plaintiff a security interest over virtually all of their assets. *Id.* at ¶ 6 n.2; *id.* at ¶ 14 n.4; **Docket No. 197**, at 2 n.3. The USA Loan Agreement and the EU Loan Agreement (collectively "Loan Agreements") required the Inyx Borrowers to establish "lock box" accounts where their customers had to remit payment for all accounts receivables, and thereupon the deposited monies became plaintiff's property. **Docket No. 197**, at 3-4. The Loan Agreements' provided that, in the event of default, plaintiff was entitled to accelerate all amounts due and demand immediate payment. *Id.* at 3. On August 31, 2005, the Inyx Borrowers executed a Cross-Default Agreement in which parties agreed that a default on one loan would mean a default on the other one, and the collateral for one loan would serve as collateral for the other one. Pavia Affidavit at ¶ 16; **Docket No. 9**, Ex. F.

On June 7, 2007, Kachkar, Chairman, CEO and Director of Inyx, and his wife Benkovitch pledged up to $30.1 million to personally guarantee the Inyx Borrowers' obligations to plaintiff ("First Personal Guarantee"). **Docket No. 9**, Ex. J. Then, on June 20, 2007, Kachkar and Benkovitch executed another guarantee of up to $70 million in addition

---

[2] The court will refer to the borrowers of the USA Loan Agreement and the EU Loan Agreement as the "Inyx Borrowers".

to the amount owed by the Inyx Borrowers that exceeded $142.4 million ("Second Personal Guarantee"). *Id.* at Ex. K. This Second Personal Guarantee was not in substitution of the First Personal Guarantee, but in addition to it. *Id.* That day, Kachkar and Benkovitch also signed an agreement whereas they confirmed that a collateral deficiency existed under the Loan Agreements, and they agreed to pledge certain mining properties up to a value of $400 million ("Collateral Deficiency Letter"). *Id.* at Ex. L.

Plaintiff alleges, and the evidence presented shows, that by June 28, 2007,[3] the Inyx Borrowers had defaulted on various Loan Agreements provisions while owing over $142 million. Pavia Affidavit at ¶¶ 23-24. On that day, plaintiff appointed the accounting firm Ernst & Young UK to be Administrators of the Inyx subsidiaries in the United Kingdom. **Docket No. 7-2**, Ex. 2 at ¶ 2 ("Middup Affidavit"). The firm had Jonathan Middup ("Middup") from its financial fraud department conduct a forensic investigation of Inyx,[4] beginning on July 2, 2007. *Id.* at ¶ 4. During Middup's investigation, he discovered that, in addition to failing to pay their loan obligations, Inyx had engaged in a series of financial irregularities. *Id.* at ¶ 7.

First, Middup found multiple sets of accounts receivable reports, an internal one kept by Inyx and another set sent to plaintiff, which differed significantly. *Id.* at ¶ 11; **Docket No. 9**, Exs. 1-4. Middup asserted that by March 31, 2007, Inyx's internal report was approximately $87 million less than the one submitted to plaintiff, and that Inyx did not adjust the figures to reflect this discrepancy until its April and May of 2007 report submission. Middup

---

[3] On June 29, 2007, plaintiff sent demand letters to the Inyx Borrowers. *Id.* at Ex. M. On July 3, 2007, plaintiff sent the Inyx Borrowers a Notice of Default and Demand, and demand letters pursuant to the personal guarantees to Kachkar and Benkovitch. *Id.* at Exs. N, P.

[4] The investigation focused on the Inyx UK subsidiaries, but Middup also reviewed documents from Inyx USA that plaintiff provided him, including the Loan Agreements. *Id.* at ¶¶ 6, 8. As discussed in this court's prior O & O, since the Inyx subsidiaries are wholly-owned by Inyx, the court will simply refer to them collectively as Inyx. **Docket No. 564**. The court notes that co-defendants have not proffered any evidence to reject this interpretation.

Affidavit at ¶¶ 12-13; **Docket No. 9**, Exs. 1-5.  Also, Middup found evidence that Inyx submitted to plaintiff duplicate, inaccurate or altered invoices, which were either not recorded or were credited in Inyx's internal report.  Middup Affidavit at ¶ 14.  For example, Middup discovered eighteen (18) invoices that had a prefix number 7, which totaled approximately $14 million, and that were not recorded on Inyx's internal records or paid by Inyx's customers.  *Id.* at ¶¶ 15-16; **Docket No. 9**, Ex. 6.  Additionally, Middup detected instances where Inyx submitted multiple invoices for the same product order, which amounted to approximately $5.4 million in additional funds disbursements to Inyx.  Middup Affidavit at ¶¶ 17-18; **Docket No. 9**, Exs. 7-8.  Inyx also sent plaintiff irregular development invoices totaling approximately $39 million that were not generated through normal invoicing practices, were not signed by customers, and had little evidence of the preparatory work that should precede them.  Middup Affidavit at ¶¶ 19-20, 22; **Docket No. 9**, Ex. 9.  Middup conducted interviews of the Inyx employees at these departments, and they had never heard of some of the customers or projects listed on these development invoices.  Middup Affidavit at ¶ 20.  Furthermore, Middup found several inflated invoices that Inyx submitted to plaintiff where the figures in plaintiff's report did not coincide with Inyx's internal accounts receivable report.  *Id.* at ¶¶ 25-26.

In addition to the irregular invoicing, Middup found that Inyx diverted at least $16 million from the lock box accounts by directing their customers to make payments to its bank accounts, instead of plaintiff's account, as required under the Loan Agreements.  *Id.* at ¶ 27.  Plaintiff proffered emails from Inyx executives directing at least 33 customers to deposit payments to Inyx bank accounts, and even sometimes providing them a discount for doing so.  *Id.* at ¶¶ 27-36; **Docket No. 9**, Exs. 21-22, 24-25, 27-29.  Joseph Rose ("Rose"), Ashton's Finance Vice President, emailed Kachkar regarding the inappropriate diversion of funds.  Middup Affidavit at ¶ 37; **Docket No. 9**, Ex. 31.  Kachkar responded that "there [we]re negotiations/discussions going on with [plaintiff]" and that the Inyx Board of Directors had approved the transactions.  Middup Affidavit at ¶ 37; **Docket No. 9**, Ex. 32.  Rose reiterated

to Kachkar that "Board approval does not make the transaction legitimate."  Middup Affidavit at ¶ 37; **Docket No. 9**, Ex. 33.

Plaintiff submitted as proof of Inyx's fraudulent behavior an affidavit from Atle Moen ("Moen"), Chief Financial Officer of Pareto Securities ("Pareto") in Oslo, Norway. **Docket No. 165-2**. Inyx sent to plaintiff a letter dated March 2, 2007 ("Pareto letter") allegedly from Pareto signed by H. Suain that asserted Pareto would be granting Inyx $300 million in financing. *Id.* Inyx explained via various emails to plaintiff that Pareto's financing would enable it to pay off the Loan Agreements. **Docket No. 165-5**.  However, Moen attests that "Pareto does not currently have, nor on March 2, 2007 did it have, an employee named Harald or H. Suain." **Docket No. 165-2**.  More noteworthy, Moen states that the Pareto letter "was not issued by Pareto and is not even written on authentic Pareto letterhead," and that "Pareto did not agree to provide the financing described in the [Pareto letter]." *Id.*

Plaintiff also proffered the August 30, 2007 opinion by Justice Low of the Superior Court of Justice in Ontario, Canada who is presiding over the related receivership proceedings of Inyx Canada Inc. ("Inyx Canada"), another Inyx subsidiary. **Docket No. 7-2**, Ex. 3.  Justice Low found that "the Inyx group of companies operated as an integrated whole and that their financial and business development activities were funneled through [Inyx Canada]." *Id.* at ¶ 7.  Furthermore, Justice Low held that, pursuant to the Loan Agreements, "[plaintiff] obtained a valid perfected security interest in all of the property, assets and undertakings of [Inyx Canada]." *Id.* at ¶ 9.  After assessing the Middup Affidavit and its accompanying exhibits, Justice Low found that the evidence was "capable of supporting an inference that there were dishonest practices in relation to the [Loan Agreements]." *Id.* at ¶ 15.  Moreover, Justice Low asserted that the "failure by the [Inyx B]orrowers to deposit receipts to the designated account in contravention of the [L]oan [A]greement[s] is reasonably capable of supporting an inference that funds are being diverted or concealed and [that] the evidence of invoices being "raised" for the purpose of loan advances but not rendered is consistent with fraudulent intent."    *Id.* at ¶ 18.  Upon appointing Ernst & Young, Inc. as receiver for Inyx Canada, Justice Low held that "[t]here is default and no evidence that [Inyx

Canada] is able [to] or intends to rectify the default." *Id.* at ¶ 27. Justice Low went on to stress that "[w]here there is some evidence of diversion of funds and of dishonest conduct as there is here, it is *a fortiori* not improper for the creditor . . . to pursue such remedies as are available to it to recover payment." *Id.* at ¶ 31.

Kachkar admitted "that there were issues with the Inyx loans." **Docket No. 164**, at ¶ 3. However, he "assert[ed] that these issues were raised and openly discussed with [plaintiff], and resolved between the parties in the ordinary course of business." *Id.* Moreover, Kachkar averred that "Inyx was current on its principal and interest payments through July 3, 2007, the date on which [plaintiff] declared Inyx in default of the [L]oan [A]greements." *Id.* at ¶¶ 6, 39. Nevertheless, Kachkar did not provide any documentary evidence for such proposition.[5] Kachkar then asserted that "Middup's documentation [was] incomplete," but does not adduce any documents that directly contradict Middup's conclusions. *Id.* at ¶ 9.

Kachkar pointed out that plaintiff's independent auditor, Charles Banister, reported on October 19, 2006, "that all the key points (escalating [accounts receivable] ledger, concerns over fundability of the [d]evelopment [i]nvoices, [i]rregularities with cash allocation, [i]rregularities with [value added tax] ("VAT") payment, [r]eporting [i]ssues) have been mentioned at previous audits." *Id.* at ¶ 12. Kachkar also provided emails demonstrating that the parties discussed pre-billing development invoices and their eventual ineligibility since March 13, 2006. *Id.* at ¶¶ 13-17, Exs. 7-9, 11. On November 20, 2006, plaintiff sent a letter advising Inyx of their knowledge of these $37.665 million pre-billing invoices, but also stressed that it did not approve of the transactions and reserved its rights under the Loan Agreements to demand payment in full of the outstanding loans. *Id.* at ¶ 20, Ex. 18. In the same letter, plaintiff confirms that Inyx pledged to pay in full all amounts due by December

---

[5] Kachkar did provide a copy of plaintiff's January 31, 2007, press release wherein plaintiff's Chairman and Chief Executive Officer referred to Inyx's Loan Agreements as "current" and "well-performing." *Id.* at ¶ 25, Ex. 31. Also, Kachkar submitted copies of letters that plaintiff sent Inyx's auditors on March 7, 2007, stating that the Loan Agreements were collateralized. **Docket No. 168-10**. Neither of these documents, however, attest to the status of the Loan Agreements on July 3, 2007, as Kachkar argues.

31, 2006, and that Kachkar and Benkovitch agreed to personally collateralize the $37.665 million.  *Id.*

Kachkar also proffered three (3) waiver letters dated March 31, 2006, August 11, 2006 and November 20, 2006, whereas plaintiff acknowledged waiving Inyx's non-compliance with certain covenants in the Loan Agreements.  *Id.* at ¶ 18, Exs. 15-17.  The covenants Inyx violated were: (1) consolidating financial statements and separating the same for each subsidiary at the end of the fiscal year, (2) maintaining at least $5 million in Working Capital, (3) having a minimum of $4 million in Excess Cash Flow, and (4) maintaining at least $8 million as Adjusted Net Worth and $18 million as Tangible Net Worth.  *Id.*  These letters waived only the specifically cited covenants and included a clause, which stated that "the granting of these waivers" did not constitute "a waiver of [plaintiff's] rights to declare any future default(s) under the terms of the [Loan Agreements]."  *Id.*  Plaintiff agreed to waive the specific covenants listed in each letter only for the period beginning on December 31, 2005 through December 15, 2006.  *Id.*

Kachkar proffered emails where Inyx notified plaintiff since January 29, 2005, that its customers were experiencing problems while depositing in plaintiff's lock box accounts at Citibank.  *Id.* at ¶ 33, Ex. 38.  Inyx and plaintiff exchanged several emails discussing the issues in July and August of 2005, and plaintiff advised Inyx it would "try to resolve [them]."  *Id.* On August 2, 2005, a Citibank representative responded to Inyx's inquiry about plaintiff's lock box account and the issues Inyx customers were experiencing.  *Id.*  On January 23, 2007, Inyx sent an email to plaintiff regarding a problem that one of Inyx's customers was having with the lock box account.  *Id.* Kachkar explained that due to these constant problems, many of Inyx's customers "were forced to make their payments directly into Inyx's UK's operating bank accounts ('cash-in-transit')."  *Id.* at ¶ 33.  Furthermore, Kachkar submitted a copy of an $8 million personal guarantee[6] that he and Benkovitch provided plaintiff on March 7, 2007,

---

[6] The court notes that this guarantee is not signed by plaintiff, and an email from plaintiff's counsel sent on March 7, 2007, to Kachkar's counsel states "[t]hese have not yet been approved by the [plaintiff]."  *Id.* at Ex. 39.  However, due to the wording of the First Personal Guarantee and the subsequent money transfer made by plaintiff paying off Inyx Pharma's VAT, the court will accept the $8 million guarantee as submitted by Kachkar.  *Id.* at Ex. 40.

which states that it was "being given in connection with the Loans and Advances by [plaintiff] . . . to be used to pay [an] overdue and unpaid VAT . . . and advances against cash in transit." *Id.* at Ex. 39; **Docket No. 9**, Ex. J (The First Personal Guarantee states "[t]his Guarantee . . . is in substitution of other Guarantees given . . . as of March 7, 2007, in the amount of $8 [million] . . . ."). The next day, plaintiff wired the money to pay off Inyx Pharma's outstanding VAT. **Docket No. 164**, at ¶ 34, Ex. 40.

In response to the aforementioned Moen affidavit, Kachkar filed a supplemental affidavit and accompanying exhibits. **Docket No. 168**. Kachkar averred that Harald Suain arranged the meetings and provided the introductions with the Pareto representatives. **Docket No. 168**, at ¶ 3. On February 8, 2007, Ole Eikeland, a Pareto employee, emailed Inyx and referred to speaking with "Harald" regarding hotel and lunch arrangements for the Inyx executives' upcoming meeting in Oslo, Norway. *Id.* at ¶ 7; **Docket No. 168-2**. On February 6, 2007, prior to their meeting, Inyx and Pareto signed a Confidentiality Agreement. **Docket No. 168-2**. Pareto and Inyx exchanged several emails discussing possible financing scenarios. *Id.* Kachkar provided copies of Pareto executives' business cards that he allegedly met with on February 12 and 15, 2007, in Pareto's Oslo, Norway office. *Id.* Kachkar also submitted receipts from hotel and chauffeur services provided in Oslo on February 12, 2007. *Id.* Kachkar denies ever meeting or discussing business with Moen. **Docket No. 168**, at ¶ 8. Kachkar reiterated his belief that Pareto made him a financing offer that expired on March 7, 2007, and that his attorney confirmed the same, but does not offer any documentation to support these statements. *Id.* at ¶¶ 9-10. Lastly, Kachkar provides numerous emails regarding Inyx's financing discussions with financial entities HSBC Securities (USA), Inc. and Goldman Sachs International during October of 2006 and December of 2006, respectively. **Docket No. 168-4**.

On September 19, 2007, plaintiff filed this motion to freeze co-defendants' assets. **Docket No. 6**. Co-defendants filed opposition briefs, but did not proffer any evidence in support of their contentions. **Docket Nos. 21, 22, 23**. Plaintiff replied (**Docket No. 37**), and approximately seven months later Kachkar submitted two affidavits, which cite to over fifty (50) exhibits that substantiate his opposition to the motion to freeze assets. **Docket Nos. 164,**

**168**.  However, the exhibits are not cited in the co-defendants' prior legal memoranda. Nevertheless, the court noted the relevant evidence[7] to be discussed herein.

The court referred the motion to the Magistrate-Judge for a R & R (**Docket No. 160**), and the same was submitted on July 23, 2008 (**Docket No. 197**).  In the R & R, the Magistrate Judge recommended that plaintiff's motion to freeze assets (**Docket No. 6**) be granted, and that co-defendants' request for plaintiff posting a bond be granted (**Docket Nos. 21, 22**).  The Magistrate also denied co-defendants' motion for an evidentiary hearing (**Docket No. 50**) and co-defendants' motion to exclude the Middup Affidavit (**Docket No. 79**).

Co-defendants raise various objections to the R & R, and attempt to provide additional support in opposition to the motion to freeze[8].  **Docket No. 207, 209.**  Specifically, they aver that the Magistrate-Judge erred in recommending the freezing of their assets pursuant to Rule 65 because: (1) the Supreme Court's holding in *Grupo* does not allow the remedy in this case; (2) plaintiff is unable to meet the traditional injunctive relief four-part test; and (3) the Magistrate-Judge's failure to hold an evidentiary hearing was an abuse of discretion.  *Id.*  In response, plaintiff asserts that the Magistrate-Judge's recommendation is fully supported and should stand.  **Docket No. 269**.  The court will address each of the co-defendants' objections in turn.

---

[7]Kachkar provides numerous filings submitted by Inyx and plaintiff's parent company to the Securities and Exchange Commission ("SEC").  **Docket No. 164**, at ¶¶ 21-24, 31-32, Exs. 20-24, 28, 33-37, 42.  However, none of these documents are relevant to the underlying issues in this case.  The same applies to various emails documenting plaintiff's over-advancement of funds to Inyx because the total amount loaned is uncontested.  *Id.* at ¶¶ 25, 38, 50-51, Exs. 10, 12-13, 30, 43, 55-56.  Kachkar also makes several irrelevant allegations as to the impropriety of plaintiff in failing to report a certain financial situation to the SEC or its auditors.  *Id.* at ¶¶ 29-30, 49-50.

[8] Inasmuch as co-defendants attempt to supplement their opposition to plaintiff's motion with additional evidence at this late stage, the court will not consider the same.  *See Corujo-Marti v. Triple-S, Inc.*, 519 F. Supp. 2d 201, 204 (D.P.R. 2007) ("[A]rguments or available evidence not raised before the magistrate-judge are deemed waived.").

## II.      Applicable Standards of Review

### A.       Standard of Review for Objections to a Report and Recommendation

A district court may refer pending motions to a magistrate-judge for a report and recommendation.  28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L. Cv. R. 72(a).  Any party adversely affected by the recommendation issued may file written objections within ten (10) days of being served with the report and recommendation.  28 U.S.C. § 636(b)(1).  A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." *Sylva v. Culebra Dive Shop*, 389 F. Supp. 2d 189, 191-92 (D.P.R. 2005) (citing *United States v. Raddatz*, 447 U.S. 667, 673 (1980)).  The objections must specifically identify those findings or recommendations to which objections are being made.  "The district court need not consider frivolous, conclusive, or general objections." *Rivera-García v. United States*, Civ. No. 06-1004 (PG), 2008 WL 3287236, *1 (D.P.R. Aug. 7, 2008) (citing *Battle v. U.S. Parole Comm'n*, 834 F.2d 419 (5th Cir. 1987)).  Moreover, to the extent the objections amount to no more than general or conclusory objections to the report and recommendation, without specifying to which issues in the report she is objecting, or where the objections are repetitive of the arguments already made to the magistrate-judge, a *de novo* review is unwarranted.  *Id.*  "Instead, the report and recommendation is reviewed by the district judge for clear error." *Id.* (citing *Camardo v. Gen. Motors Hourly-Rate Employees Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) ("It is improper for an objecting party to . . . submit[ ] papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge.  Clearly, parties are not to be afforded a 'second bite at the apple' when they file objections to a R & R")).

In conducting its review, the court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate-judge." 28 U.S.C. § 636 (a)(b)(1); *see also Templeman v. Cris Craft Corp.*, 770 F.2d 245, 247 (1st Cir. 1985); *Alamo-Rodríguez v. Pfizer Pharma., Inc.*, 286 F. Supp. 2d 144, 146 (D.P.R. 2003).  Hence, the court may accept those parts of the report and recommendation to which the plaintiff does not object.

*See Hernández-Mejías v. General Elec.*, 428 F. Supp. 2d 4, 6 (D.P.R. 2005) (citing *Lacedra v. Donald W. Wyatt Det. Facility*, 334 F. Supp. 2d 114, 125-26 (D.R.I. 2004)).

**B.    Freeze Assets Standards**[9]

"[F]ederal courts possess general equitable power to issue prejudgment injunctions in the nature of freeze orders so as to ensure the adequacy of postjudgment remedies." *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 158 (1st Cir. 2004). The court must conduct a two-part analysis in order to determine if such an injunction should be issued. *Id.* at 158-59. First, the court must assess if the particular case is the type in which such an order may be issued. *Id.* at 159. If so, then the court must evaluate the proper legal standard needed to employ the exercise of its equitable power. *Id.*

A motion to freeze assets is considered a request for injunctive relief, and must be justified under the traditional four-part standard applicable to preliminary injunctions in this Circuit. *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 157 (1st Cir. 2004). In applying the preliminary injunction standard, the court must consider: (1) whether the applicant has demonstrated a likelihood of success on the merits; (2) whether the applicant will be irreparably harmed absent injunctive relief; (3) whether issuance of the injunction will injure other parties; and (4) where the public interest lies. *Acevedo-García v. Vera-Monroig*, 296 F.3d 13, 17 (1st Cir. 2002); *In re Elias*, 182 Fed. Appx. 3 (1st Cir. 2006). The moving party, in

---

[9] Co-defendants have raised no objection to the Magistrate-Judge's decision to base his result on Fed. R. Civ. P. 65, as compared to Fed. R. Civ. P. 64 and P.R. R. Civ. P. 56.1. Rule 64 "allows for the grant of prejudgment security in the manner provided by the law of the state in which the district court is held." *Micro Signal Research, Inc. v. Otus*, 417 F.3d 28, 33 n.1 (1st Cir. 2005) (internal quotations omitted). In other words, Rule 64 "allows a federal court to borrow provisional remedies created by state law," and Puerto Rico is regarded to be "the functional equivalent of a state." *Goya Foods Inc. v. Wallack Mgmt. Co., et al.*, 290 F.3d 63, 70 (1st Cir. 2002). Therefore, the district court could have used Rule 56.1, which "empowers a court, on an ex parte application, to issue provisional remedies that it deems 'necessary to secure satisfaction of [an anticipated] judgment.'" *Id.* (citing 32 P.R. Laws Ann. app. III, R. 56.1); *see also HMG Prop. Investors, Inc. v. Parque Indus. Rio Cañas, Inc.*, 847 F.2d 908, 913 ( 1st Cir. 1988). Rule 56.1 states in pertinent part that "[t]he court may order . . . any . . . measure it deems necessary, according to the circumstances of the case" and that "the court shall consider the interests of all the parties and shall adjudicate as substantial justice may require." 32 P.R. Laws Ann. app. III, R. 56.1. Since no objection has been raised, the court will proceed with its analysis under Rule 65. However, it bears noting that had said objection been made, the results would have remained the same, with the court granting the freeze order pursuant to Puerto Rico Rule 56.1.

this case plaintiff, bears the burden of proof to demonstrate that these four factors weigh in its favor. *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

## III.  Discussion

First and foremost, the majority of co-defendants objections are little more than a recitation of the arguments raised before the Magistrate-Judge. *Rivera-García v. United States*, Civ. No. 06-1004 (PG), 2008 WL 3287236, *1 (D.P.R. Aug. 7, 2008) (explaining that to the extent the objections are repetitive of the arguments already made to the magistrate-judge, a *de novo* review is unwarranted). Nonetheless, in the interest of justice, the court will briefly entertain co-defendants' objections.

### A.  *Grupo* Standard

Co-defendants' first objection is that the Magistrate-Judge erred in finding that an asset freeze is available in this case pursuant to the Fourth Circuit's interpretation of *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), in *Rahman v. Oncology Assoc., P.C.*, 198 F.3d 489 (4th Cir. 1999). Specifically, co-defendants aver that the assets plaintiff seeks to foreclose were not obtained fraudulently, nor is there any evidence that proceeds of the fraud were being transferred or dissipated, as was alleged in *Rahman*, therefore, the case is distinguishable, and a freeze order is improper.  The court, as the Magistrate-Judge before it, does not agree.

As was ably explained in the R & R, since *Grupo*, courts have found an asset freeze appropriate only where "the plaintiff creditor asserts a cognizable claim to specific assets of the defendant" and requests that a court "invoke equity to preserve the status quo pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested." *Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 498 (4th Cir. 1999). Further, "Circuit Courts of Appeal have consistently noted that *Grupo* is limited to cases where a plaintiff has no lien or equitable interest in defendant's assets." *Fairview Machine & Tool Co. v. Oakbrook Int'l Inc.*, 77 F. Supp. 2d 199, 202 (D. Mass. 1999). Moreover, freeze orders have been granted where a plaintiff sought both a legal and a equitable remedy. *See, e.g.*, *Fairview Machine*, 77 F. Supp. 2d at 201. Here, as the complaint

makes clear, plaintiff seeks both equitable and legal relief.  They seek, amongst other things, foreclosure of collateral under <u>all</u> security agreements relating to the Loan Agreements and Personal Guarantees, which includes, but is not limited to, co-defendants' real property in Florida and their mining assets.  *See* Pavia Affidavit at Ex. L.  Since plaintiff is seeking to freeze the assets that it also seeks to foreclose on, there is a nexus between their claim in equity and the co-defendants' assets that are the target of the freeze motion.  *See Fairview Machine & Tool Co.*, 77 F. Supp. 2d at 204;  *Rahman*, 198 F.3d 496-97 ("[W]hen the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested.  This nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets.").  Hence, the Magistrate-Judge did not commit error in determining that a freeze order was available to plaintiff.

Additionally, even though co-defendants fail to discuss the same, plaintiff has submitted evidence that the Inyx Borrowers have engaged in fraud, thereby providing a strong indication of a risk that defendants will dissipate assets.  *See Micro Signal Research, Inc. v. Otus*, 417 F.3d 28, 31 (1st. Cir. 2005).  As set forth in the R & R, plaintiff provided evidence, amongst others, that: (1) defendants diverted funds away from the lock box accounts and misrepresented their accounts receivable (Pavia Affidavit at ¶ 24); and (2) Inyx engaged in fraud in connection with its assurances to plaintiff that it was obtaining additional financing to boost its capital and make it compliant with the loan terms (**Docket No. 165**).  Hence, there is enough evidence to create an inference that defendants may dissipate or conceal its assets and therefore, an order freezing assets is a "reasonable measure to preserve the status quo in aid of the ultimate relief sought." *Rahman*, 198 F.3d at 498.

> ### B.   Injunctive Relief
>
> > ### I.   Likelihood of Success on the Merits
> >
> > > #### a.   Breach of Contract

Co-defendants argue that the Magistrate-Judge concluded incorrectly that they had not proffered evidence of a written forbearance agreement and misapplied Puerto Rico's statute of frauds.  **Docket No. 209**, at 39**.**  Co-defendants allege that in June of 2007, Kachkar negotiated verbally with plaintiff so that plaintiff would not declare the Loan Agreements defaulted for one-hundred and fifty (150) days in exchange for additional personal assets as collateral.  *Id.*  Co-defendants aver that the First Personal Guarantee, Second Personal Guarantee, and the Collateral Deficiency Letter (collectively "Guarantees") reflect the one-hundred and fifty (150) day forbearance protection period they negotiated.  *Id.* at 39-40.  They further assert that plaintiff could not have declared the Loan Agreements in default because of their oral agreements and subsequent writings.  *Id.* at 40.  Moreover, co-defendants argue that the Magistrate-Judge overlooked the evidence of repeated written waivers given by plaintiff.  *Id.* at n.28.  Co-defendants also aver that it would have been "absurd" for them to pledge assets without any consideration on plaintiff's part, hence, that this further supports their alleged one-hundred and fifty (150) day forbearance period.  *Id.* at n.29.  Lastly, co-defendants assert that due to plaintiff's breach of the alleged oral forbearance agreement, their assets as pledged in the Guarantees cannot be frozen because they are excused from any further performance.  *Id.* at 42.

Essentially, as the Magistrate-Judge correctly concluded, co-defendants do not contest that they breached the Loan Agreements.  Instead, they assert this alleged oral forbearance agreement precluded plaintiff from foreclosing on the Loan Agreements, despite Inyx's continuing default status on some of its covenants.  It is uncontested that co-defendants provided plaintiff security interest over almost all of their assets as collateral under the Loan Agreements and Guarantees.  Pavia Affidavit at ¶ 6 n.2; *id.* at ¶ 14 n.4; **Docket No. 197**, at 2 n.3 (quoting Loan Agreements' language); **Docket No. 9**, Exs. J, K, L.  It is also not contested that the Loan Agreements allowed plaintiff to accelerate all amounts due and demand immediate payment upon default.  **Docket No. 197**, at 3.

Kachkar avers that Inyx was not in default because it was current on its principal and interest payments through July 3, 2007, the date plaintiff sent the Notice of Default and Demand (**Docket No. 9**, Ex. N).  **Docket No. 164**, ¶¶ 6, 39.  However, this assertion without supporting documentation does not make it so, especially since payment of principal and interest is not the only covenant Inyx was bound to comply with under the Loan Agreements. Kachkar provides excuses for Inyx's non-compliance with some of the covenants, for example: the issues experienced by some of its customers with the lock box accounts or Inyx's notifying plaintiff of the $37.665 million pre-billing invoices albeit after Inyx had received the funds. *Id.* at ¶¶ 13-17, 33, Exs. 7-9, 11, 38.  However, the waiver letters Kachkar submitted clearly show that plaintiff did not waive violations under either of those two scenarios. *Id.* at Exs. 15-17.  The waiver letters only waived the specific covenants cited and only for the period of time stated.  *Id.*  They also included a clause stating that they did not constitute a waiver to declare any future defaults.  *Id.*  Therefore, even though co-defendants argue that the Magistrate-Judge ignored the waiver letters, these letters in fact demonstrate the exact opposite of their contention, i.e. that plaintiff waived Inyx's violations orally.

Also, contrary to Kachkar's assertions, plaintiff expressed disapproval and specifically reserved its right to demand full payment after being notified of the $37.665 billion pre-billing invoices.  *Id.* at Exs. 18.  Kachkar and Benkovitch even admitted in the Second Personal Guarantee and the Collateral Deficiency Letter that there was a substantial collateral deficiency under the Loan Agreements, which was a default violation under the same. **Docket No. 197**, at 13; **Docket No. 9**, Exs. K, L.  Therefore, the court agrees with the Magistrate-Judge that plaintiff has submitted sufficient evidence to support its breach of contract cause of action.

Co-defendants' argument that this so-called oral forbearance agreement provides them a defense against the breach of contract under the Loan Agreements is, as the Magistrate-Judge concluded, meritless.  The documentation that co-defendants provide to substantiate this alleged forbearance are the Guarantees themselves.  **Docket No. 9**, Exs. J, K, L.  As the Magistrate-Judge pointed out, there is no language in the Guarantees that mention anything about the plaintiff giving co-defendants 150 days before plaintiff could declare default under

the Loan Agreements. **Docket No. 197**, at 12. The Guarantees state that plaintiff had the right to declare the Loan Agreements in default immediately, but would forbear doing so for the time being in exchange for the Guarantees. **Docket No. 9**, Ex. K. The Guarantees did not specify the period of time the plaintiff would forbear declaring Inyx on default. *Id.* Also noteworthy is that the express terms of the Loan Agreements preclude co-defendants' argument because any amendment could only be made in writing. **Docket No. 197**, at 12.

Puerto Rico law governs the Loan Agreements, and it requires that a commercial contract be corroborated. *Id.* at 13; *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank*, 122 F.3d 88, 89 (1st Cir. 1997). Puerto Rico's statute of frauds states in pertinent part that:

> Commercial contracts shall be valid and shall cause obligations and causes of action whatever may be the form and language in which they are executed, the class to which they belong, and the amount of the contract, provided their existence is shown by any of the means provided by civil law. However, the testimony of witnesses shall not in itself be sufficient to prove the existence of a contract the amount of which exceeds three hundred dollars, unless such testimony concurs with other evidence.

P.R. Laws Ann. tit. 10, § 1302. Co-defendants did not proffer any written evidence to support their oral forbearance agreement. The mere testimony of Kachkar is not enough to corroborate its existence. Therefore, since the court does not recognize the alleged oral forbearance agreement, it will not entertain co-defendants' argument that plaintiff breached the same. Hence, the court agrees with the Magistrate-Judge that plaintiff has established "a strong likelihood of success on its breach of contract claims." **Docket No. 197**, at 15.

### b.    Fraud

Co-defendants argue that the Magistrate-Judge also erred in concluding that plaintiff had a strong likelihood to succeed on its fraud claims. **Docket No. 209**, at 42. Under Puerto Rico law, in order to establish fraud, plaintiff must demonstrate: (1) a false representation by defendant; (2) reasonable reliance on the false representation; (3) an injury as a result of the reliance; and (4) defendant's intent to defraud. *P.R. Elec. Power Auth. v. Action Refund*, 515 F.3d 57, 66 (1st Cir. 2008). Plaintiff also has the burden to present strong, clear, convincing, and conclusive evidence in order to establish fraud in Puerto Rico. *Id.* at 66-67. However, this "does not mean that fraud has to be established with concluding evidence nor with mathematical certainty." *García-López v. Méndez-García*, 102 D.P.R. 383, 386 (1974).

Plaintiff proffered evidence that Inyx kept multiple sets of accounts receivable reports, and purposefully submitted the false one to plaintiff.  Middup Affidavit at ¶ 11; **Docket No. 9**, Exs. 1-4.  Plaintiff also submitted evidence that Inyx sent duplicate, inaccurate and altered invoices on a regular basis in order to obtain more funding than it was supposed to receive.  Middup Affidavit at ¶¶ 14-20, 22, 25-26; **Docket No. 9**, Exs. 6-9.  Plaintiff relied on these false documents and disbursed almost $20 million to Inyx.  Despite co-defendants' contentions, Kachkar's own words are very telling as far as scienter is concerned:  "Be a little smarter . . . Focus on the more important thing here – What we say to [plaintiff] and what we do are two different things."  **Docket No. 9**, Ex. 41.

Moreover, co-defendants' arguments are simply not persuasive.  Even though Kachkar presented some evidence that might explain some of Inyx's business practices, it is not enough to convince the court that plaintiff does not have a strong likelihood of success on its fraud claims.  On the contrary, plaintiff's evidence on the diversion of almost $16 million from the lock box is disturbing, despite the $8 million guarantee signed by Kachkar and Benkovitch.  The Pareto letter is also questionable (despite the affidavit of Harald Suain, which the court finds likewise questionable).  Even if Kachkar and other Inyx executives traveled to Oslo, Norway to meet with Pareto representatives, this does not prove the Pareto letter, signed by a non-Pareto employee or representative, is legitimate.  Plaintiff has shown that it relied on this letter and other related communications from Inyx's executives, including Kachkar, which induced plaintiff to continue funding Inyx operations at its detriment.  Therefore, the court concurs with Justice Low that the evidence is more than "capable of supporting an inference that there were dishonest practices in relation to the [Loan Agreements]," and agrees with the Magistrate-Judge that plaintiff has met its burden on setting forth a likelihood of success on its fraud claims.  **Docket No. 7-2**, at ¶ 15; **Docket No. 197**, at 17.

### ii.    Irreparable Harm

Co-defendants allege that plaintiff will not suffer any harm because it only seeks monetary damages, and that the possibility of not being able to collect the money once a judgment is entered is insufficient to warrant a freezing of their assets.  **Docket No. 209**, at 48.  However, in a fraud situation as this case presents, plaintiff can show it would suffer

irreparable harm easily because of the "strong indication that [co-defendants] may dissipate or conceal assets." *Micro Signal*, 417 F.3d 28, 31 (1st Cir. 2005).  Justice Low found Inyx's failure to deposit payments in plaintiff's lock box accounts as "reasonably capable of supporting an inference that funds are being diverted or concealed," and this court agrees. **Docket No. 7-2**, at ¶ 18.  Further, as a review of co-defendants' prior conduct evidences (e.g., diverting funds away from the lock box account), there is a chance that they will attempt to divert money so as to frustrate plaintiff's attempt at recovery.  Moreover, as the Magistrate-Judge pointed out, the assets at stake are not currently protected.  **Docket No. 197**, at 19. Hence, co-defendants' total control over the same puts them at high risk of concealment or dissipation because of the history of co-defendants' fraudulent behavior.

Co-defendants further assert that because of the time delay in plaintiff's filing of this motion and the Magistrate-Judge's issuing of the R & R, there is no imminent danger that co-defendants will dissipate its assets.  **Docket No. 209**, at 49.  However, the court holds that a couple of months delay in such heavily litigated cases[10] is not enough to sustain co-defendants' assertion.  Therefore, the court holds that plaintiff has met its burden that it will suffer irreparable harm if the freezing of assets is not granted.

### iii.    Balancing of Interests

Co-defendants aver that the "freeze order would place a hardship on them" because it would prevent them from "engaging in even routine and ordinary personal and business activities." **Docket No. 209**, at 50-51.  However, co-defendants owe plaintiff over $142 million and co-defendants' assets are the debt's collateral.   Since the Loan Agreements are indisputably in default and co-defendants' assets are security for the same, co-defendants do not have a reasonable expectation in continuing their control over the same.  Hence, the balancing of interests strongly favor plaintiff.

---

[10]The court takes judicial notice of the multiple proceedings between these parties since this case's inception in courts located in Canada, UK, Florida, New York and Delaware.  **Docket No. 197**, at 1 n.2.

### iv.    Public Interest

Co-defendants argue that plaintiff has not shown any public interest associated with the resolution of this case. **Docket No. 209**, at 50. However, plaintiff presents an interesting argument that, due to co-defendants' fraudulent and dishonest behavior, the freeze order would serve as a deterrent against other future fraud schemes and would ensure that financial institutions continue lending to deserving companies. **Docket No. 197**, at 19. The court is persuaded by this argument and agrees with the Magistrate-Judge that the public interest factor favors plaintiff. *Id.* at 20.

### v.    Benkovitch's Assets

Co-defendants aver that because Benkovitch is not a party to the fraud claims, her assets should not be frozen. **Docket No. 209**, at 51. The Magistrate-Judge agreed with plaintiff's argument that because Benkovitch personally guaranteed the assets at stake, and is married to Kachkar, the assets may be improperly diverted if not frozen. **Docket No. 197**, at 15 n.6. In *Micro Signal*, a similar situation presented itself, and upon affirming the preliminary injunction, the First Circuit held that plaintiff's wife's liability in the debt alongside her husband's clear fraudulent behavior was sufficient to support the district court's decision. *Micro Signal*, 417 F.3d at 31-33. The court concurs with the Magistrate-Judge, and follows *Micro Signal*, holding that Benkovitch's assets should be frozen alongside the other co-defendants. Hence, the court hereby **GRANTS** plaintiff's motion to freeze assets (**Docket No. 6**). Moreover, the court holds that the freeze order should incorporate the Magistrate-Judge's terms as detailed in the R & R. **Docket No. 197**, at 21-22.

### C.    Lack of Evidentiary Hearing

Co-defendants argue that the Magistrate-Judge's denial of an evidentiary hearing, prior to issuing the R & R, was an abuse of discretion. **Docket No. 209**, at 52-53. As the Magistrate-Judge correctly held, an evidentiary hearing is not required as long as the parties are afforded an opportunity to submit relevant facts and arguments so that the court can consider the interests of all the parties and adjudicate as justice requires. *See, e.g.*, *Campbell Soup Company v. Giles*, 47 F.3d 467, 470-71 (1st Cir. 1995) (hearing not required where parties had opportunity

to present relevant facts and arguments and counter the opponent's submissions, and material factual issues were not genuinely in dispute); *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 894 (1st Cir. 1988) (court acted within its discretion in granting preliminary injunction without a hearing); *Syntex Ophthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 682 (1st Cir. 1983) (hearing not mandated where "evidence already in the district court's possession" enabled it to reach reasoned conclusions); *Town of Burlington v. Department of Education*, 655 F.2d 428, 433 (1st Cir. 1981) (hearing not essential where parties exercised ample opportunity to make written submissions and plaintiff failed to submit affidavits or make offers of proof). Here, the parties have had plenty of opportunity to submit documentation and the Magistrate-Judge allowed co-defendants' late submission of evidence (**Docket Nos. 164, 168**), as well as plaintiff's (**Docket No. 165**). Therefore, the court holds that co-defendants' argument is without merit.

### D.    Bond

The Magistrate-Judge granted co-defendants' request for plaintiff to post a bond pursuant to Rule 65. **Docket No. 197**, at 20. In so doing, the Magistrate-Judge noted that the Loan Agreements include a clause waiving the request for a bond, however, the Guarantees do not. *Id.* Accordingly, the Magistrate-Judge ordered co-defendants to file documentation supporting the amount of the bond, as well as evidence of damages they may suffer as a result of the asset freeze. *Id.* at 21. In response, co-defendants objected to the Magistrate-Judge's order and suggested an alternative process for the court to employ. **Docket No. 209**, at 59-60. On August 20, 2009, this court ordered co-defendants' to file a motion within five (5) days of the issuance of the order setting forth the suggested amount of a bond in the event the court adopted the R & R or waive any claim to a bond and face possible sanctions. **Docket No. 565**. Co-defendants' have once again failed to comply with the court's order to produce evidence regarding a possible bond. As such, due to co-defendants' dilatory approach to this issue, no bond will be imposed on plaintiff.

**IV.     Conclusion**

In light of the foregoing, the R & R (**Docket No. 197**) is **ADOPTED** in full. Consequently, plaintiff's motion to freeze co-defendants' assets (**Docket No. 6**) is **GRANTED**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 1st day of September, 2009.


**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**