IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WESTERNBANK PUERTO RICO,

     Plaintiff,

     v.

JACK KACHKAR *et al.*,

     Defendants.

Civil No. 07-1606 (ADC/BJM)

## REPORT AND RECOMMENDATION

    Before the court is plaintiff Westernbank Puerto Rico's ("Westernbank" or "the bank") motion to dismiss the amended counterclaims ("counterclaims") of defendants Inyx, Inc., Jack Kachkar, and Viktoria Benkovitch (collectively "Inyx" or "defendants") (Docket No. 398, 397, 396, respectively). (Docket No. 427). Defendants opposed (Docket No. 443), and Westernbank replied. (Docket No. 477). This case was referred to me by the presiding district judge for a report and recommendation on all dispositive motions. (Docket No. 160). After careful review of the briefs on file and evidence submitted, I recommend that Westernbank's motion be granted.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

    On a motion to dismiss, "the facts are set forth as alleged in the complaint and inferences [are] taken in the light most favorable to . . . the non-moving party." Díaz-Romero v. Mukasey, 514 F.3d 115, 116 (1st Cir. 2008). In addition, the court may "augment those facts with facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice." Jorge v. Rumsfeld, 404 F.3d 556, 559 (1st Cir. 2005). In particular, when "a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998). Indeed, on a motion to dismiss, the court "may

properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint." Clorox Co. v. Proctor & Gamble Commer. Co., 228 F.3d 24, 32 (1st Cir. 2000). The rationale for this principle is that "the main problem of looking to documents outside the complaint – lack of notice to plaintiff – is dissipated 'where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint.'" Id. (internal citation omitted). Here, Inyx cites and relies on numerous documents and contracts throughout the counterclaims. Therefore, the following facts refer to the allegations contained in the counterclaims and to the documents incorporated by reference.

This case concerns various loan agreements between Westernbank and Inyx and its wholly owned subsidiaries, Inyx USA, Ltd., Inyx Europe, Ltd., and Ashton Pharmaceuticals, Ltd. (with Inyx, the "Inyx Borrowers"), through which Westernbank loaned at least $72 million to the Inyx Borrowers. (Docket No. 398, ¶¶ 19, 22, 24). On March 31, 2005, Inyx and Inyx USA (the "Inyx U.S. Borrowers") entered into an agreement with Westernbank (the "USA Loan Agreement") under which Westernbank agreed to lend up to $46 million to the Inyx U.S. Borrowers. (Id., ¶ 19; see also Docket No. 223-4 - 223-7). On August 30, 2005, Inyx's United Kingdom ("UK") subsidiaries (the "Inyx UK Borrowers") entered into a similar agreement with Westernbank (the "UK Loan Agreement"; together with the USA Loan Agreement, the "Loan Agreements"). (Docket No. 398, ¶ 22; see also Docket No. 223-9).

Under the terms of the Loan Agreements, Westernbank agreed to provide the Inyx Borrowers with lines of credit upon which they could draw down based on a percentage of their eligible accounts receivable and the value of their inventory. (Docket No. 398, ¶ 20). The Loan Agreements also included an arrangement for Inyx to maintain "lock box" accounts for payment of accounts receivable. (Id., ¶ 21). Under the agreements, Westernbank obtained a security interest in Inyx's accounts receivable and virtually all of Inyx's other assets. (Id.). Each agreement provided that, in the event of default, Westernbank was entitled to accelerate all amounts due and owed to it, demand immediate payment from the borrowers, and foreclose on the borrowers' pledged collateral. (Docket No. 9, Ex. A, § 10.2(b); Ex. C, § 10.2(b)). In addition, the Inyx Borrowers entered into a Cross-Default Agreement-Security Agreement with Westernbank providing that (1) an event of default under one

Loan Agreement would be considered an event of default under both, (2) in the case of an event of default under either agreement, Westernbank could exercise all of its rights and remedies under either agreement, and (3) all of the collateral under each Loan Agreement would serve as collateral under both. (Docket No. 398, ¶ 25; see also Docket No. 223-10, 223-11).

Both Loan Agreements precluded any amendments, modifications, waivers, or discharges of the agreement or any of their terms "orally or by course of conduct." (Docket No. 223-6, § 11.3 [USA Loan Agreement]; Docket No. 223-9, § 11.3 [UK Loan Agreement]).  The agreements stated that they could be modified, amended, or waived "only by a written agreement signed by an authorized officer of [Westernbank]." (Id.).  Moreover, the agreements provided that Westernbank "shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its rights, powers and/or remedies unless such waiver shall be in writing and signed by an authorized officer of [Westernbank]." (Id.).  The agreements also contained integration clauses providing that the agreement itself and certain other related financing agreements and instruments "represent[] the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersedes all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written." (Docket No. 223-6, § 12.5; Docket No. 223-9, § 12.5).

As Inyx freely admits in its counterclaims, "by the end of 2005, Inyx was in violation of the working capital, cash flow, and tangible net worth financial covenants contained in the Inyx Loan Agreements." (Docket No. 398, ¶ 26).  Inyx alleges, however, that Westernbank waived these covenant defaults in letters dated March 31, 2006, August 11, 2006, and November 20, 2006.  (Id.).  The March 31, 2006 letter stated that Westernbank had agreed "to waive certain specific violations" of the Loan Agreements for the fiscal period ending April 30, 2006, but expressly provided that the waivers "should not be construed or understood to be a waiver of [Westernbank's] rights to declare any future default(s) under the terms of the [Loan Agreements]." (Docket No. 223-20, p. 1).  In the August 11, 2006 letter, Westernbank agreed to waive "certain specific violations" through August 21, 2006, but expressly

stated that it did not waive Westernbank's "rights to declare any future default(s)" under the agreements.  (Docket No. 223-21, p. 1).  Finally, the November 20, 2006 letter memorialized Westernbank's waiver of "certain specific violations" through December 15, 2006, but again expressly reserved the "rights to declare any future default(s)" under the agreements.  (Docket No. 223-22, p. 1).

Inyx further alleges that throughout its banking relationship with Westernbank, Inyx fully disclosed to Westernbank that Inyx's practice was to pre-bill customers for development stage work. (Docket No. 398, ¶ 27).  Westernbank was also aware that many of Inyx's billings to customers were progress and milestone invoices that documented stages of completion of long-term projects and were not immediately collectible.  (Id., ¶ 28).  Westernbank understood that as a result of the use of such progress invoices, Inyx's accounts receivable would not be collected within 120 days and "ultimately would technically be ineligible as collateral pursuant to the Loan Agreements."  (Id.).

In November 2006, Inyx informed Westernbank that it planned to write down more than $37 million in pre-billings on development projects from its balance sheet, based on advice from its independent auditors.  (Id., ¶ 30).  This sum had previously been included in the borrowing base under the Inyx Loan Agreements.  (Id.).  In a November 20, 2006 letter, Miguel Vázquez, President of Westernbank Business Credit, confirmed that Westernbank "has been made aware of: i) the inclusion of $37,655,000 of pre-billings in the borrowing base used by [Inyx] for purposes of determining advances under the working capital lines of credit." (Docket No. 223-23, p. 1).  The letter further stated that Westernbank did "not approve of the above mentioned transactions, and reserves its rights under the [Loan Agreements] to demand payment in full of the loans outstanding and any other Obligations thereunder as a result of the disclosures notified today by [Inyx]."  (Id.).  Inyx disclosed the $37 million write-down in its December 4, 2006 Form 10-Q (the "10-Q"), which was filed with the Securities and Exchange Commission ("SEC") and forwarded to a number of individuals at Westernbank.  (Docket No. 398, ¶¶ 31-32).  The 10-Q stated that Inyx "was in violation" of certain loan covenants:

> As of September 30, 2006, the Company [Inyx, Inc.] was in violation of certain financial covenants in connection with its Westernbank loan and security agreements. As it has previously done when requested so by the Company, Westernbank has

> waived, through December 15, 2006, certain requirements such [that] the Company's
> non-compliance with its covenants under such agreements has not resulted in an event
> of default by the Company.  There can be no assurances the Company will meet such
> covenants in the future or that Westernbank will continue to grant such waivers.

(Docket No. 207, Ex. I-19, p. 17) (documents filed conventionally with the court).  The bank therefore

had knowledge that Inyx was, as a result of the write-down, "substantially under-secured, i.e., under-

collateralized."  (Docket No. 398, ¶ 33).

   The counterclaims allege that on August 31, 2006, Westernbank intentionally froze the posting

of ineligible collateral to its computer systems to falsely create the impression that the Inyx Loans were

sufficiently in formula to allow advancement of additional funds.  (Id., ¶ 36).  Inyx alleges that

Westernbank's motivation was to avoid having to take reserves and report the infirmity of its loan

portfolio.  (Id.).  As of the end of 2006 – after the bank became aware of Inyx's $37 million write-down

– Westernbank had not created a specific reserve with respect to the Inyx loans.  (Id., ¶¶ 37-38).  The

counterclaims allege that Vázquez informed Inyx Executive Vice President Jay Green that Westernbank

had not set a reserve because it was involved in merger talks, needed its balance sheets to reflect the

strongest financial condition possible, and needed to keep its stock price as high as possible.  (Id., ¶ 39).

   Westernbank set the limit on the Inyx Loans at $120 million, and Westernbank internal policies

required that any limit increases be approved by the Senior Credit Committee and the Board of

Directors of Westernbank.  (Id., ¶ 44).  Inyx asserts that, upon information and belief, no increase was

ever approved, and the decision to continue to loan money to Inyx beyond the loan limits "was made

unilaterally by WHI[1] CEO Frank Stipes" and accomplished with the assistance of a handful of other

identified Westernbank employees.  (Id., ¶ 45).  In order to keep track of these "unofficial over-

advances," Westernbank maintained a spreadsheet in which Westernbank internally accounted for, but

did not publicly report, approximately $22.6 million in over-advances.  (Id., ¶ 46).  Inyx references

April 12, 2007, and April 19, 2007 versions of the spreadsheet, titled "Inyx Europe Payroll" or "Inyx

Recovery Schedule."  (Id., ¶¶ 46-47).  The spreadsheet contained a footnote stating, "[a]gings do not

─────────────────

[1] W Holding Company, Inc., Westernbank's bank holding company.  (Docket No. 398, ¶ 8).

have adjustment of $37MM made September 06 10-Q," and the April 19, 2007 version contained a column entitled "Ineligible" marked with the footnote stating, "[n]o Ineligibles were taken into consideration for this analysis ($93MM)." (Id., ¶ 48).

The counterclaims further allege that in September 2006, Westernbank authorized and issued a $3 million loan to Inyx's wholly-owned U.S. subsidiary, Exaeris, Inc. (Id., ¶ 49). However, neither Inyx nor Exaeris "was ever informed of this $3 million 'loan'" or executed loan documentation. (Id.). Nonetheless, Stipes signed a January 3, 2008 proof of claim in the Exaeris Chapter 11 bankruptcy proceeding stating that Exaeris was not an Inyx Borrower and that the formation of Exaeris constituted a breach of the Inyx USA Loan Agreement. (Id., ¶ 50). According to the counterclaims, the "proof of claim was withdrawn when Exaeris' counsel told the Delaware Court that it believed [that] Stipes'[s] signed proof of claim contained statements of perjury." (Id.).

By late 2006, Inyx initiated a plan to take Inyx private by buying back its publicly held stock and replacing the Westernbank financing. (Id., ¶ 51). To that end, Inyx discussed refinancing with a number of well-known investment banks in 2006 and 2007. (Id., ¶ 52). As part of these discussions, investment bank Goldman Sachs ("Goldman") required Inyx to engage accounting firm McKinsey & Co. ("McKinsey") to provide an independent review of Inyx's financial prospects and assist in the preparation of a formal business plan. (Id.). The resulting business plan projected that by 2010, Inyx would receive Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA) of more than $242 million. (Id., ¶ 53). According to Inyx, this figure is significant because pharmaceutical company acquisitions customarily use a multiplier of eight times EBITDA, which would project in an Inyx sale value of $1.94 billion. (Id., ¶ 54).

The refinancing discussions reached their culmination, the counterclaims suggest, in discussions with Saadi Gadhafi, international businessman and son of the ruler of Libya. (Id., ¶ 55). In the spring of 2007, Kachkar entered into a confidential letter of intent to pursue a business partnership with Gadhafi, pursuant to which each partner would own an equal share of a holding company that would make international investments. (Id., ¶ 56). On April 6, 2007, Gadhafi's authorized representative,

Karim Murabet, executed on Gadhafi's behalf an agreement (the "Strategic Partnership Agreement")
between Gadhafi and Kachkar "which documented and made binding their partnership contemplated
by their prior letter of intent." (Id., ¶ 57; see also Docket No. 207, Ex. IV-A). The Strategic
Partnership Agreement provided for the formation of a holding company, SG Holdings, which would
carry out various investment projects, including "arrang[ing] for $355 million in funding for Inyx in
order to fully pay back Westernbank and to take Inyx private." (Docket No. 398, ¶ 57).

On April 6, 2007, Murabet confirmed to Kachkar that Sahara Bank of Libya would be the
funding institution for SG Holdings' projects, including the Inyx refinancing. (Id., ¶ 58). However,
"Sahara Bank was unaware . . . that Gadhafi was involved or affiliated with SG Holdings, and Gadhafi
required that the terms of his partnership with Kachkar (and his involvement) remain strictly
confidential, including that it not be disclosed to Sahara Bank."[2] (Id., ¶ 59). A copy of the Strategic
Partnership Agreement was forwarded to Westernbank; Murabet informed Westernbank in an April
18, 2007 e-mail and May 4, 2007 call that SG Holdings' funding would be used to pay off the Inyx
Loans and that "we were ready, willing and able to repay the Inyx loans through Sahara Bank of
Libya." (Id., ¶¶ 60-61).

The counterclaims allege that "Murabet and Kachkar emphasized to Westernbank – specifically
to Vázquez and [bank employee Gabriel] Montañez – that Gadhafi's involvement had to be kept strictly
confidential, and that it could not be disclosed to Sahara Bank." (Id., ¶ 63). Allegedly in response,
Westernbank "acknowledged that it understood Gadhafi's confidentiality requirements and promised
Kachkar and Inyx, and agreed, to keep Gadhafi's dealings with Kachkar confidential, and not to
disclose them to Sahara Bank." (Id., ¶ 64). Inyx thus alleges the existence of a "Confidentiality
Agreement," which Westernbank "breached" on or about May 8, 2007, "by secretly sending to Sahara
Bank several different SWIFT messages inquiring about the status of a letter of credit being issued in
its favor 'as per instructions of Saadi Gadhafi . . . which will serve as the payment instruction for

---

[2] Gadhafi's confidentiality concerns apparently did not prohibit him from naming the new
holding company with his own initials.

certain credit facilities granted to Inyx Inc. et al." (Id., ¶ 66).  Inyx complains that "[a]s a result of Westernbank's breach of the [C]onfidentiality [A]greement, Gadhafi terminated the Partnership Agreement and, consequently, his business plans with Kachkar, thus interfering with the SG Holdings financing deal and preventing Inyx from securing the $355 million which would have enabled Inyx to pay off the Inyx loans." (Id., ¶ 67). Kachkar further contends that through this alleged breach, the bank became liable to him for the $40 billion in profits he expected to earn from his participation in other projects with SG Holdings (including the "Zuwarah Special Condition Zone Project"). (Id., ¶ 68). On May 14, 2007, Inyx informed Westernbank that it considered the bank liable for billions of dollars in damages, and allegedly in response, Vázquez sent Inyx a letter "apologizing for the Bank's breach of confidentiality" and later reported the litigation exposure to his superiors. (Id., ¶ 70).[3]

The counterclaims next allege that Westernbank "determined to destroy Inyx as a going concern in order to cover up [Westernbank's] reckless lending practices," but not before first "hatch[ing] a plan to obtain additional collateral and guarantees from Inyx and the Kachkars under false pretenses so that the loan would not be a total loss." (Docket No. 398, ¶ 71).  In May 2007, Vázquez informed Inyx that the Inyx Loans would be supervised by a committee headed by Stipes, bank officer William Vidal Carvajal, and WHI Director Pedro R. Domínguez.  (Id., ¶ 72).  Around this time, Westernbank contracted counsel to file an administrative receivership proceeding in the United Kingdom. (Id., ¶ 74).

At the end of May 2007, Vázquez informed Green that Westernbank was "willing to extend further working capital to Inyx, but that Stipes first wanted to meet Kachkar in person." (Id., ¶ 78). Accordingly, a meeting was held in the bank's Puerto Rico offices on May 31, 2007, attended by Kachkar and various Westernbank personnel, including Stipes and Vázquez. (Id., ¶ 79).  During the

---

[3] The record in this case contains a May 14, 2007 email from Vázquez confirming to Jay Green that Westernbank contacted Sahara Bank without Inyx's knowledge "in accordance with standard banking practice and operating procedures", and that Westernbank "regret[s] any misunderstanding caused by our inquiry...." See Docket No. 207, Ex. I-1, p. 1 (documents filed conventionally with the court).  It is unclear whether this is the "letter" relied on in the counterclaim, though I do note that this email provides no support for defendants' characterization that Vázquez "apologiz[ed] for the Bank's breach of confidentiality."

meeting, Stipes allegedly "represented that the Bank was concerned about a collateral shortfall of approximately $70 million" and "demanded" that Inyx and Kachkar make up the collateral deficiency and secure the loans with additional assets. (Id., ¶ 80). Kachkar responded that he and Inyx were "committed to working with the Bank" and that he was willing to "use his personal assets to remedy the collateral shortfall," provided, however, "that the Bank would honor its promise to return certain customer payments to Inyx, advance additional working capital, and forbear from calling the Inyx Loans so that Inyx could complete its refinancing." (Id., ¶ 81). The counterclaims allege that "Stipes assured Kachkar that the Bank would agree to his conditions." (Id., ¶ 82).

Following the meeting, Inyx, the Kachkars, and Westernbank "agreed to a three-step plan proposed by Stipes" which defendants characterize as a "Forbearance and Workout Arrangement" (the "Forbearance Agreement" or "Oral Forbearance Agreement"). (Id., ¶ 83). As a first step, "it was agreed that Westernbank would not call the Inyx Loans." (Id., ¶ 84). As a second step, the Kachkars agreed to provide Westernbank with a security interest in certain Florida real estate assets and execute personal guarantees up to $30.1 million. (Id., ¶ 85). As part of the second step, "as consideration for these assets and guarantees, and in addition to the continued forbearance," Westernbank agreed to advance Inyx an additional $7.5 million in working capital. (Id.). As a third step, the Kachkars agreed to provide an additional limited guarantee of approximately $70 million and to pledge their interests in certain mining assets. (Id., ¶ 86). As part of the third step, "[a]s consideration for the $70 million in new personal guarantees and the pledging of additional collateral," Westernbank agreed to provide Inyx with an additional $15 million in working capital. (Id.). Moreover, Westernbank agreed to perform an independent appraisal of the value of the mining assets, and if the assets were valued at at least $400 million, "then Westernbank committed to restructure the entire Inyx debt." (Id.). However, if the mining collateral was valued at a lesser amount, the bank "would forbear from demanding repayment of the loans for 150 days from the date of appraisal notification so that Inyx could provide more replacement assets or seek alternative financing." (Id., ¶ 87). According to Inyx, Westernbank "agreed that it would not call the Inyx Loans or otherwise proceed to collect on them during the entirety

of the time that this Forbearance and Workout Agreement was being performed." (Id., ¶ 88).

A second meeting was held at Inyx's Miami offices on June 7, 2007, attended by Stipes, Vázquez, and other Westernbank personnel. (Id., ¶ 90). During this meeting, Stipes "exerted pressure upon Kachkar" to execute and deliver instruments effectuating second mortgages against the Kachkars' real estate assets. (Id., ¶ 91). Kachkar responded that he would not execute these instruments "until Westernbank memorialized its agreement to forbear . . . in writing." (Id., ¶ 92). In a side meeting that day, "Stipes promised and assured Kachkar that the Bank would not call the Inyx Loans or otherwise seek to collect on them while Inyx and the Kachkars were proceeding with the three-step plan." (Id., ¶ 93). According to the counterclaims, "Kachkar continued to demand a written [forbearance] agreement," but in response, Stipes repeated the agreement to forbear and "insisted that no writing was necessary." (Id., ¶ 94). Stipes then stated that "verbal promises were enforceable under Puerto Rico law," and at Stipes's request, Westernbank counsel Barry Woods "confirmed that the oral contract was enforceable under Puerto Rico law, and failed to explain any exceptions that might exist." (Id.).

Inyx asserts that Westernbank representatives "wanted to avoid a clear written contract because . . . they had the intent to defraud the Kachkars and Inyx." (Id., ¶ 95). Nonetheless, "[i]n reliance upon the Bank's and Woods'[s] representations, promises, and assurances, and in performance of their obligations under the [Forbearance Agreement]," Inyx and the Kachkars executed and delivered: (1) a $2.5 million note and mortgage against Inyx's Florida real estate (the "Inyx Note" and the "Inyx Mortgage and Security Agreement");[4] (2) a $30.1 million personal guarantee by the Kachkars (the "First Personal Guarantee");[5] (3) a mortgage and security agreement pledging the Kachkars' Florida real estate as collateral for the Inyx Loans (the "Kachkar Mortgages");[6] and (4) a mortgage and security agreement pledging as collateral for the Inyx Loans certain Florida real estate owned by Benkovitch individually. (Id., ¶ 96). Subsequent to the delivery of these items, Westernbank counsel prepared a

---

[4] See also Docket No. 223-14 and 223-15.
[5] See also Docket No. 223-12.
[6] See also Docket No. 223-16.

collateral deficiency letter agreement to set forth the terms by which the Kachkars' mining assets would be pledged to Westernbank (the "Collateral Deficiency Letter").[7]  (Id., ¶ 98).

In a June 12, 2007 meeting, the WHI Audit Committee discussed the Inyx Loans and scheduled a meeting for June 19, 2007 to discuss specifically whether the Inyx Loans should be declared impaired.  (Docket No. 398, ¶ 99).  However, during May and June 2007, Stipes, Vázquez, and others "manipulated" the WHI Board and Audit Committee by "falsely reporting, or failing to correct false reports, that Inyx had hidden the collateral deficiency from Westernbank."  (Id., ¶ 103).  Despite these reports, Westernbank personnel had been aware of "the pre-billing issues" in early 2006 and, at the latest, by the end of 2006.  (Id., ¶ 104).  As quoted in the counterclaims, a May 2006 internal memorandum prepared by Westernbank executive Julia Fuentes states that in August 2006, the bank "extended [the] eligibility period for invoices for product development" and on September 30, 2006, Westernbank was "asked to acknowledge that we were financing pre billings for product development which Deloitte . . . reversed as revenues and wrote off as receivables."  (Id.).  Fuentes noted that at this time, Westernbank asked Inyx "to seek refinancing elsewhere" but "[n]otwithstanding, we continued financing all these receivables ([$37 million]) which were not taken off the aging."  (Id.).

On June 18, 2007, Stipes advised Kachkar in a telephone conversation that Westernbank "was demanding that the Kachkars immediately execute the Collateral Deficiency Letter and deliver the $70 million limited guarantee."  (Id., ¶ 107).  Stipes did not disclose to Kachkar that the bank was in the process of preparing to institute an administrative receivership proceeding in the UK or that it was discussing declaring the Inyx loans impaired.  (Id.).  Kachkar responded that he "would sign the Collateral Deficiency Letter and provide the [$70 million] Limited Guarantee when the Bank executed a working capital commitment letter . . . embodying the parties' prior agreement."  (Id., ¶ 108).

On June 19, 2007, Westernbank declared the Inyx Loans to be impaired.  That evening, Stipes and other bank representatives informed counsel for the Kachkars, Enzo Barichello – without

---

[7] See also Docket No. 223-19.

disclosing to the Kachkars[8] the decision to declare the loans impaired – "that the documents had to be signed by midnight because the Bank needed to issue a press release and had to answer to the Audit Committee." (Id., ¶¶ 110-11).  On June 20, 2007, the Kachkars executed the $70 million limited guarantee (the "Second Personal Guarantee")[9] and the Collateral Deficiency Letter.  (Id., ¶ 113).

The Second Personal Guarantee provided that "the liability of Guarantors for the entire Guaranteed Obligations shall mature and become immediately due and payable upon the Obligations becoming due under the Loan Agreement, whether at maturity, by acceleration or otherwise." (Docket No. 223-13, §§ 2(b), 4).  The Guarantee contained a no-reliance clause and an integration clause.  (Id., §§ 2(b), 12).  In signing the Second Personal Guarantee, Kachkar and Benkovitch acknowledged that the Inyx Borrowers were "'out of formula' under the Loan Agreement" and that there was a "substantial collateral deficiency thereunder." (Id., p. 1).  Further, they acknowledged that Westernbank "has the right, under the Loan Agreement and [Personal Guarantees] at this time to make demand for immediate payment of all amounts due under the Loan Agreements." (Id.).  The Guarantee provided that Kachkar and Benkovitch "requested that [Westernbank], in its sole discretion, not at this time make immediate demand for payments . . . [and Westernbank] has agreed not to make such demand at this time in exchange for [Kachkar and Benkovitch's] entering into this Guarantee." (Id.).  However, the Guarantee provided in the very next sentence that the Guarantors "agree and acknowledge that [Westernbank] may, at any time, hereafter, in its sole discretion, make such demand and nothing contained herein shall be or shall be deemed to be a waiver of [Westernbank's] right to make such demand at any time in the future." (Id., p. 1-2).

At the time they signed the Second Personal Guarantee and the Collateral Deficiency Letter, the Kachkars did not know of the loan impairment declaration and now claim that had they known, "they would not have signed the documents."  (Id.).  Defendants allege that both these documents

---

[8] The counterclaims do not make clear whether this information was disclosed to Barichello.

[9] See also Docket No. 223-13 ("Second Personal Guarantee") (together with the First Personal Guarantee, the "Personal Guarantees").

"reflect and evidence the forbearance protection that had been agreed to orally by the parties" but that the Working Capital Letter was not ready for execution by Westernbank at that time.  (Id., ¶¶ 114-15). Thus, "[b]ecause certain documents were not yet executed," the Kachkars and Westernbank agreed that the Second Personal Guarantee and Collateral Deficiency Letter would be held in escrow and "would only be released to the Bank upon the execution of the Working Capital Letter and the funding of the $6,000,000 of working capital."  (Id., ¶ 116).  Defendants allege that "[i]n breach of the Escrow Agreement," Westernbank and others "caused and allowed the escrowed documents to be released to Westernbank on or about June 21, 2007."  (Id., ¶ 117).  Defendants were then informed that the bank would not provide the Working Capital Letter or the $6 million until it had finished assessing the Kachkars' mining assets.  (Id.).

On June 22, 2007, Kachkar telephoned Stipes and Vázquez to "complain about the improper release of the documents from escrow" and demanded that either the documents be returned to escrow or that the bank sign the Working Capital Letter and provide the $6 million immediately.  (Id., ¶ 118). Kachkar was informed that the delay was due to "'preliminary reports'" indicating that the mining assets were not as valuable as the bank initially believed.  (Id.).  According to the counterclaims, Westernbank "falsely claimed to be retaining an independent appraiser to determine the fair value." (Id.).  While the reports which Kachkar provided to Westernbank "substantiated" the "substantial value" of the mining assets, the bank, nonetheless, "used the mining valuation as a pretense to delay returning the improperly released Collateral Deficiency Letter and [Second Personal] Guarantee to the Kachkars."  (Id., ¶ 119).  However, the bank "never had any independent mining expert perform any good-faith appraisals of the mining efforts" and the bank's representation of that effort was "a complete sham designed to deceive Inyx and the Kachkars."  (Id.).  Defendants allege that the Kachkars "never would have agreed" to the Personal Guarantees and other collateral agreements "if Westernbank had not agreed to the forbearance protection."  (Id., ¶ 120).  Indeed, the "entire basis" and "only logical reason" why the Kachkars made the guarantees and other pledges of personal assets "was in consideration for forbearance from Westernbank so that the Inyx Loans could be restructured."  (Id., ¶ 121).

On June 28, 2007, Westernbank placed all of Inyx's UK subsidiaries into administration receivership control in England in a UK proceeding. (Id., ¶ 122). Inyx claims that Westernbank instituted the proceeding "under false pretenses." (Id., ¶ 122). Further, Inyx complains that Westernbank had been planning to file the administration proceeding at the same time that Westernbank representatives "were also falsely and fraudulently representing to Inyx and the Kachkars that it would forbear from calling the Inyx Loans, and that it would provide Inyx with additional working capital." (Id., ¶ 124). According to Inyx, the Inyx Loans "were current in terms of principal and interest payments due under the loans up through the time that Administration was filed." (Id., ¶ 125). Further, the administration proceeding was "premised" upon a June 28, 2007 notice delivered to Inyx's UK subsidiaries (the "June 28 Notice") on the "very day" that the administration was filed, and "at virtually the same moment that the Administration was filed." (Id., ¶ 126). The June 28 Notice recited four "various Events of Default [that] are today outstanding" under the Loan Agreements.[10] (Docket No. 310-7). The June 28 Notice, the counterclaims indicate, "did not purport to accelerate any amounts due on the Inyx Loans, made no demand upon Inyx or its UK subsidiaries, and did not properly declare any 'Event of Default' under any of the Inyx Loan Agreements." (Id., ¶ 127). Instead, Westernbank did not demand payment of a purported collateral deficiency until the following day, June 29, 2007 (the "June 29 Demand"), and did not purport to accelerate the Inyx Loans until July 3, 2007 (the "July 3 Notice of Default and Demand"). (Id., ¶ 128).

The June 29 Demand stated that the amounts of the outstanding loans exceeded the amounts available under the two Loan Agreements, and demanded the payment of the excess amounts, totaling more than $87 million. (Docket No. 223-24, p. 1-2; see also Docket No. 223-25, p. 1-2). The July 3 Notice of Default and Demand stated that based on various events of default, all obligations under the Loan Agreements had been accelerated and had become due and owing, in the amount of over $142 million. (Docket No. 223-26, p. 2). The July 3 Notice of Default and Demand recited fourteen events

---

[10] Although the Notice itself was filed by Westernbank and not Inyx (Docket No. 310-7), the instant counterclaim incorporates the Notice by reference; Inyx had actual notice of it and relies on it to frame this counterclaim. Thus, this court may consider the Notice without converting Westernbank's motion to dismiss into a motion for summary judgment. Clorox Co., 228 F.3d at 32.

of default under the Loan Agreements.  (Id., p. 3).

The counterclaims explain that Inyx's UK subsidiaries were "the major revenue generators of Inyx's overall business" and "absolutely essential to Inyx's operation as a going concern," and consequently, the administration "set off a chain reaction of insolvency proceedings relating to each and all of Inyx's other subsidiaries."  (Docket No. 398, ¶ 129).  In particular, Inyx's U.S. subsidiaries filed for bankruptcy protection in Delaware on July 3, 2007, and Inyx Canada was placed in receivership by Westernbank on July 20, 2007.  (Id.).

Both Inyx and Kachkar were creditors of the UK subsidiaries, and therefore had rights in the administration.  (Docket No. 398, ¶ 131).  As part of the administration, the UK administrators put Inyx Pharma and Ashton on the market for sale to the highest bidder.  (Id., ¶ 133).  In an August 30, 2007 letter, Kachkar submitted an offer to purchase both Inyx Pharma and Ashton at a price of 105% of the highest offer received from any other party.  (Id., ¶ 134).  The administrators "rejected Dr. Kachkar's proposal out of hand" and filed a motion with the English court seeking a ruling that they would not be held liable to the companies' creditors for refusing to sell the companies to Kachkar at the proposed price.  (Id., ¶ 135).  However, the English Court "refused to rule that the Administrators could not be held liable to creditors of the UK subsidiaries for refusing to deal with Dr. Kachkar."  (Id., ¶ 136).  Inyx Pharma and Ashton were subsequently sold by the administrators to third parties at a price lower than Kachkar "would have paid to acquire each of them."  (Id., ¶ 137).

Defendants bring claims for (1) breach of contract for breach of the Oral Forbearance Agreement; (2) (by Jack Kachkar and Inyx) breach of contract for breach of the Confidentiality Agreement; (3) unjust enrichment; (4) (by Inyx) fraudulent inducement with respect to Inyx's $2.5 million Inyx Note and $2.5 million Mortgage and Security Agreement; (5) fraudulent inducement with respect to the Oral Forbearance Agreement, including the Kachkars' and Inyx's entering into the Personal Guarantees, agreements related to their real property interests, and the Collateral Deficiency Letter; (6) (by the Kachkars) fraudulent inducement for entering into the Personal Guarantees, agreements related to their real property interests, and the Collateral Deficiency Letter; (7) conversion related to Westernbank's interests in assets and real property belonging to the Kachkars and Inyx; (8)

(by Inyx) breach of contract for breach of the Inyx Loan Agreements; (9) (by Inyx) breach of the implied covenant of good faith and fair dealing; (10) rescission of instruments relating to Inyx's $2.5 million note and mortgage documents and the Kachkars' Personal Guarantees, agreements related to their real property interests, and the Collateral Deficiency Letter; (11) slander of title relating to Westernbank's recordation of Inyx's and the Kachkars' mortgages in the public records of Miami-Dade County, Florida; (12) (by Jack Kachkar) intentional interference with contractual relations relating to the Strategic Partnership Agreement with Gadhafi; (13) (by the Kachkars) breach of the Escrow Agreement; (14) (by the Kachkars) breach of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").[11]  (Id., ¶¶ 138-215; Docket No. 397, ¶¶ 134-216).

Westernbank moved to dismiss the counterclaims (Docket No. 427), defendants opposed (Docket No. 443), and Westernbank replied (Docket No. 477).

## DISCUSSION

### I.    Standard of Review

Westernbank moves to dismiss the counterclaims under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court recently held that to survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). This decision "retire[d]" the prior standard, 550 U.S. at 563, under which a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Even under the new framework, however, a court should "accept well-pled factual allegations in the complaint as true and make all reasonable inferences in the plaintiff's favor." Miss. Public Employees' Retirement

---

[11] Benkovitch shares all of Kachkar's counterclaims except the two relating to the Strategic Partnership Agreement with Gadhafi, and she does not make any counterclaims that Kachkar does not share; though the claims relating to collateral necessarily differ as to which collateral each individual put up, the causes of action are the same. In the interest of efficiency, I will cite to Kachkar's counterclaims (see Docket No. 397) when referring to both Kachkar's and Benkovitch's counterclaims; I will not cite separately to Benkovitch's counterclaims. (See Docket No. 396). All findings, holdings, and recommendations I make in reference to Kachkar's counterclaims apply also to Benkovitch's parallel counterclaims.

System v. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008).

While a complaint need not contain detailed factual allegations in order to withstand dismissal, a litigant's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal citation and alteration omitted). The court need not accept as true legal conclusions from the complaint or "naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 557) (internal alteration omitted); Maldonado v. Fontanes, 568 F.3d 263, 267 (1st Cir. 2009). The complaint must allege enough factual content to nudge a claim across the line from conceivable to plausible. Iqbal, 129 S.Ct. at 1952 (citing Twombly, 550 U.S. at 570). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 1949 (citing Twombly, 550 U.S. at 556). The court's assessment of the pleadings is context-specific, requiring the court "to draw on its judicial experience and common sense." Id. Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but has not shown, that the pleader is entitled to relief. Id. (quoting Fed. R. Civ. P. 8(a)(2)); Maldonado, 568 F.3d at 268.

In addition, on a motion to dismiss a claim grounded in fraud, the claim must comply with the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009). This standard means that a complaint must specify the time, place, and content of an alleged false representation; conclusory allegations are insufficient. U.S. ex rel. Gagne v. City of Worchester, 565 F.3d 40, 45 (1st Cir. 2009) (Gagne) (citing U.S. ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 731 (1st Cir. 2007)). The standard applies to state law fraud claims asserted in federal court. Cardinale, 567 F.3d at 13 (citing Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 427 (1st Cir. 2007)); Generadora de Electricidad Del Caribe, Inc. v. Foster Wheeler Corp., 92 F. Supp. 2d 8, 18 (D.P.R. 2000) (for fraud claim brought under diversity, state law governs substantive issues while federal law governs pleading procedure and requirements).

## II.      Analysis

### A.      Choice of law

The parties dispute whether Puerto Rico or Florida law should apply to the counterclaims. Jurisdiction over the counterclaims in this case is grounded in diversity of citizenship since none of the counterclaims involves a federal question.  Therefore, the choice-of-law principles of the forum, Puerto Rico, apply.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).

Westernbank argues that because the counterclaims closely relate to a number of written agreements, the choice-of-law clauses contained in those agreements apply to the counterclaims. (Docket No. 427, p. 8).  In particular, Westernbank looks to the choice-of-law provisions in the Inyx Loan Agreements, noting that most of defendants' counterclaims arise, directly or indirectly, out of the Inyx Loan Agreements.  (Docket No. 443, p. 11; Docket No. 223-6, § 11.1(a) [USA Loan Agreement]; Docket No. 223-9, § 11.1(a) [UK Loan Agreement]).  The choice-of-law clauses in these agreements were drafted broadly, contemplating many different types of claims, and indeed defendants have made just such a variety of counterclaims.  The choice-of-law clause in the USA Loan Agreement provides that Puerto Rico law applies to "[t]he validity, interpretation and enforcement of this Agreement and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto with respect thereto, whether in contract, tort, equity or otherwise . . . (without giving effect to principles of conflicts of law)."  (Docket No. 223-6, § 11.1(a)).  Nearly identical choice-of-law clauses appear in the UK Loan Agreement (Docket No. 223-9, § 11.1(a)) and the Personal Guarantees.  (Docket No. 223-12, § 9(a) [First Personal Guarantee]; Docket No. 223-13, § 9(a) [Second Personal Guarantee]).  The Inyx Loan Agreements define "Finance Agreements," in turn, "[to] mean, collectively, this Agreement and all notes, guarantees, security agreement documents and instruments now or at any time hereafter executed and/or delivered by Borrower or any Obligor in connection with this Agreement, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced."  (Docket No. 223-4, § 1.27 [USA Loan Agreement]; Docket No. 223-9, § 1.29 [UK Loan Agreement]).

Defendants argue that this court should ignore the parties' contractual choice of law and apply the "dominant contacts" doctrine to determine what law governs the counterclaims. (Docket No. 443, p. 10-11). Defendants' argument is unavailing. This court has held that the dominant contacts doctrine applies only in the absence of a choice-of-law clause; where such a clause exists, it is deemed valid and reasonable unless the party opposing its applicability establishes otherwise, a burden defendants have not met here. Odishelidze v. Agora, Inc., 1996 WL 655787, at *1 (D.P.R. Oct. 31, 1996); see also Usine à Glace Nationale, S.A. v. Pepsi Cola Mktg. Corp., 206 F. Supp. 2d 253, 255 (D.P.R. 2002).

Moreover, under Puerto Rico law, a choice-of-law clause will be invalidated only if either (1) the chosen state lacks a substantial relationship to the parties or transaction or there is no reasonable basis for the parties' choice, or (2) application of the law of the chosen state would be contrary to the fundamental public policy of a state with a materially greater interest than the chosen state in the determination of a particular issue. Shelley v. Trafalgar House Pub. Ltd. Co., 918 F. Supp. 515, 521 (D.P.R. 1996) (citing Restatement (Second) of Conflicts § 187 (1971)). Defendants do not dispute that Puerto Rico has a substantial relationship to the parties; Westernbank is headquartered in Puerto Rico, and that is enough. See Dykes v. DePuy, Inc., 140 F.3d 31, 40 (1st Cir. 1998) (applying Massachusetts law that designated state must have "some substantial relation to the contract"). Defendants argue that Florida has a materially greater interest than Puerto Rico in the determination of the counterclaims, but they have not sufficiently stated what fundamental Florida public policy is violated by applying Puerto Rico law.[12]  As there are no grounds for invalidating them, this court will enforce the choice-of-law clauses in the various written agreements, up to the full breadth of claims they were drafted to encompass.

_____

[12] Defendants argue that Florida's "banking statute of frauds," unlike Puerto Rico's statute of frauds, permits proving oral agreements through testimonial evidence, and that Florida has "a strong policy interest" in the recognition and enforcement of the Oral Forbearance Agreement. (Docket No. 443, p. 11). Assuming arguendo that this is an accurate statement of each forum's law, the mere fact that Puerto Rico's law is dissimilar to Florida's does not mean that applying the former contravenes the latter's public policy, and defendants do not cite any affirmative policy pronouncements by the Florida legislature in support of their claim. Moreover, this argument applies only to the counterclaims involving breach of the Oral Forbearance Agreement; defendants have made no public policy arguments regarding choice of law for the counterclaims unrelated to that alleged agreement.

It is clear from the comprehensive drafting of the definitions and choice-of-law clauses in the

Inyx Loan Agreements that Puerto Rico law governs any dispute arising out of the relationship between

the parties, in contract, tort,[13] equity, or otherwise, with respect to the Inyx Loan Agreements, the

Personal Guarantees, the Inyx Note, the Inyx Mortgage and Security Agreement, the Kachkar

Mortgages, and the Collateral Deficiency Letter, as well as the "validity, interpretation, and

enforcement" thereof.   Altogether, the choice-of-law clause is broad enough to encompass the

counterclaims involving these various written agreements.   Even were the "dispute arising out of"

language not broad enough to cover them, the term "enforcement" covers the counterclaims for breach

of contract and the implied covenant of good faith and fair dealing, while the term "validity" covers

the counterclaims for fraudulent inducement,[14] rescission, and slander of title (since whether the

recordation of the mortgages was slanderous depends in part on their invalidity).   The counterclaims

_____

[13] Defendants note case law from this court, relying on other jurisdictions' reasoning, that "contractual choice of law clauses do not encompass tort causes of action." Shelley, 918 F. Supp. at 521-22. However, the contractual clause at issue in Shelley encompassed only the agreement itself. Id. at 523. Tort actions fall outside of contractual choice-of-law clauses where the choice-of-law clause is written to be narrow and limited to actions on the contract itself. Neuro-Rehab Assocs. v. Amresco Commercial Fin., L.L.C., 2006 WL 1704258, at *9 (D. Mass. June 19, 2006) (citing and distinguishing Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co., 986 F.2d 607, 611 (1st Cir. 1993)). But a number of courts have held that where "the fair import of the provision" shows that the parties intended to include tort, then the contracting parties' tort claims do fall under the choice-of-law clause. Jiffy Lube Intern., Inc. v. Jiffy Lube of Pa., Inc., 848 F. Supp. 569, 576 (E.D. Pa. 1994); Cerabio LLC v. Wright Med. Tech., Inc., 410 F.3d 981, 987 (7th Cir. 2005); see also Travel Servs. Network, Inc. v. Presidential Fin. Corp. of Mass., 959 F. Supp. 135, 146 (D. Conn. 1997) (citing Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309-10 (2d Cir. 1994)). Here, the phrasing "any dispute . . . whether in contract, tort, equity or otherwise" clearly encompasses tort claims.

[14] According to the Restatement (Second) of Conflict of Laws, the choice-of-law clause in a contract governs a fraudulent inducement claim relating to that contract except when it is alleged that the choice-of-law clause itself was fraudulently induced; defendants do not allege that this was the case here. Restatement (Second) of Conflict of Laws § 201 & cmt. c (1971).  I believe the Puerto Rico Supreme Court would adopt section 201 were it to consider it (which to date it has not), since the Court has consistently resorted to the Restatement for guidance in resolving pertinent legal issues. Beatty Caribbean, Inc. v. Viskase Sales Corp., 241 F. Supp. 2d 123, 128 (D.P.R. 2003) (citing cases). Furthermore, it is appropriate to rely on sources outside the Court when it has not yet addressed a certain legal issue, Rodriguez-Suris v. Montesinos, 123 F.3d 10, 13 (1st Cir. 1997), and several other courts have adopted section 201's conflict-of-laws principle. See, e.g., Mazzoni Farms, Inc. v. E.I. DuPont de Nemours & Co., 761 So.2d 306 (Fla. 2000); Elgar v. Elgar, 679 A.2d 937, 942 (Conn. 1996); Fuku-Bonsai, Inc. v. E.I. Du Pont de Nemours & Co., 187 F.3d 1031, 1033 n.3 (9th Cir. 1999) (applying Delaware law).  Therefore, I find that the fraudulent inducement counterclaims are governed by the parties' choice of Puerto Rico law.

for unjust enrichment and conversion qualify as "disputes arising out of" the written agreements underlying those claims.   Moreover, the term "Finance Agreements" as used in the agreements encompasses all of the contracts for collateral that Inyx and the Kachkars put up "in connection with" the Inyx Loans.

By operation of the Inyx Loan Agreements' choice-of-law clauses, Puerto Rico law also governs "[t]he validity, interpretation and enforcement of," and "any dispute arising out of the relationship between the parties" with respect to, the Oral Forbearance Agreement and the Escrow Agreement. These do not contain choice-of-law clauses, but they directly relate to the written Agreements.   In particular, the alleged Oral Forbearance Agreement is an agreement to forbear from calling the Inyx Loans (Docket No. 397, ¶ 135), and thus may be viewed as "arising out of" the Inyx Loan Agreements for purposes of the choice-of-law analysis.   Similarly, the alleged Escrow Agreement was an agreement to hold in escrow the Second Personal Guarantee and the Collateral Deficiency Letter, both of which are governed  by the Inyx Loan Agreements' choice-of-law clause, and thus may be viewed as indirectly "arising out of" those agreements.  (Docket No. 397, ¶ 193).   Moreover, as mentioned, the Second Personal Guarantee itself contains a choice-of-law clause similar to the Inyx Loan Agreements' clause, stating that Puerto Rico law governs "any dispute arising out of the relationship between any of Guarantors and Lender, whether in contract, tort, equity or otherwise." (Docket No. 223-13, § 9(a)). Therefore, Puerto Rico law directly governs the Escrow Agreement counterclaim by operation of the Second Personal Guarantee's choice-of-law clause.

As to the alleged oral Confidentiality Agreement, unlike the other written agreements to which Kachkar was a party, the underlying Strategic Partnership Agreement that was to be kept confidential involved Kachkar and Saadi Gadhafi, not Kachkar and Westernbank.  (Docket No. 398, ¶¶ 57, 59, 63-64).  However, one specific, key purpose of the business partnership between Kachkar and Gadhafi was the repayment of the Inyx Loans, to be funded by Sahara Bank.  (Id., ¶¶ 57, 58, 61).  Indeed, the reason Westernbank's officers were informed of the Partnership Agreement was that it was Westernbank that ultimately stood to receive money from Sahara Bank.  (Id., ¶¶ 58, 61, 65).  In this manner, the counterclaims concerning the Confidentiality Agreement also involve a "dispute arising out of the

relationship between the parties" to the Loan Agreements, and thus fall within the ambit of the broadly-drafted choice-of-law clauses in those Loan Agreements.

Accordingly, I find that pursuant to the parties' choice of law, Puerto Rico law governs the following counterclaims: (1) defendants' counterclaims for breach of the Oral Forbearance Agreement (Docket No. 397, ¶¶ 134-40; Docket No. 398, ¶¶ 138-44); (2) Kachkar's and Inyx's counterclaims for breach of the Confidentiality Agreement (Docket No. 397, ¶¶ 141-50; Docket No. 398, ¶¶ 145-53); (3) Kachkar's counterclaim for intentional interference with contractual relations (Docket No. 397, ¶¶ 151-55); (4) defendants' counterclaims for unjust enrichment (Docket No. 397, ¶¶ 156-62; Docket No. 398, ¶¶ 154-60); (5) defendants' counterclaims for fraudulent inducement (Docket No. 397, ¶¶ 163-86; Docket No. 398, ¶¶ 161-77); (6) defendants' counterclaims for conversion (Docket No. 397, ¶¶ 187-91; Docket No. 398, ¶¶ 178-82); (7) Inyx's counterclaim for breach of the Inyx Loan Agreements (Docket No. 398, ¶¶ 183-98); (8) Inyx's counterclaim for breach of the covenant of good faith and fair dealing implied in the Inyx Loan Agreements (Docket No. 398, ¶¶ 199-202); (9) the Kachkars' counterclaims for breach of the Escrow Agreement (Docket No. 397, ¶¶ 192-96); (10) defendants' counterclaims for rescission of instruments (Docket No. 397, ¶¶ 197-201; Docket No. 398, ¶¶ 203-08); and (11) defendants' counterclaims for slander of title (Docket No. 397, ¶¶ 202-08; Docket No. 398, ¶¶ 209-15). The one remaining counterclaim, the Kachkars' FDUTPA counterclaim, is by definition governed by Florida law.  (Docket No. 397, ¶¶ 209-16).

> **B.      Breach of the Oral Forbearance Agreement**

Westernbank first argues that defendants' claim for breach of the Oral Forbearance Agreement is barred under Puerto Rico's version of the statute of frauds.  The Puerto Rico statute of frauds rule precludes a party from proving the existence of commercial contracts over $300 based solely on testimonial evidence. 10 L.P.R.A. § 1302 (2006) ("section 1302").  Pursuant to this rule, this court has refused to enforce an alleged oral loan agreement where the plaintiff could not furnish any non-testimonial evidence that its counter-party, a bank, had consented to the alleged agreement. Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B., 954 F. Supp. 438, 454 (D.P.R. 1996) ("this article

[section 1302] attempts to foster security in commercial transactions by promoting the use of more formal instruments"), aff'd, 122 F.3d 88 (1st Cir. 1997).

Defendants respond that the Oral Forbearance Agreement was not a commercial contract and that the statute of frauds therefore does not apply. However, the analysis in Garita Hotel demonstrates that the agreement should be considered a commercial contract as a matter of law. First, "[t]here is some authority supporting the view that any loan to which a bank is a party should be considered a commercial loan," Garita Hotel Ltd. P'ship, 954 F. Supp. at 452, although the Puerto Rico Supreme Court has not definitively spoken on this issue. See Pescaderia Rosas, Inc., v. Lozada Rivera, 116 P.R. Dec. 474, 481 n.8, 16 P.R. Offic. Trans. 579 (1985) ("As to bank loans, which have caused a controversy, we are not expressing ourselves on this occasion"). Also, the Puerto Rico Commercial Code provides that "a loan shall be considered commercial if [both of] the following conditions are present: (1) That one of the contracting parties is a merchant. (2) When the articles loaned are destined to commercial transactions." 10 L.P.R.A. § 1651 (2006). Here, banks are "merchants" for purposes of the Commercial Code. 10 L.P.R.A. § 1001 (2006). See also Garita Hotel Ltd. P'ship, 954 F. Supp. at 452. Furthermore, Inyx does not – and cannot – dispute that the funds loaned to it by Westernbank are "destined to commercial transactions." While the Commercial Code does not include a "doctrinary definition" of "commercial transaction," the Puerto Rico Supreme Court has explained that "[t]he factors that define the commercial or civil nature of a transaction vary on a per-case basis." Pescaderia Rosas, Inc., 116 P.R. Dec. at 479, 16 P.R. Offic. Trans. 579. Nonetheless, commercial transactions share the "common element[s]" of "their purpose, their connection with commercial traffic, their frequency, [and] their approach to the exchangeable value of things." Id. The USA Loan Agreement at issue here specifically provides that it is entered into for the purposes of "provid[ing] such credit facility to be used in part to pay the purchase price of such business and assets" of Inyx's purchase of Aventis Pharmaceutical Puerto Rico, Inc. (Docket No. 223-4, p. 6). This is certainly a "commercial transaction," and by extension, any agreement by Westernbank to forbear on calling that loan was also commercial in nature. Therefore, the alleged Oral Forbearance Agreement is subject to the Puerto Rico statute of frauds.

As mentioned, Puerto Rico's statute of frauds provides that for commercial contracts, "the testimony of witnesses shall not be sufficient to prove the existence of a contract the amount of which exceeds three hundred dollars, unless such testimony concurs with other evidence." 10 L.P.R.A. § 1302.  However, the exception to the statute of frauds – allowing oral contracts to be proven by testimonial evidence if "such testimony concurs with other evidence" – precludes dismissal on a 12(b)(6) motion based on the statute of frauds defense.  Cf. Vila & Hnos., Inc. v. Owens Illinois de P.R., 117 P.R. Dec. 825, 17 P.R. Offic. Trans. 987 (1986) (alleged oral agreement fails to satisfy the statute of frauds where "[t]here is no other type of evidence of record, aside from the oral evidence that proves the existence of the financing contract").  In other words, defendants must be provided an opportunity to provide such "other evidence" before a statute of frauds argument will defeat their claim.  Therefore, the statute of frauds does not provide a basis for dismissal at this time.

Westernbank next argues that Puerto Rico law and the terms of the Loan Agreements themselves preclude enforcement of the alleged Oral Forbearance Agreement because that agreement could not have modified the parties' Loan Agreements.  In particular, the Loan Agreements contain no-oral-modification clauses providing that "neither this Agreement nor any provision hereof shall be amended, modified, waived, or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of [Westernbank]."  (Docket No. 223-6, § 11.3; Docket No. 223-9, § 11.3).  In addition, the no-oral-modification clause extends to "any provision" of the agreement, and thus, by its terms, the no-oral-modification clause itself may not be waived orally.  Courts applying Puerto Rico law have enforced no-oral-modification clauses, rejecting attempts to alter the terms of written contracts based on alleged oral agreements.  See, e.g., Nike Int'l Ltd. v. Athletic Sales, Inc., 689 F. Supp. 1235, 1244 (D.P.R. 1988) (refusing to enforce alleged oral agreement where written contract provided that terms could be waived, changed, or otherwise modified only in writing); Freightliner, LLC v. P.R. Truck Sales, 399 F. Supp. 2d 57, 74 (D.P.R. 2005) (same).  Under Puerto Rico law, "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." 31 L.P.R.A. § 3471 (2006).  Thus, the

clear terms of the Loan Agreements preclude any oral modification such as that put forward by defendants.

Westernbank further argues that the alleged June 7, 2007 Oral Forbearance Agreement, even if it existed, would be invalid and unenforceable because it would have been superseded a few days later by the June 20, 2007 Second Personal Guarantee. The Second Personal Guarantee contains an integration clause providing that it "represents the entire agreement and understanding of the parties concerning the subject matter hereof, and supersedes all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written." (Docket No. 223-13, § 12). Therefore, Westernbank argues, any oral agreement was extinctively novated. As explained by this court, "[e]xtinctive novation has been defined as the extinction of an obligation by the creation of a new one destined to replace it; that is, the substitution of an obligation by another one."[15] Las Brisas, S.E. v. Dep't of Agric., FmHA, 8 F. Supp. 2d 141, 145 (D.P.R. 1998). Puerto Rico law provides that "[i]n order that an obligation may be extinguished by another which substitutes it, it is necessary that it should be so expressly declared, or that the old and new be incompatible in all points." 31 L.P.R.A. § 3242 (2006). Defendants argue that extinctive novation is not present because the obligations are not incompatible in all points. However, it is the first clause, not the second, of the disjunctive section 3242 which is operative here: because the Second Personal Guarantee states that it "supersedes all other prior agreements . . . whether oral or written," it is "expressly declared" that any obligation under the alleged Oral Forbearance Agreement was "extinguished." The Second Personal Guarantee states "that Lender has the right . . . at this time to make demand for immediate payment of all amounts due under the Loan Agreement and such guarantees" given by the Kachkars, but that "Lender has agreed not to make such demand at this time." (Docket No. 223-13, p. 1). The Second Personal Guarantee's forbearance language thus extinguishes any alleged oral forbearance obligation.

Even if this language is insufficient to "expressly declare[]" that any prior obligation has been

---

[15] Novation may also be modificative, having the effect of modifying rather than extinguishing the parties' original obligations. Las Brisas, S.E., 8 F. Supp. 2d at 145.

extinguished, the terms of the Second Personal Guarantee would serve to modify the alleged Oral Forbearance Agreement.  According to defendants, under the Oral Forbearance Agreement, "it was agreed that Westernbank would not call the Inyx Loans."  (Docket No. 398, ¶ 84).  In contrast, the Second Personal Guarantee provides that Guarantors "agree and acknowledge that [Westernbank] may, at any time, hereafter, in its sole discretion, make such demand and nothing contained herein shall be or shall be deemed to be a waiver of [Westernbank's] right to make such demand at any time in the future."  (Docket No. 223-13, p. 1).  Therefore, the express terms of the Second Personal Guarantee serve to modify any "blanket" forbearance agreement and specifically provide that Westernbank may call in the loans at any future time.  Therefore, the claim for breach of the alleged preceding Oral Forbearance Agreement must fail.

### C.     Fraudulent inducement

Defendants also bring counterclaims alleging that Westernbank fraudulently induced them to enter into agreements to provide additional collateral security, namely the Inyx Note and Mortgage and Security Agreement, the Kachkar Mortgages, the Personal Guarantees, and the Collateral Deficiency Letter.  (Docket No. 397, ¶¶ 163-86; Docket No. 398, ¶¶ 161-77).  Westernbank argues that these claims fail because: (1) they are barred by Puerto Rico's statute of frauds,[16] (2) they fail to meet Federal Rule of Civil Procedure 9(b)'s heightened pleading requirement, and (3) they are contradicted by the terms of the documents on which they are based, given the integration and no-reliance clauses in those documents.  (Docket No. 427, p. 5-6, 10-16, 21-22).  Defendants respond that the statute of frauds is no bar under either Puerto Rico or Florida law, that their claims meet the Rule 9(b) standard, and that any contradictory terms within the allegedly fraudulently-induced documents cannot defeat the claims

---

[16] Westernbank's arguments in support of this defense focus entirely on the counterclaim for breach of the alleged Oral Forbearance Agreement and do not separately address how the defense applies to the fraudulent inducement claims.  Indeed, the defense does not apply here.  Puerto Rico's statute of frauds prohibits a party from proving the existence of commercial contracts over $300 based solely on testimonial evidence.  10 L.P.R.A. § 1302.  Here, however, defendants merely allege that they were fraudulently induced to enter into written contracts whose existence is undisputed.

because fraudulently-induced contracts are voidable by the defrauded party.[17]  (Docket No. 443, p. 33-35).

The Puerto Rico Civil Code provides, "[t]here is deceit when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made."[18]  31 L.P.R.A. § 3408 (2006).  Fraudulent inducement may arise from the acts or omissions of one of the contracting parties.  P.C.M.E. Commercial, S.E. v. Pace Membership Warehouse, Inc., 952 F. Supp. 84, 92 (D.P.R. 1997) (emphasis added); Márquez v. Torres Campos, 111 P.R. Dec. 854, 871 (1982) (sustaining a finding of fraud when one of the contracting parties remained silent as to one important condition of the contract).  Moreover, "[i]n order that deceit may give rise to the nullity of a contract, it must be serious, and must not have been employed by both of the contracting parties."  31 L.P.R.A. § 3409 (2006).  If the fraud is "incidental," it gives rise only to a claim for indemnity of loss and damages.  Id.

Inyx alleges two counts of fraudulent inducement, the Kachkars three.  Two of the Kachkars' three claims overlap with Inyx's, differing only as to which collateral each party allegedly was induced to pledge.  Inyx's Count IV and the Kachkars' Count V allege that Frank Stipes's oral "representations, promises and assurances" of forbearance, and provision of additional working capital, "were knowingly false when made," and that these representations were intended to, and did, induce Inyx and the Kachkars to pledge additional collateral.  (Docket No. 397, ¶¶ 164-66; Docket No. 398, ¶¶ 162-64).  The second count common to the defendants (Inyx's Count V, the Kachkars' Count VII) restates the same allegations concerning Stipes's promises and also alleges that Stipes and Woods falsely stated that verbal promises are enforceable under Puerto Rico law.  (Docket No. 397, ¶¶ 177-85; Docket No.

---

[17]  Since Puerto Rico law applies to these claims, see Section II.A above, the court will not consider defendants' arguments that are predicated on Florida law.

[18]  The Spanish term "dolo" (deceit) as used in the Civil Code is a distinct concept from fraud: fraud is the "most heightened species" of the "dolo" genus, but not all "dolo" is fraud.  Foster Wheeler Corp., 92 F. Supp. 2d at 19.  But since "a fact pattern involving contract fraud will always involve 'dolo,'" and since Rule 9(b) applies to the fraud form of "dolo," id., I will use the term "fraud" in discussing Puerto Rico's "dolo" statutes while recognizing that the two concepts are distinct.

398, ¶¶ 168-76).  The Kachkars' third count (Count VI) alleges that Stipes and Vázquez, and therefore Westernbank and WHI, omitted to inform them as of June 18 and 19, 2007, that the Inyx Loans had been declared impaired by the bank and that the bank's Audit Committee was going to conduct a review of the bank's portfolio and lending practices.  (Docket No. 397, ¶¶ 101, 103, 107, 170-71).  The Kachkars allege the bank officers made these "material omissions" "intentionally," "with the intent of inducing the Kachkars to execute and deliver" their additional collateral, in violation of a "duty to disclose these omitted material facts."  (Id., ¶¶ 170-74).

Rule 9 provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  Under this heightened pleading standard for fraud, the claimant must specify the false statements and by whom they were made.  Id.; Cardinale, 567 F.3d at 13.  The counterclaims for fraudulent inducement thus must specify the time, place, and content of an alleged false representation; conclusory allegations are insufficient.  Gagne, 565 F.3d at 45; see also Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999).  In other words, the pleader must "specify the who, what, where, and when of the allegedly false or fraudulent misrepresentation."  Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).  The claimant also must identify the basis for inferring scienter;[19] "[t]he courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint *also* sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading."[20]  Cardinale, 567 F.3d at 13 (citing Greenstone v.

---

[19] Scienter is a mental state embracing intent to deceive, manipulate, or defraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).; Telerep Caribe, Inc. v. Zambrano, 266 F. Supp. 2d 284, 286 n.2 (D.P.R. 2003);

[20] While this standard may seem inconsistent with the second sentence of Rule 9(b), case law addressing the interaction of the rule's two sentences makes clear that a fraud claimant "cannot avoid the [first sentence's 'with particularity'] requirement simply through a general averment that defendants 'knew' earlier what later turned out badly.  Case law requires a [claimant] to do more. . . .  Were the law otherwise, a complaint could evade too easily the 'particularity' requirement in Rule 9(b)'s first sentence."  Greenstone, 975 F.2d at 25.

Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992), superseded by statute on other grounds, Private

Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737).  The complaint is

sufficient if it can "afford a basis for believing that plaintiffs could prove scienter."  Greenstone, 975

F.2d at 25 (internal citation and quotation omitted).  Claims brought on information and belief must

set forth the source of the information and the reasons for the belief.  Greebel, 194 F.3d at 194 (internal

citations and quotation omitted).

Measured by Rule 9(b), the first count (Inyx's Count IV, the Kachkars' Count V) is plainly

deficient.[21]  It does not state the time or place of Stipes's allegedly fraudulent representations: the claim

generally cross-references the facts section of the counterclaims (and all prior counterclaims already

pleaded), so the reference to "Stipes's representations, promises and assurances that the Bank would

forbear from calling the Inyx Loans, and would provide Inyx with additional working capital" could

denote either (or both) of the two meetings between plaintiff and defendants – the May 31, 2007,

meeting in Puerto Rico or the June 7, 2007, meeting in Miami.  (Docket No. 397, ¶¶ 163-64; Docket

No. 398, ¶¶ 161-62).  There is no indication in the counterclaim of which meeting the defendants mean

to invoke, or whether the counterclaim refers to some other conduct that did not occur during either

meeting.  The "where" and "when" of the factual "circumstances constituting fraud" thus have not been

stated with particularity.  Fed. R. Civ. P. 9(b); Alternative Sys. Concepts, 374 F.3d at 29.

Even if the allegations did fulfill "where" and "when" requirements, the claim still falls short

because, with regard to the scienter requirement, it does not go beyond a "general averment of the

defendant's 'knowledge' of material falsity."  Cardinale, 567 F.3d at 13.  Importantly, the fact that

---

[21] The counterclaim "repeats and realleges the allegations set forth" up to that point, then states, "Stipes'[s] representations, promises and assurances that the Bank would forbear from calling the Inyx Loans, and would provide Inyx with additional working capital, were knowingly false when made.  These knowingly false representations by Stipes were intended solely to induce [defendants] to pledge additional collateral security for the Inyx Loans. [Defendants] justifiably relied upon Stipes'[s] false and fraudulent representations, to their detriment, by pledging and providing to the Bank all of the additional collateral . . . .  Stipes made each and all of the above-described fraudulent misrepresentations in his capacity as an officer of Westernbank, and on its behalf."  (Docket No. 397, ¶¶ 163-68; see also Docket No. 398, ¶¶ 161-66).

Westernbank eventually called the Inyx loans and placed the UK Subsidiaries into administration in late June says nothing about the bank's intent several weeks beforehand, when the two meetings occurred.  Under Rule 9(b), a "party bringing a fraud claim must also demonstrate that the alleged act of fraud is more than a future prediction that later proved to be erroneous." Zambrano, 266 F. Supp. 2d at 286; Brisamar, Inc. v. Enright House, Ltd., 2005 WL 1215796, at *3 (D.P.R. May 20, 2005) (magistrate judge's report and recommendation) (internal citations omitted); see also Greenstone, 975 F.2d at 25 ("a general averment that defendants 'knew' earlier what later turned out badly" is insufficient).  Whatever statements the defendants are referring to, they do not meet their burden of demonstrating that Stipes's comments were fraudulent rather than merely erroneous in light of later events.  Alleging only that the statements were "knowingly false when made" is the very definition of a conclusory, deficient pleading for fraud.  See Cardinale, 567 F.3d at 13 (general averment of defendant's "knowledge" of material falsity inadequate unless specific facts alleged that make it reasonable to believe defendant knew statement was materially false or misleading).  Because their allegations do not meet the Rule 9(b) standard, Inyx's Count IV and the Kachkars' Count V should be dismissed.

The defendants' second counterclaim for fraud in the inducement, predicated on Westernbank's statements that oral contracts are enforceable under Puerto Rico law, as well as its further promises not to call the Inyx loans and to provide working capital, gives more specifics.  The counterclaims set forth the time and location of the meeting where the allegedly false representations were made: June 7, 2007, at Inyx's Miami office.  (Docket No. 397, ¶¶ 177-186; Docket No. 398, ¶¶ 168-77).  Again, however, the counterclaim fails to provide a sufficient basis for inferring scienter.  As with the first count, the claim generally cross-references the facts section of defendants' counterclaims.  (Docket No. 397, ¶¶ 86-94, 176; Docket No. 398, ¶¶ 90-98, 167).  The facts and the count itself state that Stipes told Kachkar that verbal agreements are enforceable under Puerto Rico law because Kachkar was "continu[ing] to demand a written [forbearance] agreement." (Docket No. 397, ¶¶ 90, 177; Docket No. 398, ¶¶ 94, 168).  The count alleges that Stipes and Woods made "[t]hese knowingly false

representations" about Puerto Rico law "with the wrongful intent of inducing Inyx and the Kachkars to pledge" additional collateral.  (Docket No. 397, ¶ 183; Docket No. 398, ¶ 174).  The factual allegations state, "[a]t no time did Stipes, Woods, or any other of the . . . Bank representatives reveal that Westernbank had no intention of honoring the oral [forbearance] agreement.  [They] wanted to avoid a clear written contract because, as is explained further herein, they had the intent to defraud the Kachkars and Inyx."  (Docket No. 397, ¶¶ 90-91; Docket No. 398, ¶¶ 94-95).

But this assertion in the factual allegations – to be "explained further" in defendants' counterclaims – that Westernbank never intended to honor the Oral Forbearance Agreement "is not itself supported with particulars that suggest scienter . . . ; no particulars are pleaded which would suggest the elements of fraud in the inducement." Cardinale, 567 F.3d at 13.  The "further explanation" could  refer to any part of the remaining forty-plus paragraphs of the defendants' factual allegations, or to the counterclaim itself.  This lack of specificity alone is enough to make the claim fall short under Rule 9(b), as with the first count above.  However, the court suspects the defendants' promise of "further explanation" may refer to the defendants' allegations that shortly after the June 7 meeting, the bank began preparing the administration proceeding and considering declaring the Inyx Loans impaired.  (Docket No. 397, ¶¶ 95-104; Docket No. 398, ¶¶ 99-107).  Yet even taking these allegations as true, the bank's actions in the two to three weeks *after* Stipes said at the June 7 meeting that oral agreements were legally enforceable are unpersuasive as a basis for inferring scienter *at the time*: that on June 7, 2007, Westernbank "feigned [its] original expressed intention" to honor the Oral Forbearance Agreement.  Cardinale, 567 F.3d at 13.  Any actions by the bank that happened later in a month full of fast-paced business negotiations and transactions do not "make it reasonable to believe that [Westernbank] knew that a statement was materially false or misleading" at the time of the Miami meeting.  Id.  As has already been discussed above, under Rule 9(b), "[a] party bringing a fraud claim must also demonstrate that the alleged act of fraud is more than a future prediction that later proved to be erroneous." Zambrano, 266 F. Supp. 2d at 286.  The defendants have not met this burden here, so their second fraud claim (Inyx's Count V, the Kachkars' Count VII) also should be dismissed.

The Kachkars, independent of Inyx, plead a third counterclaim (Count VI) alleging fraudulent inducement due to the Westernbank officers' "material omission" from their communications with the Kachkars of the fact that the Inyx Loans had been declared impaired by the bank, a fact the Westernbank officers knew as of June 19, 2007. (Docket No. 397, ¶ 170). They also allege fraudulent inducement in the bank officers' "purposefully and deceitfully omitt[ing] to inform" the Kachkars of the impending UK administration, as they would not have executed the additional collateral documents had they known; they "would have considered [the impending administration] important and material to their decision." (Id., ¶ 101). The Kachkars further allege that administration preparations had begun "at or before the time of the first WHI Audit Committee meeting," *i.e.*, June 12, 2007, and continued through the administration's filing on June 28. (Id., ¶ 96). Stipes contacted the Kachkars by telephone on June 18 to ask them to execute the additional collateral documents. (Id., ¶¶ 103, 109). The bank's counsel, Woods, called the Kachkars' counsel on the 19th after the loans had been declared impaired and urged them again to execute the documents. (Id., ¶ 106). When the Kachkars executed the two documents in Toronto on June 20, they still had not been informed of the loans' impairment. (Id., ¶ 109). If the Kachkars had known about the loan impairment declaration, they would not have signed the documents. (Id., ¶¶ 113, 172). The Kachkars allege that Westernbank "intentionally failed to disclose these facts to the Kachkars, with the intent of inducing the Kachkars to execute and deliver" the additional collateral. (Docket No. 397, ¶ 173).

The "who" (Stipes and Woods), "what" (the loans' impairment and the administration, by omission), and "when" (June 18 and 19, 2007) requirements of the heightened pleading standard thus are met. The "where" is unclear, as the Kachkars apparently were in Toronto at the time they and their counsel received the phone calls from Westernbank officers and counsel, who presumably were in Puerto Rico. However, I will decline to use a rigid interpretation of "place" and will accept "by telephone to Toronto" as a "place" where the representations were made. I find that these allegations state with sufficient particularity the circumstances of the alleged fraud under Rule 9(b). See Efrón v. Embassy Suites (P.R.), Inc., 47 F. Supp. 2d 200, 204 (D.P.R. 1999) (complaint sufficient where

plaintiff "briefly set forth the dates, contents, and circumstances surrounding each alleged incident of . . . fraud") (cited in Barron-Ruíz v. Am. Airlines, Inc., 2009 WL 3160971 (D.P.R. Sept. 29, 2009)).

Nevertheless, this counterclaim still must "afford a basis for believing that plaintiffs could prove scienter." Greenstone, 975 F.2d at 25). In the case of omissions, outside the special context of securities fraud, "a misleading omission[] is actionable as fraud . . . if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." Emery v. Am. Gen. Fin., Inc., 71 F.3d 1343, 1348 (7th Cir. 1995) (cited in Bonilla v. Volvo Car Corp., 150 F.3d 62, 69-70 (1st Cir. 1998)). Here, the Kachkars allege that Stipes's and Woods's omissions were made with fraudulent intent and that the Kachkars would not have signed the collateral documents had they known the omitted facts: that the bank was preparing the administration proceeding and had just declared the Inyx Loans impaired. (Docket No. 397, ¶¶ 172-73). The Kachkars' false belief that the Inyx Loans and the UK Subsidiaries were still on solid ground resulted in their taking an action – pledging collateral to Westernbank – which redounded to Westernbank's advantage but to the Kachkars' legal detriment. A reasonable fact-finder could conclude from these allegations that the Westernbank officers knew when they made the omissions that the omissions would induce the Kachkars' false belief and would mislead them into signing the collateral documents. These specific facts go beyond an inadequate "general averment of the defendant's 'knowledge' of material falsity." Cardinale, 567 F.3d at 13. Therefore, the Kachkars have sufficiently alleged a basis for inferring scienter, and their claim, unlike the other claims, passes muster under Rule 9(b).

Be that as it may, Westernbank presents an additional argument for dismissal of all of the fraudulent inducement claims, namely that defendants could not reasonably rely on any representation or omission by Westernbank given the integration and no-reliance clauses in the Personal Guarantees. The defendants respond that a fraudulently-induced contract is voidable by the party against whom the fraud was committed. Rodríguez v. Vuono, 757 F. Supp. 141, 149 (D.P.R. 1991); Brisamar, 2005 WL 1215796, at *4. Under Puerto Rico law, the party alleging fraud has the burden of demonstrating: (1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon;

(3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud.  31 L.P.R.A. § 3408;

P.R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 66 (1st Cir. 2008) (summary judgment

standard) (citing Microsoft Corp. v. Computer Warehouse, 83 F. Supp. 2d 256, 262 (D.P.R. 2000)

(motion to dismiss standard)).  The defendants have alleged false representations and omissions, intent,

and injury; however, the reliance alleged must be reasonable, or the claim does not make out a prima

facie case of fraud.

As Westernbank notes (Docket No. 427, p. 16), the Personal Guarantees contain an integration

clause.[22]  The identical clauses provide that each Guarantee "represents the entire agreement and

understanding of the parties concerning the subject matter hereof, and supersedes all other prior

agreements, understandings, negotiations and discussions, representations, warranties, commitments,

proposals, offers and contracts concerning the subject matter hereof, whether oral or written." (Docket

No. 223-12, § 12; Docket No. 223-13, § 12).  An agreement containing a clause such as this precludes

a party from claiming *reasonable* reliance on any "understandings" or "representations" that pre-dated

the agreement, where the agreement mentions nothing in accord with the allegedly fraudulent

misrepresentations.  Jackvony v. RIHT Fin. Corp., 873 F.2d 411, 415-16 (1st Cir. 1989) (reviewing

grant of directed verdict for defendant in securities fraud case).

In Kobatake v. E.I. DuPont De Nemours and Co., 162 F.3d 619, 625-26 (11th Cir. 1998), the

Eleventh Circuit held that on a motion to dismiss, a claim for fraudulent inducement by omission is

barred by a valid merger clause in a contract that does not contain the alleged misrepresentation.  The

plaintiffs and defendants had reached settlement agreements through their attorneys' negotiations,

"which took place near the end of extremely contentious litigation."  Id. at 626.  Pursuant to the terms

of the settlement agreements, the plaintiffs executed general releases, which contained merger clauses

providing that "[a]ll agreements and understandings between [plaintiff] and DuPont are embodied and

expressed herein" and "[plaintiff] signs this Release as its own free act, without any promise,

---

[22] The defendants do not allege that the no-reliance or integration clauses were themselves
induced by the alleged fraudulent representations and omissions.

inducement, or representation not fully expressed herein." <u>Id.</u> at 623.  After settling, the plaintiffs

discovered information that they alleged would have caused them to reevaluate the settlements; they

sued, alleging they were fraudulently induced into settling. <u>Id.</u> at 623, 626.  The plaintiffs attempted

to void the releases, arguing that the merger clauses did not apply because "defendants were obligated

to inform them of the information that would have caused them to reevaluate the settlements." <u>Id.</u> at

626.

The Eleventh Circuit rejected the fraudulent inducement argument as an "[a]ttempt[] to avoid

the plain language of the releases"; it held that the merger clauses were valid, so the plaintiffs could

not void the releases on the basis of fraudulent inducement. <u>Id.</u>  The court held the plaintiffs could not

void the releases because they, with the aid of counsel, had negotiated releases specifically providing

that the plaintiffs were executing them "without any promise, inducement, or representation not fully

expressed herein." <u>Id.</u> at 626-27.  The court also rejected the argument that the defendants had a duty

to disclose the undisclosed information because there was no evidence that the transaction was not an

arm's length transaction between professionals or that a relationship existed between plaintiffs and

defendants that would give rise to a duty to disclose, particularly in light of the negotiations the parties'

attorneys undertook to produce the settlements. <u>Id.</u> at 626.

The facts in <u>Kobatake</u> are similar to the case at bar: Kachkar was an experienced business

professional who, like Westernbank, was represented by counsel throughout the course of the

negotiations and transactions concerning collateral that took place in June 2007 between Westernbank

and the defendants.  The Kachkars' counterclaim for fraudulent inducement by omission alleges a duty

to disclose, but does not specify any legal or contractual relationship that would give rise to such a duty.

The allegations of the parties' course of dealings as set forth in the counterclaims clearly evince that

the executions of the Personal Guarantees and other collateral agreements were arm's-length

transactions between professionals.  The integration clause in the Guarantees, like the merger clause

in <u>Kobatake</u>, states that it represents the entirety of the agreement between the parties and excludes any

prior representations.   (Docket No. 223-12, § 15; Docket No. 223-13, § 15).

I find that in light of the integration clauses in the two Guarantees, the defendants cannot claim reasonable reliance on the Westernbank officers' statements or omissions as a basis for fraudulent inducement of the Guarantees. Therefore, the Kachkars' claim for fraudulent inducement by omission (Count VI) fails with regard to the Second Personal Guarantee. For the same reason, even had they met the Rule 9 pleading requirements, the Kachkars' other claims for fraudulent inducement (Counts V and VII), in which they claim "justifiable reliance" on Westernbank officers' statements in pledging the First Personal Guarantee and other collateral, still would fail with regard to that Guarantee. (Docket No. 397, ¶¶ 166, 185).

While the Personal Guarantees' integration clause operates to foreclose claims of fraudulent inducement of the Guarantees, its reach is limited to "the subject matter" of the Guarantees, and does not encompass the other collateral agreements made at the same time as the Guarantees. However, the no-reliance clause in the Guarantees, also noted by Westernbank (Docket No. 427, p. 15-16), is broader. (Docket No. 223-12, § 2(b); 223-13, § 2(b)). The identical clauses in the Personal Guarantees read, "[e]ach of Guarantors acknowledges that Lender has not made any representations to any of Guarantors with respect to Borrower, any other Obligor or otherwise in connection with the execution and delivery by Guarantors of this Guarantee and Guarantors are not in any respect relying upon Lender or any statements by Lender in connection with this Guarantee." (Id.). The Personal Guarantees thus waive the Kachkars' right to rely on Westernbank or its representations or statements "in connection with" the Guarantees, particularly in light of Kachkar's business sophistication and his representation by counsel. See, e.g., Vigortone Ag Prods. v. AG Prods., 316 F.3d 641, 645 (7th Cir. 2002) ("[s]ince reliance is an element of fraud, the ['no-reliance'] clause, if upheld – and why should it not be upheld, at least when the contract is between sophisticated commercial enterprises – precludes a fraud suit"); see also P.R. Elec. Power Auth., 515 F.3d at 67 ("Puerto Rico law places little weight on a sophisticated and experienced business party's assertion of unknowing reliance."). As mentioned, the First Personal Guarantee was executed contemporaneously with the Inyx Note and Mortgage and Security Agreement and the Kachkar Mortgages in the first round of collateral, and the Second Personal

Guarantee with the Collateral Security Letter in the second round.  The "in connection with" language is broad enough to encompass all of these agreements.  The same "Lender or any statements by Lender" underlie both the Guarantees and the other collateral.

The no-reliance clause thus precludes the defendants from claiming reasonable reliance on Westernbank in entering into *any* of the allegedly fraudulently-induced documents.  As above, even had the Kachkars' two claims for fraudulent inducement by affirmative statements met the Rule 9 pleading standard, the no-reliance clause in the First Personal Guarantee forecloses those claims.  Moreover, as Inyx also alleges "justifiable reliance" on the Westernbank officers' statements in its fraudulent inducement claims, those claims would likewise fail even had they met the Rule 9 pleading requirements.  (Docket No. 398, ¶¶ 164, 176).

In sum, the defendants cannot allege reasonable reliance on Westernbank's representations or omissions in light of the clear language of the no-reliance and integration clauses in the Personal Guarantees.  Because they do not allege an essential element of fraud in the inducement, all three fraudulent inducement counterclaims fail to state a claim upon which relief can be granted, regardless of whether they meet the Rule 9(b) pleading standard, and should therefore be dismissed.

    **D.**      **Breach of the Inyx Loan Agreements**

Inyx, independent of the Kachkars, asserts a counterclaim for breach of the Inyx Loan Agreements (Count VII).  (Docket No. 398, ¶¶ 183-98).  Inyx's theory appears to be that Westernbank breached the Loan Agreements by placing the UK Subsidiaries into administration later the same day it sent the June 28 Notice of the administration proceeding's commencement.  To this end, Inyx contends that before Westernbank could institute the administration proceeding, it was required to give Inyx notice of any alleged defaults by the UK Subsidiaries, demand payment of any collateral deficiency, and allow Inyx ten days to cure the defaults before they would become actual Events of Default under the Loan Agreements.  (Id.).

Section 10.2(b) of the UK Loan Agreement permitted Westernbank, "in its discretion and without limitation," to place Inyx's UK Subsidiaries in administrative receivership control only if "an

Event of Default exists or has occurred and is continuing." (Docket No. 223-9, §10.2(b)). The agreement further provides that an "Event of Default" exists when "any Borrower fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Financing Agreements . . . and such failure shall continue for ten (10) days, except that, such ten (10) day cure period shall not be applicable in the case of (A) any failure which cannot be cured at all or within such ten (10) day period, (B) intentional breach by a Borrower or (C) a failure which has been the subject of a prior failure within the preceding three (3) months." (Docket No. 223-5, § 10.1(a); Docket No. 223-9, § 10.1(a)) (emphasis in original). Westernbank contends that Inyx's counterclaim fails to adequately allege a breach of the foregoing language for several reasons, which I will address in turn.

Initially, Westernbank notes that Inyx's theory appears to assume that Westernbank could declare the UK Subsidiaries in default only if those subsidiaries were not current in terms of payments of principal and interest. (Docket No. 427, p. 24). However, the Cross-Default Agreement provides that any events constituting default under either of the Loan Agreements will be considered an Event of Default under the other. (Docket No. 223-10, p. 1). The Loan Agreements themselves define "Event of Default" to include numerous events other than nonpayment or default on debts. (Docket No. 223-5, §§ 10.1(a)-(m); Docket No. 223-9, §§ 10.1(a)-(o)). It therefore was not necessary either that the UK Subsidiaries be the particular Inyx Borrowers in default, or that the type of default be lack of payment, in order for Westernbank to declare those subsidiaries in default under the Loan Agreements and the Cross-Default Agreement. Even assuming as true Inyx's allegation that both Inyx Loan Agreements were current on principal and interest due to the bank, Westernbank still could – and did – declare other Events of Default. Indeed, the June 28 Notice lists several events of default apart from any payment failures of the UK subsidiaries,[23] any of which could potentially trigger a receivership by

---

[23] The notice lists the following outstanding Events of Default: "(a) a[n] intentional failure by one or more of the Chargors to pay all proceeds of getting in and realization of its book debts into a Receipts Account in breach of Clause 9.5 of one or more of the Security Agreements; and (b) a failure to comply with the financial covenants set out in Clauses 9.14, 9.15 and 9.17 of each of the Credit

operation of the Cross-Default Agreement.[24]

Next, the parties dispute whether the agreement required Westernbank to include a demand for payment in its June 28 Notice. As Westernbank correctly notes, the UK Loan Agreement provides no such requirement. Rather, the UK Loan Agreement provides that, "without limiting the foregoing, at any time an Event of Default exists or has occurred and is continuing, [Westernbank] may, in its discretion and without limitation . . . with or without judicial process or the aid of assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral, [or] . . . collect, foreclose, receive, appropriate, setoff and realize . . . any and all Collateral . . . ." (Docket No. 223-9, §10.2(b)). Given the foregoing language, Westernbank was not required to include a demand for payment in its Notice before instituting any administration proceeding.

The next matter of contention is whether Westernbank was required to grant Inyx ten days to cure any of the defaults recorded in the June 28 Notice, or whether such a cure period was inapplicable because one or more of the defaults were, as Westernbank contends, incurable within such ten-day period under an exception set forth in Section 10.1(a) of the Loan Agreements. Westernbank raises two types of argument with respect to whether this exception applies. First, Westernbank argues that the counterclaim failed to adequately plead as a "condition precedent" the facts that would make this exception inapplicable. Second, Westernbank contends that the complaint does not satisfy the "plausibility" standard under Twombly insofar as one or more of the events of default were clearly incurable due to Inyx's financial condition.

With respect to the first argument, Rule 9(c) provides, "[i]n pleading the performance or

_____

Agreements, which failure is not capable of remedy." (Docket No. 310-7). Clause 9.5 requires the Inyx Borrowers to maintain insurance on the collateral pledged. (Docket No. 223-9, § 9.5). Clause 9.14 requires the Inyx Borrowers to maintain working capital of not less than $5 million at all times. (Id., § 9.14). Clause 9.15 requires the Inyx Borrowers at all times to maintain an adjusted net worth of not less than $8 million and a tangible net worth of not less than $18 million. (Id., § 9.15). Clause 9.17 requires the Inyx Borrowers, during each fiscal year of the Loan Agreements' term, to have excess cash flow of not less than $4 million. (Id., § 9.17).

[24] Inyx does not deny that these "non-monetary covenant defaults" existed; it merely challenges whether they constituted proper "Events of Default" under the agreements. (Docket No. 398, ¶¶ 188).

occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred." Fed. R. Civ. P. 9(c). While liberal, the rule still requires the claimant to allege and show compliance with and performance of the contract and all conditions precedent, or to state waiver or excuse thereof. Jefferson Const. Co. v. U.S. for Use and Benefit of Bacon, 283 F.2d 265, 267, 267 n.2 (1st Cir. 1960), cert. denied, 365 U.S. 835 (1961); 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1303 at 326 (3d ed. 1998). Here, Inyx alleges that the defaults cited in the June 28 Notice "are non-monetary covenant defaults which, pursuant to Section 10.1(a) of the Loan Agreements, do not become actual 'Events of Default' unless and until the borrowers have failed to cure them within ten (10) days," and therefore the Inyx Borrowers were entitled to the cure period. (Docket No. 398, ¶¶ 188, 195, 197). Their claim does not explicitly "state compliance with the . . . condition[] precedent," *i.e.*, that the defaults were curable at all or within ten days. Jefferson Const. Co., 283 F.2d at 267. However, "the appropriate inquiry" for Rule 9(c) is whether the counterclaim "included an *adequate* 'general averment'" that Inyx has met all conditions precedent, even though the counterclaim never "explicitly alleged" compliance. Walton v. Nalco Chem. Co., 272 F.3d 13, 22 (1st Cir. 2001) (emphasis in original). Since the counterclaim extensively discusses the ten-day cure period, I find Inyx has adequately generally averred compliance with the Loan Agreements' condition precedent and has thus met its burden under Rule 9(c). (Docket No. 398, ¶¶ 183-98).

Westernbank's second argument is more substantial. Westernbank argues that the particular defaults which occurred here fall within the first condition, Section 10.1(a)(ii)(A),[25] because Inyx owed Westernbank nearly $140 million and would not have been able to repay that quantity in a ten-day

---

[25] Westernbank argues in its reply brief that the other two conditions, (B) and (C), also apply because "[i]t is uncontested that Defendants were in repeated default under the Loan Agreements on more than one occasion during the preceding three months (and so admitted in their 10[-]Q report dated November 30, 2006, and the [Second Personal Guarantee]), [and] that they were intentionally so." (Docket No. 477, p. 18). The June 28 Notice does state an intentional failure under Clause 9.5 (Docket No. 310-7), so the ten-day period was not required as to that default, pursuant to condition (B). However, a 10-Q report filed more than six months before the date of the Notice cannot show a prior failure within the preceding three months as required by condition (C).

period,[26] especially because Inyx had unsuccessfully sought refinancing for over six months prior to the June 28 Notice. (Docket No. 427, p. 26). The Loan Agreements' language requires only that the defaults be curable within ten days, not that the entire amount of the debt be repayable within that time. (See Docket No. 223-9, § 10.1(a)). Even so, under the particular defaults enumerated in the June 28 Notice, Inyx would have to meet the Agreements' requirements of maintaining $5 million in working capital, an $8 million adjusted net worth, an $18 million tangible net worth, and $4 million of excess cash flow in order to cure the defaults. (See supra n.21). Therefore, Westernbank reasons, Inyx's counterclaim does not meet the Twombly "plausibility" threshold, since Inyx admits in its counterclaims that it had sought financing from various sources for more than six months prior to the date of the Notice, but none of its inquiries had panned out. (Docket No. 427, p. 26-27; see also Docket No. 398, ¶¶ 51-52, 130). Inyx responds that this contention is an evidentiary argument not properly made on a motion to dismiss, and that no demand was made for Inyx to repay the Inyx Loans in full. (Docket No. 443, p. 40).

On a motion to dismiss, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Twombly, 550 U.S. at 556 (internal citation and quotations omitted). But even "accepting as true all well-pleaded factual averments and indulging all reasonable inferences in the plaintiff's favor," the court need not accept "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996). Inyx's counterclaim asserts that had it had the ten-day cure period, "Inyx would [have] had the ability to cure, and have cured the alleged defaults, to the extent that they in fact existed." (Docket No. 398, ¶ 197). As noted, Inyx's defaults were of clauses requiring the maintenance of many millions of dollars of working capital, excess cash flow, and adjusted and tangible net worth. Given the ample facts Inyx has alleged demonstrating its difficulties in finding financing outside Westernbank, the assertion that it would have cured the defaults within ten

---

[26] Westernbank's position accords with the June 28 Notice it sent to the defendants, which states that except with regard to Clause 9.5, the defaults are "not capable of remedy." (Docket No. 310-7).

days is just such an "unsupportable conclusion" that this court need not accept as true.

In particular, Inyx alleges that in late fall of 2006, Kachkar and Inyx's senior management began planning to replace the Westernbank financing. (Docket No. 398, ¶ 51). Inyx's management approached Goldman Sachs, HSBC, Credit Suisse, and "a number of other investment banks" about refinancing the Inyx Loans, and "[t]hese discussions continued well into 2007." (Id., ¶ 52). By the time the administration proceeding commenced on June 20, 2007, "Inyx was [still] pursuing financing options, with Goldman Sachs and others." (Id., ¶ 130). When Kachkar was in financing talks with Saadi Gadhafi, more than ten days passed between the execution of the Strategic Partnership Agreement on April 6, 2007 and Murabet's e-mailing Westernbank on April 18, 2007 that SG Holdings would be "ready, willing and able to repay the Inyx loans" – a mere statement of intent, not actual provision of funds. (Id., ¶¶ 57-61). That financing never materialized, as the partnership deal fell through. (Id., ¶ 67).

Inyx's own facts show that the allegation that Inyx could cure the UK Subsidiaries' defaults in ten days or less has no support at all. Rather, the facts point to the defaults being "failure[s] which cannot be cured at all or within [a] ten (10) day period" – as the June 28 Notice itself remarks. The defaults recorded in the June 28 Notice fall into an exception from the ten-day cure requirement set out in Section 10.1 of the UK Loan Agreement, so Westernbank did not breach the Loan Agreements by failing to give Inyx ten days to cure. Moreover, the lack of a cure period did not prevent the "non-monetary covenant defaults" from being actual "Events of Default" under the Loan Agreements. Westernbank declared outstanding Events of Default in the June 28 Notice, and by the terms of the Loan Agreements, the existence of such events allowed it to institute the administration receivership proceeding immediately, at its discretion.

In summary, even if every fact that Inyx alleges is true – that Westernbank did not give notice, demand payment, or allow ten days to cure the defaults which Inyx admits existed – none of these failures by the bank constitutes a breach of the Inyx Loan Agreements. For this reason, I do not credit Inyx's assertion that Westernbank's conduct "constituted willful misconduct and/or was grossly

negligent." (Docket No. 398, ¶ 196; Docket No. 443, p. 43). On a motion to dismiss, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555 (internal citation and quotation omitted). Therefore, Inyx's counterclaim for breach of contract must fail.

### E.    Breach of the implied covenant of good faith and fair dealing

In connection with its claim for breach of the Inyx Loan Agreements, Inyx asserts a counterclaim for breach of the implied covenant of good faith and fair dealing. (Docket No. 398, ¶¶ 199-202). Westernbank contends that the claim fails to state a cause of action under Puerto Rico law. (Docket No. 427, p. 27).

Westernbank first argues that there is no requirement of good faith in Puerto Rico contract law. It cites Article 1210 of the Civil Code, which states, "[c]ontracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfilment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law." 31 L.P.R.A. § 3375 (2006). Westernbank asserts, without any supporting citations, that this language merely "define[s] the nature of the underlying contractual obligation," so any breach thereof is breach only "of the contract, not of a distinct obligation." (Docket No. 427, p. 28).

This is incorrect. "Puerto Rican law imposes the duty of good faith performance on contracting parties." Adria Int'l Group, Inc. v. Ferré Dev., Inc., 241 F.3d 103, 108-09 (1st Cir. 2001) (citing An-Port, Inc. v. MBR Indus., Inc., 772 F. Supp. 1301, 1314 (D.P.R. 1991)). This requirement "in a contract is one of the general requirements of the system of law in Puerto Rico." An-Port, 772 F. Supp. at 1314 (citing Velilla v. Pueblo Supermarkets, Inc., 111 P.R. Dec. 585, 587-88, 11 P.R. Offic. Trans. 732 (1981)). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Adria Int'l Group, 241 F.3d at 108 (citing Restatement (Second) of Contracts § 205 cmt. a (1981)); see also Century Packing Corp. v. Giffin Specialty Equip. Co., LLC, 438 F. Supp. 2d 16, 26 (D.P.R. 2006).

It is plain, then, that although it is not termed an "implied covenant," good faith is a requirement in Puerto Rico contract law.  (Docket No. 443, p. 43).  The question, then, is whether Inyx's counterclaim sufficiently alleges breach of this requirement.  I find that it does not.  The counterclaim, which reincorporates Inyx's factual allegations and breach-of-contract counterclaim, alleges that in filing the UK Administration, Westernbank breached not only the parties' Loan Agreements, but also breached the "implied obligations of good faith and fair dealing."  (Docket No. 398, ¶¶ 183-201). Importantly, however, and as I discussed above at Section II.D, Westernbank's actions did not breach the Inyx Loan Agreements.  Moreover, Inyx's counterclaim fails to specify any act other than the filing of the UK Administration in support of the counterclaim, nor has Inyx attempted to explain how such a breach could occur if the filing of the Administration in fact complied with the terms of the agreement.  In short, while the placement of the UK Subsidiaries into administration may not have been consistent with Inyx's expectations, Inyx could not *justifiably* expect that Westernbank would refrain from contractually-permitted conduct.  To this end, Westernbank's actions were "faithful[] to an agreed common purpose" (the terms of the Loan Agreements), <u>Adria Int'l Group</u>, 241 F.3d at 108, and Inyx thus cannot meet an element of the good faith cause of action: conduct by one party inconsistent with the other party's justified expectations.  Accordingly, the counterclaim should be dismissed.

## F.      Unjust enrichment

The defendants allege (Kachkar's Count IV, Inyx's Count III) that Westernbank was unjustly enriched by the additional collateral that they pledged on June 7 and 20, 2007, in exchange for the bank's agreeing to forbear from calling the Inyx Loans; they further allege lack of an adequate remedy at law.  (Docket No. 397, ¶¶ 156-62; Docket No. 398, ¶¶ 154-60).

The five elements of an unjust enrichment claim are: "1) Occurrence of an enrichment.  2) A correlative loss (impoverishment).  3) A connection between the loss (impoverishment) and the enrichment.  4) Absence of cause to justify the enrichment.  5) Lack of a legal provision which precludes application of an enrichment without cause."  <u>Ortiz Andújar v. E.L.A.</u>, 122 P.R. Dec. 817, 22 P.R. Offic. Trans. 774, 780 (1988) (<u>Ortiz</u>).

Westernbank contends that the unjust enrichment claim fails because, under Puerto Rico law, an unjust enrichment claim may stand only where no other law applies to the case, and the defendants have made other claims (such as those for breach of contract and fraudulent inducement) based on the same facts as their unjust enrichment claim. In particular, "[w]hen there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration." 31 L.P.R.A. § 7 (2006). "[W]e are really talking of unjust enrichment when the laws have not foreseen a situation where a [transfer of property] occurs, which . . . cannot be rationally explained by the prevalent body of laws." Ortiz, 22 P.R. Offic. Trans. at 780. Defendants counter that they have argued their unjust enrichment claims in the alternative such that if the breach of contract and fraudulent inducement claims fail, there would be no adequate remedy at law and thus the unjust enrichment claims would stand.

Defendants incorrectly interpret unjust enrichment doctrine. As Westernbank correctly points out (Docket No. 427, p. 20), the doctrine applies only when there is no *applicable statute*, which is distinct from lack of a legal remedy. Unjust enrichment doctrine does not apply where there exists a legal provision that excludes its application, such as the existence of a contract that expresses the intentions of the parties. Ortiz, 22 P.R. Offic. Trans. at 787, 780 (doctrine inapplicable where transfer of property "has a valid cause, to wit: when there is a legal agreement or a will"); Garriga, Hijo, Inc. v. Cond. Marbella, 143 P.R. Dec. 927, 934 (1997) ("between [the parties] there exists a contract; the doctrine of unjust enrichment does not apply") (court's translation). The defendants' claims for breach of contract (namely, the Oral Forbearance Agreement), fraudulent inducement, and conversion all arise from the bank's ceasing to forbear on calling the Inyx Loans soon after the defendants had pledged additional collateral. These claims, which employ the same set of facts as the unjust enrichment claim, are all based on applicable statutes. That the defendants have failed to plead these claims adequately to survive the motion to dismiss, or that Westernbank's affirmative defenses have defeated them, does not render the underlying tort and contract laws inapplicable to the situation. Since several statutes are

applicable to the case at issue, the doctrine of unjust enrichment is precluded.  Furthermore, the

doctrine does not apply because contracts for the collateral also exist between the parties, detailing the

terms of the transfers of collateral, which were made in return for the bank's temporary forbearance.

Therefore, defendants' counterclaim for unjust enrichment should be dismissed.

### G.      Breach of the Escrow Agreement

The Kachkars allege that Westernbank violated an agreement that the Second Personal

Guarantee and the Collateral Deficiency Letter (the "Escrowed Documents") would be held in escrow

until Westernbank executed and delivered the Working Capital Letter.  (Docket No. 397, ¶¶ 192-96).

Westernbank, which denies the existence of the alleged agreement, argues that even if an oral[27] Escrow

Agreement had existed, it would be unenforceable pursuant to the Second Personal Guarantee's

integration clause[28] and no-oral-waiver clause.[29]  (Docket No. 427, p. 28-30).

---

[27]  This Escrow Agreement has not been produced by either the defendants or Westernbank, although Westernbank has introduced a handwritten escrow agreement and release dated June 7 and 8, 2007, respectively, that relate to other collateral security.  (Docket No. 223-17, 223-18).  The counterclaims do not allege whether the June 20 Escrow Agreement was in writing, merely that "it was agreed" that the documents would be escrowed.  (Docket No. 397, ¶¶ 112, 193).  Nor does the defendants' reply to the motion to dismiss challenge Westernbank's characterization of the agreement as oral, except for a reference to the agreement as a "document."  (Docket No. 443, p. 45).  Since the defendants' counterclaims have not alleged that there was a written agreement, I assume the Escrow Agreement was oral.  It is not clear whether Puerto Rico law demands that escrow agreements be in writing; however, the weight of authority from other jurisdictions supports the precept that an escrow agreement must be in writing, while only a few courts have held otherwise.  See 28 Am. Jur. 2d Escrow § 6 (2009) (collecting cases).  Even absent any legal requirement of a writing, if a writing is clearly required by a contract between the parties, that stipulation will be observed.  31 L.P.R.A. § 3471.

[28]  The integration clause provides: "This Guarantee represents the entire agreement and understanding of th[e] parties concerning the subject matter hereof, and supersedes all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written."  (Docket No. 223-13, § 12).

[29]  The "Amendments and Waivers" clause provides: "Neither this Guarantee nor any provision hereof shall be amended, modified, waived or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender.  Lender shall not by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its rights, powers and/or remedies unless such waiver shall be in writing and signed by an authorized officer of Lender.  Any such waiver shall be enforceable only to the extent specifically set forth therein.  A waiver by Lender of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which Lender would otherwise have on any future occasion, whether similar

Initially, it is not clear from the facts recited by the defendants whether they signed the Escrowed Documents before or after they learned that the Working Capital Letter was not ready, and thus whether the alleged oral Escrow Agreement arose before or after these documents were signed. (Docket No. 398, ¶¶ 113-17). The factual chronology is not outcome-determinative, however, since the Second Personal Guarantee's integration clause supersedes any oral agreement made prior to it, and the Guarantee's no-oral-waiver clause nullifies any oral agreement made after it.

As discussed regarding the breach of Oral Forbearance Agreement counterclaim, see Section II.B above, the Second Personal Guarantee's integration clause provides that the Guarantee "represents the entire agreement and understanding of th[e] parties concerning the subject matter hereof, and supersedes all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written." (Docket No. 223-13, § 12). While the defendants argue that the Escrow Agreement was an independent agreement unaffected by the integration clause, the clause's terms encompass escrow agreements. The Escrow Agreement constitutes an "oral" "agreement[]" or "understanding[]" "concerning the subject matter" of the Guarantee. (Id.). Therefore, if the oral Escrow Agreement was made before the documents to be escrowed were executed, it was superseded by the integration clause. Moreover, as discussed above, see Section II.B, the clause is broad enough to extinctively novate the Escrow Agreement since it expressly declares extinguished all prior agreements concerning that subject matter.

The result is the same if the Escrow Agreement was made subsequent to the execution of the Escrowed Documents. The Second Personal Guarantee's "Amendments and Waivers" clause forbids oral modifications or waivers of Westernbank's rights:

> Neither this Guarantee nor any provision hereof shall be amended, modified, waived or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of [Westernbank]. [Westernbank] shall not by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its rights . . . unless such waiver shall be in writing and signed by an authorized officer of [Westernbank].

in kind or otherwise." (Docket No. 223-13, § 8).

(Id., § 8).  As the alleged agreement to place the Escrowed Documents in escrow was necessarily an agreement to waive Westernbank's right to enforce the Guarantee against the Kachkars, the Escrow Agreement had to be in a signed writing.

In sum, the parties' own written agreement forecloses the Escrow Agreement from recognition, and accordingly, the defendants' counterclaim for breach of the Escrow Agreement should be dismissed.

###    H.    Conversion

The defendants plead counterclaims for conversion of the $2.5 million Inyx Note and mortgage on Inyx's real property, and of the Kachkars' Personal Guarantees and the Kachkar Mortgages. (Docket No. 397, ¶¶ 187-91; Docket No. 398, ¶¶ 178-82).  The defendants allege that Westernbank "wrongfully and maliciously" assumed these property interests and guarantees and refused to return them despite the defendants' "due demand."  (Id.).  The defendants now claim Westernbank converted all these security interests and guarantees, causing them monetary damages in the amount of the collateral's value and depriving them of the ability to sell the properties in the summer of 2007, which the defendants allege was "the top of the real estate market in south Florida."  (Docket No. 397, ¶ 191; Docket No. 398, ¶ 182).

Conversion in Puerto Rico is an intentional tort, a form of the fault described in Article 1802. Barretto Peat, Inc. v. Luis A. Ayala Colon Sucrs., Inc., 709 F. Supp. 321, 323 (D.P.R. 1989) (citing Fed. Ins. Co. v. Banco Popular de P.R., 750 F.2d 1095, 1100 (1st Cir. 1983)), aff'd, 896 F.2d 656 (1st Cir. 1990).  The existence of liability under Article 1802 requires (1) an act or omission caused through fault or negligence, (2) a damage suffered, and (3) a causal nexus between the damage and the other party's wrongful or negligent act.  Montalban v. Centro Com. Plaza Carolina, 132 D.P.R. 785, 795-96, 1993 WL 840023 (1993); Elba A.B.M. v. Univ. of P.R., 125 D.P.R. 294, 308, 1990 WL 658047 (1990).  In particular, the act of conversion consists of "not the simple acquisition of another's property, but the malicious and wrongful privation of the ownership rights, the illegal exercise, or the assumption of authority over another's property, thereby depriving the lawful owner or possessor, permanently or

for an indefinite period, of its use and enjoyment." Fed. Ins. Co. v. Banco de Ponce, 582 F. Supp. 1388, 1393 (D.P.R. 1984) (citing Hull Dobbs Co. v. Superior Court, 81 P.R.R. 214, 222 (1959)), aff'd, 751 F.2d 38 (1st Cir. 1984). See also Heirs of Sorbá v. Viñas, 49 P.R.R. 31, 35 (1935) ("The legal wrong denominated 'conversion' is any unauthorized act of dominion or ownership exercised by one person over personal property belonging to another in denial of, or inconsistent with, his right.") (internal citation omitted). While the First Circuit has "recognize[d] that Puerto Rico's 'conversion' precedents are somewhat ambiguous[,] . . . Puerto Rico allows recovery for conversion upon a showing of 'malicious and wrongful' privation of ownership rights," with reference to "civil law concepts of fault." Banco de Ponce, 751 F.2d at 42 (citing Hull Dobbs, 81 P.R.R. at 222).

Westernbank argues that the court should not regard the conversion counterclaim as a separate cause of action, but rather as a request for a specific type of remedy for claims based on fraudulent inducement.  Westernbank reasons that the conversion claim is "logically dependent" on the defendants' fraudulent inducement claims, and since Westernbank "was entitled by contract to possession of [defendant's] property . . . its continued possession is therefore improper only if the contracts were somehow annulled." (Docket No. 427, p. 31).  Put another way, defendants' claim that Westernbank unlawfully "converted" their collateral can only be "plausible" if the agreements Westernbank relied on to seize these assets are found to be unenforceable. Iqbal, 129 S.Ct. at 1952 (to survive motion to dismiss, factual allegations must be enough to elevate the claim from the conceivable to the plausible) (citing Twombly, 550 U.S. at 570).  A close look at the factual allegations convinces me that defendants have not met this burden.

The defendants allege the following: the bank and the defendants made a "three-step plan" to make up a $70 million collateral shortfall under the Inyx Loans; under the plan, in return for the defendants' pledge of additional collateral, the bank orally promised to forbear on calling the Inyx Loans, to advance additional working capital to Inyx, and to independently appraise the Kachkars' mining assets.  (Docket No. 398, ¶¶ 83-86).  After negotiations in which they were represented by counsel, the defendants executed the Inyx Note and Mortgage and Security Agreement, the Kachkar

Mortgages, and the First Personal Guarantee.  (Id., ¶¶ 80-97).  Bank officers allegedly promised the defendants that they would forbear from calling the loans and would immediately begin providing Inyx with the additional working capital, and allegedly assured Kachkar that an oral agreement is enforceable under Puerto Rico law.  (Id., ¶¶ 90-97).  The Second Personal Guarantee was allegedly part of the same "three-step plan."  (Id., ¶¶ 83-86).  The defendants allege that Westernbank "continued to seek the collateral and guarantees with the intent of converting the property to the Bank's use and had no intention of providing consideration in exchange therefor."  (Id., ¶ 107).  The Kachkars allege that WHI "intentionally delayed the filing" of an SEC disclosure form so that the bank could get the Second Personal Guarantee before the Kachkars learned of the loan impairment.  (Id., ¶ 111).  The Kachkars executed the Second Personal Guarantee the day after Woods contacted the Kachkars' personal counsel to request that they execute it.  (Id., ¶¶ 110, 113).  At the time of execution, the Kachkars did not know of the Inyx Loans' impairment or the impending administration, and would not have signed the Second Personal Guarantee had they known.  (Id., ¶¶ 105, 110-13).  The bank allegedly agreed to hold the Second Personal Guarantee in escrow until it had provided working capital to Inyx.  (Id., ¶ 116). Allegedly, Westernbank did not, as promised, independently appraise the pledged mining assets, provide additional working capital, or follow the alleged oral Escrow Agreement or the alleged Oral Forbearance Agreement.  (Id., ¶¶ 116-19, 122, 126, 128).  The defendants allegedly incurred monetary damages in the amount of the collateral's value and were deprived of the ability to sell their properties in summer 2007, which the defendants allege was "the top of the real estate market in south Florida."[30] (Docket No. 397, ¶ 191; Docket No. 398, ¶ 182).

Importantly, the above-mentioned facts must be viewed in the context of the several contracts that establish the duties and obligations of the parties.  Cf. Ramos Lozada v. Orientalist Rattan Furniture, Inc., 130 D.P.R. 712, 724-28; 1992 PR-Eng. 755597 (1992) (where damages suffered arise

---

[30] The defendants never allege that they actually intended or attempted to sell the mortgaged properties at that time, nor do they explain why the existence of the mortgages wholly "prevented" them from selling the properties, *i.e.*, why the defendants could not sell the properties subject to the mortgages. Also, the defendants do not allege conversion of the mining assets pledged to Westernbank.

as a consequence of non-compliance with pre-existing contract, plaintiff may recover in tort only if, *inter alia*, damages also arose from a general (non-contractual) duty not to cause harm). In particular, the Loan Agreements contain an integration clause and clauses forbidding any modification, amendment, or waiver of the Agreements except by written agreement signed by an authorized officer of Westernbank. (Docket No. 223-6, §§ 11.3, 12.5 [USA Loan Agreement]; Docket No. 223-9, §§ 11.3, 12.5 [UK Loan Agreement]). The Second Personal Guarantee also contains an integration clause as well as a no-reliance clause. (Docket No. 223-13, §§ 2(b), 12). As has been discussed, the defendants were admittedly in default of their duties under the Loan Agreements. (See, e.g., Docket No. 223-13, p. 1; Docket No. 223-19, p. 1). Under the Loan Agreements, whenever "an Event of Default exists or has occurred and is continuing," Westernbank was entitled to "collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral" "in its discretion and without limitation," and also "may, at any time or times, proceed directly against [the Inyx Borrowers or the Kachkars] to collect the Obligations without prior recourse to the Collateral." (Docket No. 223-9, § 10.2(a)-(b)). Westernbank was thus entitled to call the loans, proceed with the administration, and release the Second Personal Guarantee from its alleged escrow. Under the Agreements, the bank did not have to honor any alleged oral representations by its officers, including any alleged representations regarding forbearance, escrow, or the enforceability of oral agreements. In short, any duty Westernbank owed to the defendants was contractually defined. Westernbank's conduct did not violate the Loan Agreements, as has been discussed (see Section II.D above), so it is not plausible that its contractually-permitted course of action is "malicious and wrongful" or constitutes conversion. In addition, the pleadings do not show any allegations that Westernbank owed (or breached) any non-contractual duties to the defendants that would make its conduct conversion. Cf. Ramos Lozada, 130 D.P.R. at 728, 729 (plaintiff landlord could elect to proceed under either contract or tort since defendant's conduct violated both the contract between the parties and an independent duty arising from Puerto Rico landlord/tenant law).

Furthermore, the allegation that the bank intended to convert the Kachkars' second round of collateral with "no intention of providing consideration in exchange" is undermined by express language in the Second Personal Guarantee. The very first page of the Guarantee provides that the Kachkars "acknowledge, represent and warrant" to Westernbank that it "has the right . . . at this time to make demand for immediate payment of all amounts due under the Loan Agreement and such guarantees [given by the Kachkars]," but that, at the Kachkars' request, the bank "has agreed not to make such demand at this time *in exchange for* Guarantors entering into this Guarantee. However, . . . Guarantors agree and acknowledge that Lender may, at any time, hereafter, in its sole discretion, make such demand . . . ." (Docket No. 223-13, p. 1) (emphasis added). This contractual language plainly shows that Westernbank provided consideration for the Kachkars' execution of the Guarantee, and that the Kachkars agreed to a forbearance period that covered only "at this time" without extending to "any time, hereafter." That the Kachkars are dissatisfied that the forbearance period ultimately lasted "less than 10 days" does not change the fact that Benkovitch and Kachkar, a sophisticated businessman represented by counsel, agreed to the contractual language above, and it does not make Westernbank's conduct conversion. (Docket No. 398, ¶ 106). The allegation of intent to convert is flatly contradicted by the Guarantee's language, so I do not need to accept the allegation as true.

In sum, while the bank's alleged actions may or may not be a model of sound business practice, they do not nudge the conversion claim across the line from conceivable to plausible. Under Twombly and Iqbal, the defendants have not shown a plausible entitlement to relief. Therefore, their counterclaims for conversion should be dismissed.

### I.      Rescission of instruments

Defendants seek rescission of the $2.5 million Inyx Note and Mortgage and Security Agreement, as well as certain documents entered into by the Kachkars, namely the Personal Guarantees, the Kachkar Mortgages, and the Collateral Deficiency Letter. (Docket No. 397, ¶¶ 197-201; Docket No. 398, ¶¶ 203-08).

Puerto Rico law provides that five categories of contract may be rescinded:

(1) The contracts which may be executed by guardians without the authorization of the competent part of the Court of First Instance, provided the persons they represent have suffered lesion of more than one-fourth (1/4) part of the value of the things which may have been the object thereof.

(2) Those executed in representation of absentees, provided the latter have suffered the lesion referred to in the preceding number.

(3) Those executed in fraud of creditors, when the latter cannot recover, in any other manner, what is due them.

(4) Contracts relating to things in litigation should they have been executed by the defendant without the knowledge and approval of the parties in litigation or of the competent judicial authority.

(5) Any other contracts specially determined by law.

31 L.P.R.A. § 3492 (2006) ("section 3492").

Westernbank first argues that defendants' claims for rescission are not legally sufficient because the Puerto Rico Civil Code identifies only a particular universe of documents as being amenable to rescission, and defendants do not identify any documents on this list.[31]   (Docket No. 427, p. 31). Westernbank overlooks the fifth category of section 3492.  To this end, Section 3511 of the Civil Code specially determines that a contract is voidable where a party is the victim of deceit when contracting; that party thus has the option to rescind the instrument.  31 L.P.R.A. § 3511 (2006); Tardanico v. Murphy, 983 F. Supp. 303, 307 (D.P.R. 1997); Garita Hotel Ltd. P'ship, 954 F. Supp. at 450.  Here, the defendants argue they are entitled to rescission because of Westernbank's alleged fraudulent inducement.  (Docket No. 397, ¶¶ 198-99; Docket No. 398, ¶¶ 204-05).  Their counterclaim invokes section 3511, and thus section 3492(5), even if they do not cite the Code.

In order for the contracts to be voidable under section 3511 for fraud in the inducement, plaintiffs must sufficiently plead fraud under Rule 9(b)'s heightened pleading requirement, since Rule

---

[31] Westernbank also argues that rescission is available only where the party seeking it has no adequate remedy at law, and since the defendants allege fraudulent inducement and other legal claims, Westernbank argues, rescission is unavailable.  (Docket No. 427, p. 31-32).  I agree.  Under Puerto Rico law, "[t]he action for rescission is a subsidiary one; it may be enforced only when the person injured has no other legal remedy to obtain reparation for the injury."  31 L.P.R.A. § 3495 (2006).  As discussed above in Section II.F, the defendants have brought several causes of action based on the same set of allegations, and their deficiencies in pleading those other causes do not negate the availability of those legal theories.

9(b)'s particularity requirement applies when "fraud lies at the core of the action," even if fraud is not a statutory element. Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985) (internal citation and quotation omitted); see also Haft v. Eastland Fin. Corp., 755 F. Supp. 1123, 1133 (D.R.I. 1991).  The rescission counterclaim does no more than allege that the instruments the defendants seek to rescind "were fraudulently induced by defendant Westernbank's false and fraudulent misrepresentations and omissions." (Docket No. 397, ¶ 198; Docket No. 398, ¶ 204).  Importantly, this adds nothing to the fraudulent inducement claims and the factual allegations they (and the rescission claim) incorporate. Thus, for the same reasons discussed above, see Section II.C, the defendants have not adequately alleged fraud with regard to any of the collateral except for the Second Personal Guarantee and the Collateral Deficiency Letter.  Moreover, as discussed in the same section, defendants cannot establish the "reasonable reliance" element of their fraudulent inducement claim as to all the documents at issue. These agreements thus are not voidable for fraud.

Notwithstanding the above, the Kachkars also claim entitlement to rescission of the Second Personal Guarantee and the Collateral Deficiency Letter because the two agreements "were not supported by any consideration by the Bank." (Id., ¶ 198).  In Puerto Rico, a contract must be supported by consideration to be valid.  See 31 L.P.R.A. §§ 3391, 3431 (2006).  There is no contract without consideration. 31 L.P.R.A. § 3432 (2006); Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 16 P.R. Offic. Trans. 214 (1985).  A complaint for rescission of contract based on lack of consideration does not state a cause of action when, from the complaint itself and the facts in the case, it is clear that sufficient consideration exists to uphold the contract's existence and validity.  Sucn. Del Moral v. Mayaguez Light, Power & Ice Co., 54 P.R.R. 141, 148-49 (1939).  As discussed above (see Section II.H), the Second Personal Guarantee is clearly supported by consideration.  It explicitly notes that "Guarantors acknowledge, represent and warrant to lender that they will receive *significant consideration and benefits* by entering into this Guarantee," noting Westernbank's "agreement to forbear at this time" from demanding payment.  (Docket No. 223-12 (emphasis added)).  Given this explicit contractual language indicating the presence of consideration, the Kachkars' argument for

rescission of the Second Personal Guarantee is not plausible.

Furthermore, regarding the Collateral Deficiency Letter, it is presumed that consideration for a contract exists and is licit unless the debtor proves to the contrary, even if the consideration is not expressed in the contract.  31 L.P.R.A. § 3434 (2006).  It is a "general principle of contract law," applicable under Puerto Rico law, that "courts will not inquire into the adequacy of consideration in an agreed-upon exchange, unless that consideration is so grossly inadequate as to shock the conscience of the court."  <u>P.R. Elec. Power Auth.</u>, 515 F.3d at 64.  Any detriment to the opposite party constitutes valuable consideration.  <u>Bennett v. Boschetti</u>, 31 P.R.R. 809, 814 (1923); 31 L.P.R.A. § 3431.  A bilateral obligation assumed by each party to the contract has, as its consideration, the promise offered in exchange; it is called mutual consideration.  <u>U.S. v. Pérez</u>, 528 F. Supp. 206, 209 (D.P.R. 1981); <u>Adria Int'l Group</u>, 241 F.3d at 107.  Here, the Kachkars promised to pledge the Mining Collateral to Westernbank and to execute the Second Personal Guarantee to provide additional collateral for the money forwarded under the preexisting Inyx Loans.  (Docket No. 223-19, §§ 1, 5).  In return, Westernbank promised to reasonably determine the amount of Mining Collateral necessary to cure the collateral deficiency, release the Mining Collateral to Kachkar under certain circumstances, and return to Kachkar the excess value of the Mining Collateral over $400 million.  (<u>Id.</u>, §§ 1(c), 3, 4).  The legal detriment to Westernbank in offering these promises to the Kachkars constitutes sufficient consideration.  Therefore, the Collateral Deficiency Letter cannot be rescinded for lack of consideration.  As the defendants plead no other grounds for rescission of any of the agreements, the claim should be dismissed.

### J.        Breach of the Confidentiality Agreement

Kachkar and Inyx allege that Westernbank improperly disclosed to Sahara Bank Saadi Gadhafi's involvement in the Strategic Partnership Agreement, in violation of an alleged Confidentiality Agreement between Kachkar and Westernbank.  Inyx alleges damages of nearly $2 billion, including the $355 million investment allegedly intended by Gadhafi to pay off the Inyx Loans, which allegedly would have prevented the administration proceeding and the destruction of Inyx as a going concern.

(Docket No. 398, ¶¶ 151-53).  Kachkar alleges damages in excess of $1 billion, representing the lost profits and revenues he would have earned from the Strategic Partnership Agreement as well as the lost value of his equity holdings in Inyx, which he puts at $7 million.  (Docket No. 397, ¶ 150).

Importantly, a complaint is "required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1995) (cited in Torres v. Bella Vista Hosp., Inc., 523 F. Supp. 2d 123, 133 (D.P.R. 2007)).  Under Puerto Rico law, the elements of a cause of action for breach of contract are 1) a valid contract and 2) a breach by one of the parties to the contract.  Torres, 523 F. Supp. 2d at 152.  Moreover,  "[i]n order for an action for damages caused by non-performance of contract to prosper, it is not sufficient that the plaintiff establish the nonfulfillment of the obligation, but it is also necessary that he establish the real and positive existence of the damages caused." Fagot Rodriguez v. Republic of Costa Rica, 139 F. Supp. 2d 173, 197 (D.P.R. 2001) (citing Pérez v. Sampedro, 86 P.R.R. 498 (1962)); see also Computec Sys. Corp. v. Gen. Automation, Inc., 599 F. Supp. 819, 826-27 (D.P.R. 1984).

The defendants allege that Gadhafi required strict confidentiality as a condition of his business arrangement with Kachkar to pay off the Inyx Loans through Sahara Bank, and that Westernbank officers agreed with the defendants to keep Gadhafi's business relationship with Kachkar strictly confidential and not to disclose Gadhafi's involvement with Kachkar to Sahara Bank.  (Docket No. 398, ¶¶ 63-65, 146-47).  The defendants further allege that the bank officers, acting within the scope of their employment, disclosed Gadhafi's involvement to Sahara Bank in breach of the Confidentiality Agreement.  (Id., ¶ 148).  Absent Westernbank's breach, the defendants allege, Gadhafi "was ready, willing and able to perform, and would have performed" the Strategic Partnership Agreement, making defendants' alleged damages "the direct and proximate result of the breach."  (Docket No. 397, ¶ 146-47; Docket No. 398, ¶¶ 150-51).

Westernbank argues that this claim fails because the alleged agreement is directly contradicted by the Strategic Partnership Agreement, which states that the "parties shall be able to disclose their

business relationship to other parties in order for SG Holdings to implement its business strategy."
(Docket No. 207, Ex. IV-A, p. 4).   Defendants, however, point out that the Strategic Partnership
Agreement is an agreement between Kachkar and Gadhafi and therefore irrelevant to demonstrating the
existence of an agreement between Kachkar and Westernbank.   I agree with the defendants as to this
narrow point.  That the Strategic Partnership Agreement permitted Kachkar or Gadhafi to disclose their
business relationship does not speak to any separate agreement between Kachkar and Westernbank.
Contrary to Westernbank's argument, the disclosure clause in the Strategic Partnership Agreement does
not "estop" the defendants' allegations as to the existence of the alleged Confidentiality Agreement.
(Docket No. 427, p. 17).   Moreover, to the extent that Westernbank's argument is viewed as an
evidentiary argument as to crediting the existence of such an alleged oral agreement in light of the
Strategic Partnership Agreement, that argument is insufficient to defeat the claim on a motion to
dismiss.  "Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's
factual allegations."  Twombly, 550 U.S. at 555 (internal citation, quotation, and omission omitted).
Westernbank makes no other argument against this claim.

Regardless, Twombly and Iqbal still require that the defendants' factual allegations make out
a plausible entitlement to relief that goes "above the speculative level."  Twombly, 550 U.S. at 555.
The court need not accept as true legal conclusions couched as fact.  Id. at 556.  It is not implausible
that, as the counterclaim alleges, Westernbank and Kachkar agreed that the former would not disclose
Gadhafi's involvement to Sahara Bank without his specific authorization.  (Docket No. 398, ¶ 146).
But the claim must also plausibly allege the damages element, namely that Westernbank's alleged
breach caused Gadhafi to terminate the Strategic Partnership Agreement with Kachkar.  That is, the
defendants must allege facts that render plausible their assertion that Westernbank's breach was the
legal causation of all the damages alleged.  I find that defendants have not cleared this hurdle.

The Strategic Partnership Agreement expressly permits Kachkar to disclose his business
relationship with Gadhafi to others "in order for SG Holdings to implement its business strategy," with
no condition of specific authorization by Gadhafi.  (Docket No. 207, Ex. IV-A, p. 4) (documents filed

conventionally with the court).   Accordingly, it is implausible that *Kachkar*'s disclosure of his

relationship with Gadafi to Sahara Bank could form the legal basis for termination of the Strategic

Partnership Agreement, since the repayment of the Inyx Loans was certainly part of SG Holdings'

"implement[ation] [of] its business strategy."   (Docket No. 207, Ex. IV-A, p. 4, 6).   Here, the

defendants have not alleged any facts explaining why it is plausible, rather than merely conceivable,

that Gadhafi would treat the same disclosure so differently simply because it was made by

Westernbank, a non-party to the Strategic Partnership Agreement. To allege that Gadhafi summarily

terminated the entire, prospectively multi-billion-dollar business agreement between himself and

Kachkar as "the direct and proximate result of the breach" by Westernbank, and so Westernbank should

be held liable, is just the type of conclusory statement that will not pass muster under Twombly and

Iqbal. (Docket No. 398, ¶ 151). See Cortelco Sys. of P.R. Inc. v. Phoneworks, Inc., 2009 WL 4046794,

at *3 (D.P.R. Nov. 20, 2009).  The facts simply do not plausibly allege "the real and positive existence

of the damages caused," here claimed to be around $3 billion total.  Fagot Rodríguez, 139 F. Supp. 2d

at 197.  Because, in light of the express language in the Strategic Partnership Agreement, the defendants

cannot plausibly demonstrate under Twombly that Westernbank's breach was the legal cause of

Gadhafi's termination of the business relationship with Kachkar and thus of the damages claimed, the

counterclaim for breach of the Confidentiality Agreement should be dismissed.

### K.       Intentional interference with contractual relations

Related to the claim for breach of the Confidentiality Agreement is Kachkar's claim for

intentional interference with contractual relations relating to his Strategic Partnership Agreement with

Gadhafi.   Kachkar contends that Westernbank's disclosure of Gadhafi's allegedly confidential

involvement interfered with the Strategic Partnership Agreement, causing Gadhafi to pull out of the

agreement and not engage in the business projects it contemplated. (Docket No. 397, ¶ 153).  Kachkar

alleges that this interference damaged him in an amount equal to the lost profits and revenues he would

have earned under the agreement, in excess of $ 1 billion.  (Id., ¶ 155).  Westernbank argues that the

tortious interference claim fails under Puerto Rico law because it alleges the mere expectancy of a

future relationship rather than an actual contract.  Kachkar, for his part, contends that the Strategic Partnership Agreement goes beyond a mere expectancy.  Kachkar points to the "signed written [Strategic] Partnership Agreement" between him and Gadhafi, in which the two agree to establish SG Holdings in order to invest in various projects, involve SG as a strategic partner in all of Kachkar's businesses, and invest $355 million in Inyx, enough for repayment of the Westernbank loans.  (Docket No. 443, p. 38; see also Docket No. 207, Ex. IV-A, p. 1-2).

Under Puerto Rico law, "the existence of a contract with which a third person interferes is an indispensable requirement for bringing an action for tortious interference. The action does not lie when what is affected is a mere expectancy or a profitable financial relationship. . . . Regarding the particular matter under our consideration, we adopt this civil-law postulate, which differs from the common-law approach. To bring an action for tortious interference . . . , a contract must exist and it must be for a fixed period of time." Dolphin Int'l of P.R. v. Ryder Truck Lines, 127 P.R. Dec. 869, 882-83, 1991 WL 735928 (P.R. Jan. 31, 1991) (internal citation omitted).

Importantly, a fixed time period in the contract is essential to a tortious interference claim.  As the court explained in Dolphin International, "for fundamental constitutional and strong public policy reasons, there can be no tortious interference when the contract at issue has no[] expiration date and is terminable at will." A.M. Capen's Co., Inc. v. Am. Trading & Prod. Corp., 200 F. Supp. 2d 34, 43 (D.P.R. 2002) (noting also that service contracts without a fixed term can be terminable at will by any of the contracting parties); see also Leopoldo Fontanillas, Inc. v. Luis Ayala Colón Sucrs., Inc., 283 F. Supp. 2d 579, 588 (D.P.R. 2003) (no alleged term of duration, "[h]ence, such alleged agreements were terminable at will, and no contract right to continue a business relationship existed").  If a contract did exist but "simply did not contain an expiration date," then a claim for tortious interference cannot lie. A.M. Capen's Co., 200 F. Supp. 2d at 49.

These considerations prove fatal to Kachkar's counterclaim for tortious interference.  Here, the Strategic Partnership Agreement is simply a term sheet, looking forward to prospective occurrences rather than memorializing any concrete deal for hundreds of millions of dollars in funding.  It

contemplates a strategic partnership on Kachkar's existing ventures, including repayment of the Inyx Loans, and on projects in which Kachkar "would like to get involved in the near future." (Docket No. 443, p. 38; Docket No. 207, Ex. IV-A, p. 1). The term sheet speaks in generalizations and speculative future occurrences: that "SG Holdings will look at investments and operating companies" in various industries, and that "SG Holdings should look at developing" other projects in Libya. (Docket No. 207, Ex. IV-A, p. 1, 4). The term sheet's first paragraph provides that it "outlines the strategic and commercial basis upon which we will operate as we develop and grow our business partnership, while any particular project may be conducted under separate agreements that may be additionally required at the time of such projects." (Id., p. 1). Even the financing for repayment of the Inyx Loans, the only specific project referred to in the term sheet, appears not to be set in stone. While the financing falls under a "schedule" of "initial projects" that SG Holdings "will participate in," the term sheet states that "[t]he parties may amend the schedule from time to time" (id., p. 4), suggesting that the $355 million financing could simply be "amended" out of ever coming to pass. The "Overview" of the Inyx financing "project," which is one page long, contains no deadline, no time frame, and no structured plan to support its general idea that "SG Holdings [is] to provide approximately $355 million" for repayment of the Inyx Loans, taking the company private, and other enumerated purposes. (Docket No. 207, Ex. IV-A-1, p. 1). In short, the Strategic Partnership Agreement constitutes a "mere expectancy" of a business relationship.

Moreover, neither the Strategic Partnership Agreement nor the Inyx financing project overview contains a fixed time period or expiration date, and Kachkar has made no allegations of any such deadline with regard to either undertaking. As set forth above, without a fixed expiration date it cannot be the subject of a tortious interference claim under Puerto Rico law. Further, for the reasons discussed above, it is not plausible under Twombly that Westernbank's alleged disclosure could be the legal causation of the damages Kachkar asserts. Therefore, this counterclaim should be dismissed.

### L.   Slander of title

The defendants' slander-of-title claims relate to Westernbank's recordation of the Inyx Mortgage and Security Agreement and the Kachkar Mortgages in the public records of Miami-Dade County, Florida.  (Docket No. 397, ¶¶ 202-08; Docket No. 398, ¶¶ 209-15).  Westernbank argues that these claims are without merit because they are predicated on the claims for fraudulent inducement, which themselves have no merit.  Indeed, I have recommended dismissal of the defendants' relevant counterclaims for fraudulent inducement for failure to meet the heightened pleading standard for claims alleging fraud,[32] as well as for failure to show the reasonable reliance element of fraud.  See Section II.C above.  As a result, the slander-of-title claims necessarily must fail, as no counterclaims survive that allege the recorded mortgages are invalid.  Even if those claims' dismissal did not foreclose the slander-of-title counterclaims, however, the latter fail to state a claim upon which relief can be granted for other reasons.

Under the standard set forth in Twombly, defendants must allege a "plausible entitlement to relief."  550 U.S. at 559.  On a motion to dismiss, a plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555 (internal citation and alteration omitted).  In a slander of title action, "[m]alice is an essential element of an action for damages for slander of title, and the claim cannot prosper where as in this case there is complete absence of evidence on that point."  García Reyes v. Sociedad Mario Mercado e Hijos, 91 P.R. 544, 91 P.R. Offic. Trans. 529, 532 n.1 (1964) (citing H. A. Wood, Annotation, Malice as Element of Action for Slander of Title, 129 A.L.R. 179).  Even under Florida law, which defendants argue applies, "[a]n action for slander of title is based upon the false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, resulting in special damages."  Old Plantation Corp. v. Maule Indus., Inc., 68 So.2d 180, 181 (Fla. 1953).  The required element of malice may take the form either of express malice (malice in fact), which "imports a desire or intention to injure," or of implied malice (malice in law),

---

[32] The fraudulent inducement by omission counterclaim by the Kachkars that I found met Rule 9(b)'s requirements does not pertain to any collateral involved in the slander-of-title counterclaim.

which "means a wrongful act, done intentionally, without just cause or excuse."  H. A. Wood, Annotation, Malice as Element of Action for Slander of Title, 129 A.L.R. 179.  Absent proof of actual malice, implied malice may be "presumed from a false defamatory publication, constituting the alleged slander of title, resulting in injury to the plaintiff."  Id.

Here, the counterclaim alleges that the recordation "published falsehoods that the Bank knew, or should have known, would likely . . . injure or impair the value and/or alienability of" the mortgaged properties, "without justification or excuse, and intentionally and willfully"; that Westernbank recorded the mortgages "knowingly[,] without justification, illegally, and in contravention of the Bank's contractual obligations" to the defendants; and that the defendants have "been damaged by the Bank's wrongful publications," including "incurr[ing] professional fees and expenses" to clear the cloud on the titles.  (Docket No. 397, ¶¶ 203-07; Docket No. 398, ¶¶ 210-14).  Westernbank's recordation of the mortgages is not mentioned anywhere else in the counterclaims; the defendants' lengthy version of the facts omits it.  The counterclaim does not specify what the alleged falsehoods are or what contractual obligations Westernbank allegedly owed to the defendants.  Lacking any supporting facts, the counterclaim is merely a "formulaic recitation" that amounts to nothing more than "labels and conclusions."  Twombly, 550 U.S. at 555.  As in García Reyes, there is a complete absence of evidence of malice, beyond these conclusory allegations; therefore, an essential element of the cause of action is missing.  The allegations fail to state a plausible entitlement to relief under Twombly.  Thus, even if this claim had not been foreclosed by the dismissal of the fraudulent inducement counterclaims, the defendants have failed to state a claim upon which relief can be granted.

**M.      Breach of Florida's Deceptive and Unfair Trade Practices Act**

Finally, Westernbank argues that the claims brought under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") are without merit because the FDUTPA expressly excludes from its reach federally-regulated banks, and Westernbank is a bank regulated by the Federal Deposit Insurance Corporation ("FDIC").  (Docket No. 427, p. 32-33).  In particular, the FDUTPA provides, "[t]his part does not apply to: . . . Banks or savings and loan associations regulated by federal agencies."  Fla. Stat. Ann. § 501.212(4)(c) (2004).

The counterclaims do not allege that Westernbank is a federally-regulated bank, and Westernbank did not support its argument for dismissal with any evidence documenting its regulation by the FDIC.  However, the bank's amended complaint as plaintiff in this case (incorporated by reference into the counterclaims) alleges that it is FDIC-insured.  (Docket No. 3, ¶ 9).  Even if Westernbank's incorporated allegation is insufficient, a federal court "may look to matters of public record in deciding a Rule 12(b)(6) motion without converting the motion into one for summary judgment." Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000) (citing Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993)).  The court may also use facts about "matters susceptible to judicial notice" in deciding a motion to dismiss. Jorge, 404 F.3d at 559; see also Fed. R. Evid. 201(b)-(c).  Importantly, a bank's FDIC-insured status is a proper subject of judicial notice: the FDIC, "the insuring agency itself, is a source whose accuracy cannot be reasonably questioned." U.S. v. Chapel, 41 F.3d 1338, 1342 (9th Cir. 1994).  Also, a number of courts have held that a federal court may take judicial notice of information on an official government website. See, e.g., Laborers' Pension Fund v. Blackmore Sewer Constr., Inc., 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information from FDIC's official website); Nebraska v. E.P.A., 331 F.3d 995, 998 n.3 (D.C. Cir. 2003); Hall v. Virginia, 385 F.3d 421, 424 n.3 (4th Cir. 2004).

Here, the FDIC's official website reports that the FDIC is Westernbank's primary federal regulator.  http://www2.fdic.gov/idasp/index.asp (follow "Bank Find" hyperlink; then search for "Westernbank").  Therefore, I take judicial notice of the fact that Westernbank is an FDIC-regulated bank.  Because Westernbank clearly falls within FDUTPA's exemption, the defendants' FDUTPA claims must fail.

## CONCLUSION

For the reasons stated above, I recommend that Westernbank's motion to dismiss be **GRANTED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Fed. R. Civ. P. 72(b)(2). Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  Failure to file timely and specific objections to the report and

recommendation is a waiver of the right to appellate review.  See Thomas v. Arn, 474 U.S. 140, 155

(1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun.

Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836

F.2d 4, 6 (1st Cir. 1987).

      **IT IS SO RECOMMENDED**.

      In San Juan, Puerto Rico, on this 10th day of December, 2009.


                        *S/ Bruce J. McGiverin*
                        BRUCE J. MCGIVERIN
                        United States Magistrate Judge